# EXHIBIT B

| | |
|---|---|
| From: | Ivan Chaperot |
| To: | Michael Ritter |
| Subject: | Status update and decision needed - Confidential |
| Date: | Friday, June 20, 2014 2:15:22 PM |
| Attachments: | 2014-06-20 Finjan - Palo Alto Networks Mutual NDA - Extended until 2014-09-30.docx |

Michael:

This is to follow-up with my offer of June 11 to send 4 additional claim charts for your consideration.

Regarding the 4 additional claim charts, we are still offering to send these for your consideration with the intent to facilitate your assessment of Palo Alto Networks licensing needs. I recognize you can do this assessment independently without the benefit of our analysis. I also understand your analysis is in progress and at some point, once your analysis is concluded, there will be no benefit for you to receive additional claim charts.

The table below summarizes the claim charts provided to date and those available with NDA/standstill:

| U.S. Patent No. | Representative Product Families | Status of Analysis |
|---|---|---|
| 6,804,780 | Palo Alto Networks Next-Generation Firewalls | Provided on 10/16/2013 |
| 6,965,968 | Palo Alto Networks Firewalls | Provided on 6/5/2014 |
| 7,058,822 | Palo Alto Networks Firewalls and Global Protect Software | Available with NDA/standstill |
| 7,418,731 | Palo Alto Networks Firewalls and WF-500 Appliance | Available with NDA/standstill |
| 7,975,305 | Palo Alto Networks Virtual Appliance Next-Generation Firewalls and Content-ID Engine | Available with NDA/standstill |
| 8,141,154 | Palo Alto Networks Firewalls, WildFire Cloud-Based Service and WF-500 Appliance | Available with NDA/standstill |

Should you be interested in receiving 4 additional claim charts, we are offering to enter into a mutual NDA/standstill agreement. Compared to the mutual NDA/standstill agreement offered on March 21, 2014, I made the following changes (highlighted in yellow):
- I am extending the proposed discussion period until Sept. 30, 2014, and
- I and using today as the new effective date.

Could you please let me know your decisions on the following points:
   (1)  Are you interested in receiving additional information from Finjan to assist you in your

assessment?
(2) If you are interested in receiving additional information, would you also be interested in entering into a NDA/standstill agreement?

Thank you,

**Ivan Chaperot**
Finjan Holdings, Inc.
Vice President, IP Licensing
Office: 650-282-3233
Cell: 650-353-8711
E-Mail: ivan@finjan.com

This communication (including any attachments) is intended solely for the recipient(s) named above and may contain information that is confidential, privileged, subject to regulations, or legally protected. Any unauthorized use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender by return e-mail message and delete all copies of the original communication.

Palo Alto Networks, Inc. – Finjan Holdings, Inc.
**MUTUAL NON-DISCLOSURE AGREEMENT**

This mutual non-disclosure agreement ("Agreement"), effective as of June 20, 2014, is made and entered into by and between Finjan Holdings, Inc., a Delaware corporation with a principal place of business at 122 East 42nd Street, Suite 1512, New York, NY 10168 ("Finjan") and Palo Alto Networks, Inc., a Delaware corporation with a principal place of business at 3300 Olcott Street, Santa Clara, CA 95054 ("Palo Alto Networks").  The parties hereby agree as follows:

1.  The parties desire to disclose to each other, under the terms and conditions of the Agreement, certain information, which the disclosing party considers proprietary and confidential regarding general technical and business information.

2.  "Discussion Period" means a period commencing on the effective date of this Agreement and ending at the earlier of: (a) ten (10) days after either party gives the other written notice of termination, or (b) September 30, 2014.

3.  "Proprietary Information" means all or any portion of the information disclosed during the Discussion Period by one party to the other, which is to be governed by the obligations of non-disclosure and restricted use; provided that such information: (a) if in written, recorded, graphical or other tangible form, be stamped "Proprietary", "Confidential", or with a similar legend denoting the proprietary interest of the disclosing party; (b) if orally delivered, is identified as proprietary at the time of disclosure (or within 15 days following such disclosure) or is reasonably known by the receiving party to be proprietary to the disclosing party.

4.  Proprietary Information shall not include any information or device that: (a) is in the possession of the receiving party prior to its disclosure by the disclosing party and not subject to other restriction on disclosure; (b) is independently developed by the receiving party without access or use of the information disclosed pursuant to this Agreement; (c) is publicly disclosed by the disclosing party; (d) is rightfully received by the receiving party from a third party without restriction on disclosure; (e) is approved for unrestricted release or unrestricted disclosure by the disclosing party; or (f) becomes generally known to the public through no wrongful act of the receiving party.

5.  Receiving party may use disclosing party's Proprietary Information solely for the purpose of exploring potential intellectual property-related transactions, opportunities, or matters with disclosing party ("Potential Transactions") and for the purpose of evaluating, investigating, researching, and/or investing in Potential Transactions.  Under no circumstances may receiving party use disclosing party's Proprietary Information for any other purpose without disclosing party's prior written consent.

6.  The parties agree, for a period of seven (7) years from the date of disclosure: (a) to use the same degree of care which the receiving party accords its own proprietary or confidential information, but in no event less than reasonable care, to prevent the disclosure of Proprietary Information to third parties; (b) to limit dissemination of the other party's Proprietary Information to only those of the receiving party's officers, directors, agents and employees who require access thereto to perform their functions regarding the purpose of this Agreement; (c) to ensure that each person or entity who receives or has access to Proprietary Information has previously entered into a written nondisclosure agreement with the receiving party of similar terms and obligations as hereunder; and (d) to return to the disclosing party, or certify as destroyed, all Proprietary Information of the disclosing party upon receipt of a written request therefore from the disclosing party.  Notwithstanding this Paragraph 6, a receiving party may

disclose or produce any Proprietary Information to the extent required pursuant to a valid order of a court or authorized government agency, provided the receiving party has given the disclosing party reasonable advance notice of such request such that the disclosing party has an opportunity to defend, limit or protect such production or disclosure.

7. Before exporting or reexporting any Proprietary Information, a party must comply with all then current regulations of the U.S. Department of Commerce Office of Export Administration and/or other applicable agencies.

8. All Proprietary Information shall remain the proprietary property of the disclosing party. Nothing contained in this Agreement or the disclosures made pursuant to this Agreement shall be construed as granting any license or rights under any proprietary right whether present or future. The parties agree that neither disclosing party's disclosure to receiving party of any Proprietary Information during the Discussion Period, nor receiving party's possession of such Proprietary Information pursuant to this Agreement and resulting from a disclosure during the Discussion Period, shall constitute, or be used by disclosing party or any third party as evidence in any legal action either to prove or disprove the validity, notice, or an accusation of infringement of any intellectual property rights for any purpose, including without limitation for the purpose of (i) proving direct or indirect infringement or (ii) pursuing damages based on reasonable royalties, lost profits, enhanced damages due to alleged willful infringement, or any other remedy or theory of liability (collectively "Damages").  The disclosing party shall not use such disclosure of Proprietary Information to, directly or indirectly, seek, instruct, allow, or assist any third party to seek such Damages against receiving party. For the avoidance of doubt, the parties agree that any disclosure of any information (including Proprietary Information) outside of the Discussion Period, can be used as evidence by either party in any legal action. The parties further agree that neither party nor its affiliates will initiate, directly or indirectly, any legal action against the other party or its affiliates during the Discussion Period, including without limitation for the purpose of (i) challenging the validity or infringement of intellectual property rights (e.g., re-examination, inter partes reexamination, declaratory judgment action) or (ii) asserting the infringement of intellectual property rights.

9. The Parties agree that any discussion pursuant to this Agreement and/or any Proprietary Information shared between the parties is subject to Rule 408 of the Federal Rules of Evidence. Nothing in this Agreement shall be construed to limit, expand, or otherwise alter the effect of Rule 408 with respect to discussions not encompassed by this Agreement hereby.

10. Each party represents and warrants that neither its execution and delivery of this Agreement nor its performance hereunder will result in a breach of any agreement or contract to which that party or any of its officers, directors, agents and employees may be a party.  Neither party shall, after the effective date of this Agreement, enter into any agreement or take any action that restricts its performance under this Agreement.

11. This Agreement shall be governed by the laws of the State of California with the exception of its conflict of laws rules.  Any suit related to this Agreement shall be brought solely in the California state courts in and for the county of Santa Clara or the federal courts in the Northern District of California, and both parties hereby submit to the personal jurisdiction of such courts for any such suits and waive all defenses of lack of personal jurisdiction and forum non conveniens.  Neither party may assign any rights under this Agreement.  Each party acknowledges that monetary remedies may be inadequate to protect Proprietary Information and that the disclosing party may seek injunctive relief in the event of any threatened or actual breach

this agreement. The invalidity or unenforceability of any term of this Agreement shall not adversely affect the validity or enforceability of the remaining terms.

12. This Agreement contains the entire agreement of the parties with respect to this subject matter and may not be modified or changed in any manner except by a writing duly executed by the parties. All prior discussions and negotiations relating to the treatment of Proprietary Information are superseded by this Agreement.

13. The term of this Agreement (the "Term") shall coincide with the Discussion Period. However, each party's obligations with respect to the other party's Proprietary Information or with respect to Section 9 will survive for seven (7) years from the date of disclosure.

| **Palo Alto Networks, Inc.** | **Finjan Holdings, Inc.** |
|---|---|
| By: | By: |
| Print Name: | Print Name: Phil Hartstein |
| Title: | Title: President |
| Date: | Date: |