# Exhibit 8

**MORRISON | FOERSTER**

425 MARKET STREET
SAN FRANCISCO, CA
94105-2482

TELEPHONE: 415.268.7000
FACSIMILE: 415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

BEIJING, BERLIN, BOSTON,
BRUSSELS, DENVER, HONG KONG,
LONDON, LOS ANGELES, NEW YORK,
NORTHERN VIRGINIA, PALO ALTO,
SAN DIEGO, SAN FRANCISCO, SHANGHAI
SINGAPORE, TOKYO, WASHINGTON, D.C.

May 12, 2021

Writer's Direct Contact
+1 (415) 268-6971
DVanNort@mofo.com

By email (denning@fr.com)

Roger Denning
Fish & Richardson P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130

Re:     *Finjan LLC v. Palo Alto Networks, Inc.*, Case No.14-cv-04908-PJH (N.D. Cal.)

Dear Roger:

I write regarding deficiencies in Finjan's April 1, 2021 infringement contentions. These deficiencies must be remedied immediately, as the contentions fail to provide Palo Alto Networks reasonable notice of Finjan's infringement theories and have prejudiced Palo Alto Networks' preparation of its invalidity contentions. These deficiencies are particularly striking in light of the access to Palo Alto Networks' source code that Finjan has had for months. By now, Finjan should know how the accused products operate and be able to articulate its infringement theories with specificity or, in the more likely alternative, know that the accused products are fundamentally different than what Finjan's patents cover.

As an initial matter, Finjan has no basis to characterize its infringement contentions as "preliminary." The Patent Local Rules do not allow for "preliminary" contentions. Finjan has a history in its other patent cases of providing deficient contentions and only belatedly providing its infringement theory after defendants' complaints. These actions cause delay and hamper defendants' abilities to defend against Finjan's shifting infringement theories. *See Finjan, Inc. v. Proofpoint*, Inc., 2015 WL 1517920, at *9 (N.D. Cal. Apr. 2, 2015) (holding that infringement contentions did not satisfy Patent Local Rule 3-1 where Finjan "failed to describe how the product literature cited in its infringement contentions mapped onto the specific claim language of the asserted patent"); *Finjan, Inc. v. Sophos, Inc.*, 2015 WL 5012679, at *2-3, *4 (N.D. Cal. 2015) (requiring pinpoint citations to source code in amended contentions where further source code review was required, including both direct infringement and infringement under the doctrine of equivalents); *Finjan, Inc. v. Check Point Software Tech., Inc.*, 2019 WL 955000, at *6 (N.D. Cal. Feb. 27, 2019) (requiring pinpoint source code citations to show "where" and "how" each limitation of each asserted claim is found within each underlying instrumentality); *Finjan, Inc. v. SonicWall, Inc.*, 2019 WL 6493967, at *6 (N.D. Cal. Dec. 3, 2019) (holding that Finjan must revise its infringement

**MORRISON** | **FOERSTER**

Roger Denning
May 12, 2021
Page Two

contentions to eliminate new theories of infringement which were not properly disclosed); *Finjan, Inc. v. SonicWall, Inc.*, 2019 WL 2077849, at *16 (N.D. Cal. May 10, 2019) (denying Finjan's request to depose defendant 30(b)(6) witness prior to disclosing specific infringement theories, and granting defendant request for Finjan to provide more specific source code related infringement contentions).

Finjan's gamesmanship is improper.  In a good faith effort to avoid burdening the Court with this issue, if Finjan addresses the deficiencies identified below by **May 28, 2021**, Palo Alto Networks will not oppose Finjan's motion to amend its contentions.  Note, however, that Palo Alto Networks will hold Finjan to what is disclosed in that amendment. *See Finjan, Inc. v. SonicWall, Inc.*, 2019 WL 6493967, at *5-6 (N.D. Cal. Dec. 3, 2019) (striking "new theories" of infringement); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 3640694 (N.D. Cal. June 11, 2015) (granting in part defendant's motion to strike portions of Finjan's expert report which advanced new theories which were not disclosed in its infringement contentions, in violation of the N.D. Cal. Patent local rules).  If Finjan does not agree to provide amended contentions by May 28, 2021 to address all of the deficiencies set forth below, please provide your availability to meet and confer before **May 21, 2021** so that Palo Alto Networks can raise the issue with the Court.

**Failure to Provide Source Code Pinpoint Citations**

Finjan's general reference to source code files is so vague as to provide no notice whatsoever.  In each of its charts, Finjan has listed "source code" sections that are merely file paths that Finjan alleges contain the code responsible for practicing the claims.  For example, for element 1[a] of the '154 patent, Finjan cites over 100 individual files covering over 275,000 lines of source without identifying any line numbers, functions, operations, or variable names.  (Appendix E-1 at 162-194.)  And that is just for one element of one claim of one patent.  These general filename citations fail to provide the required specificity for infringement contentions under the Patent Local Rules:  "Where the accused instrumentality includes computer software based upon source code made available to the patentee, the patentee must provide 'pinpoint citations' to the code identifying the location of each limitation." *Tech. Licensing Corp. v. Grass Valley USA, Inc.*, No. 3:12–cv–06060–PSG, 2014 WL 3752108, at *2, n.14 (N.D. Cal. July 30, 2014) (citing *Big Baboon Corp. v. Dell, Inc.,* 723 F.Supp.2d 1224, 1228 (C.D.Cal.2010)).  Specifically, "[i]t is Finjan's obligation to identify the particular claim components in each claim, map those components onto the features of the allegedly infringing products, and pinpoint cite source code that practices that component." *Finjan, Inc. v. Check Point Software Tech., Inc.*, 2019 WL 955000, at *6 (N.D. Cal. Feb. 27, 2019).

MORRISON | FOERSTER

Roger Denning
May 12, 2021
Page Three

Finjan must identify the alleged infringing functionality by reference to lines numbers, function calls, and/or operations in the source code.  If it cannot do this for any currently asserted claims, Finjan should drop those claims immediately.

## Doctrine of Equivalents

Finjan includes "catch-all" doctrine of equivalents (DOE) arguments throughout its contentions.  But these arguments merely reiterate the claim language and make conclusory statements that the accused products perform the same function, in the same way to achieve the same result.  (*See, e.g.*, Appendix B-1 at 90; Appendix C-1 at 79-80; Appendix E-1 at 202-204.)  At no point does Finjan explain its DOE theories in any reasonable level of detail.  Thus, Finjan has failed to put Palo Alto Networks on notice of any specific DOE infringement theories.  To the extent Finjan intends to rely on DOE to show infringement, it must explain those theories in sufficient detail to provide notice to Palo Alto Networks.  *Finjan, Inc. v. Proofpoint, Inc.*, No. C 13–05808 HSG, 2015 WL 1517920, at *10 (N.D. Cal. Apr. 2, 2015) ("It is improper to assert the doctrine of equivalents with generic 'placeholder' language on the hope that future discovery might support such an assertion.").

## Patent-by-Patent Deficiencies

In addition to the above general deficiencies, below is a list of specific deficiencies that Finjan must address.  This list describes the most glaring deficiencies identified to date; Palo Alto Networks analysis is ongoing and may identify additional deficiencies.

- Infringement Claim Charts for the '780 Patent (Appendices A-1, A-2)
  - Finjan's claim charts obfuscate its infringement theories by combining multiple claim limitations as one claim element.  Specifically, Finjan combines the "obtaining a Downloadable" step and the "fetching at least one software component" step into a single claim element.  (*See, e.g.*, Appendix A-1 at 4-5.)
    - What is Finjan's theory and evidence for each step?  Is Finjan asserting that both steps are met by the same functionality?
  - "fetching at least one software component identified by the one or more references"
    - Finjan fails to show that at least one software component is "fetched" and how it is fetched.  For example, Finjan cites a single page entitled "About Threat Prevention Licenses" and states that it shows that referenced software components are fetched. (*See, e.g.*, Appendix A-1 at 10-11.)  As another example, Finjan simply states, without any explanation, that a "Downloadable can reference other software

MORRISON | FOERSTER

Roger Denning
May 12, 2021
Page Four

  components required to be executed by the Downloadable, which can
  be fetched by Traps." (*See, e.g.*, Appendix A-2 at 14.)
  - ▪ For each of its theories, what specific functionality is Finjan accusing
    for the "fetching" step and how is the "fetching" carried out?
  - ○ "performing a hashing function on the Downloadable and the fetched
    software components to generate a Downloadable ID"
    - ▪ Finjan fails to show that a hashing function is performed on the
      Downloadable *and* the fetched software components.  Finjan merely
      points to the existence of alleged referenced software components but
      does not show that a hashing function is performed on the software
      components. (*See*, *e.g.*, Appendix A-1 at 86, 171-172; Appendix A-2
      at 16-17.)
    - ▪ For each of Finjan's theories, what specific features of functionality in
      the accused products perform a hashing function on the Downloadable
      together with the fetched software components?

- Infringement Claim Chart for the '731 Patent (Appendix B-1)
  - ○ "a file cache for storing files that have been scanned by the scanner for future
    access, wherein each of the stored files is indexed by a file identifier"
    - ▪ Finjan points to alleged cached "results of Content-ID" and Wildfire's
      behavioral reports as "caching" and "indexing," but does not explain
      its infringement theory. (*See, e.g.*, Appendix B-1 at 75-80).  Finjan
      also points to various databases and makes the conclusory statement
      that the databases "constitute a cache for storing files" but does not
      identify how any of the identified memory is used as a cache or how it
      interprets something to be a cache. (*See, e.g.*, Appendix B-1 at 81-90).
      Likewise, Finjan's mere citation to "filecache1" and "filecache2" fails
      to explain how those structures store scanned filed for future access.
      (*See, e.g.*, Appendix B-1 at 84-85).
    - ▪ For each of Finjan's theories, what specifically is Finjan relying on for
      the "file cache" that stores scanned files for future access?
  - ○ "a security profile cache for storing the security profiles derived by the
    scanner, wherein each of the security  profiles is indexed in the security
    profile cache by a file identifier associated with a corresponding file stored in
    the file cache"
    - ▪ Finjan does not identify any features or functionality of any alleged
      "security profile cache" that indexes security profiles "by a file
      identifier associated with a corresponding file stored in the file cache."
      (*See, e.g.*, Appendix B-1 at 90-117)  The contentions make no attempt
      to connect anything stored in an alleged "security profile cache" to
      files in an alleged "file cache."

MORRISON | FOERSTER

Roger Denning
May 12, 2021
Page Five

- For each of Finjan's theories, what specifically is the "file cache" and the "security profile cache" and where/how does the specific "security profile cache" index security profiles by a file identifier associated with a corresponding file stored in the specific "file cache?"

- Infringement Claim Charts for the '926 Patent (Appendices C-1, C-2)
  - "retrieving security profile data for the incoming Downloadable from a database of Downloadable security profiles indexed according to Downloadable IDs based on the incoming Downloadable ID, the security profile data including a list of suspicious computer operations that may be attempted by the Downloadable"
    - For the "security profile data," Finjan identifies a "signature's default action," such as "whether to block the file or send an alert." (*See, e.g.*, Appendix C-1 at 44.)  But Finjan provides no citations to this alleged functionality and fails to explain how the "signature's default action" includes "a list of suspicious computer operations."
    - Where does Finjan believe this accused functionality exists in the NGFW, how is the "signature's default action" based on a "Downloadable ID," and how does the "signature's default action" include "a list of suspicious computer operations" as recited in the claims?
  - "database manager"
    - Finjan fails to cite any functionality or features as the recited "database manager."  Finjan refers to "the NGFW agent (a database manager)" but does not explain what agent it is referring to. (*See, e.g.*, Appendix C-1 at 44.)  Elsewhere, Finjan cites the entire NGFW as the database manager but fails to explain what specific NGFW features or functionality constitutes the recited database manager. (*See, e.g.*, Appendix C-1 at 45, 51.)  Finjan does the same for WildFire. (*See, e.g.*, Appendix C-1 at 59-60.)
    - For each of Finjan's theories, what specific feature or functionality of NGFW or WildFire does Finjan allege is a "database manager" as recited in the claims?

- Infringement Claim Chart for the '633 Patent (Appendix D-1)
  - "mobile protection code"/"mobile protection executor"
    - Finjan does not identify the "mobile protection code" that the "mobile protection executor" executes.
    - For each of Finjan's theories, what specifically is the "mobile protection code" and "mobile protection executor" that executes that code, as recited in the claim?

**MORRISON | FOERSTER**

Roger Denning
May 12, 2021
Page Six

- o "downloadable-information destination"
  - ▪ For each of Finjan's theories, what specifically is the "downloadable-information destination"?

- Infringement Claim Charts for the '154 Patent (Appendices E-1, E-2)
  - o "content processor"/"security computer"
    - ▪ Finjan's statement that "The accused content processor is comprised of structures, functionalities, operations, or systems of NGFW alone, or in combination with a client computer" is so vague as to include an infinite number of possible combinations components.  (*See, e.g.*, Appendix E-1 at 10.)  Finjan's statements for the "security computer" are similarly vague.  (*See, e.g.*, Appendix E-1 at 10 ("The accused security computer is comprised of structures, functionalities, operations, or systems of NGFW, namely pattern recognition modules.").)
    - ▪ For each of Finjan's infringement theories, what specifically is the "content processor" and the "security computer?"
  - o "first function"
    - ▪ Finjan seemingly equates "a first function" with a "substitute function" and alleges that "the NFGW insert substitute functionality (substitute function calls) into received content."  (*See, e.g.*, Appendix E-1 at 10-11; Appendix E-2 at 38.)  But Finjan never identifies what the "first function" or the "substitute function" is or what in the accused product allegedly "inserts" the substitute functionality.  At other times, Finjan alleges that a "call to a first function is inserted by the WildFire Cloud" or that "Traps . . . injects a call to a first function" but again fails to identify what the "first function" is.  (*See, e.g.*, Appendix E-1 at 10-11; Appendix E-2 at 40.)
    - ▪ For each of Finjan's theories, what specifically is the "substitute function" or "first function" and what functionality or features are responsible for inserting or injecting functions under Finjan's infringement theory?
  - o "second function"
    - ▪ For the "second function," Finjan alleges that "the content processor invokes the second function with the input (original function)."  (*See, e.g.*, Appendix E-1 at 16.)  But Finjan never identifies what it is mapping to the "second function" or what the "original function" is or what functionality is allegedly responsible for invoking the second functionality.  (*See, e.g.*, Appendix E-1 at 10-11.)  For example, in its claim chart for Traps, Finjan merely uses the term "second function"

MORRISON | FOERSTER

Roger Denning
May 12, 2021
Page Seven

without describing the "second function" at all.  (*See, e.g.*, Appendix E-2 at 39, 40, 67, 76.)

- For each of Finjan's theories, what is the "second function" that Finjan is relying on?  If Finjan is equating the "second function" to an "original function," what is the "original function" that Finjan is relying on and what functionality or features is Finjan relying on to invoke the second function?

  o   "input"/"content"

  - Finjan fails to identify "input" in its infringement contentions that is included both in a call to a first function and when invoking a second function.  For example, Finjan refers to "input that was marked" but only previously identified "content to be marked."  (*See, e.g.*, Appendix E-1 at 10-11.)  Over 150 pages later in the contentions, Finjan states that "the system marks the input" and "the first function marks the input" but again fails to explain what the input is or how any marking occurs.  (*See, e.g.*, Appendix E-1 at 164, 183.)  Finjan also states that "the NGFW sends content (inputs)" or "the file (input)" for analysis, but "content" is a separate element than "input" and Finjan provides no explanation for how content and input can be mapped to the same thing.  (*See, e.g.*, Appendix E-1 at 13, 14.)  Elsewhere, Finjan identifies "credentials and a request for the target webpage to load" as "input," but fails to explain how these are included in "content," in "a call to a first function," or when "invoke[ing] a second function." (*See, e.g.*, Appendix E-1 at 19.)  And Finjan again equates this "input" to "content" despite these being separate claim elements.  (*See, e.g.*, Appendix E-1 at 21.)  In other places Finjan again contradicts itself by asserting that a URL is "content with inputs."  (*See, e.g.*, Appendix E-1 at 45.)  In its claim chart for Traps, Finjan either uses the term "input" without describing the "input" at all  (*see, e.g.*, Appendix E-2 at 38-41) or identifies example "input" without identifying the first function or the second function that is used that  input (*see, e.g.*, Appendix E-2 at 88, 90).

  - For each of Finjan's theories, what is the "content" and what is the "input" in the accused products?  Is Finjan relying on the same thing for both "input" and "content?"  What "first function" and "second function" are used with each "input?"

- Infringement Claim Chart for the '408 Patent (Appendix F-1)
  o   "instantiating, by the computer, a scanner for the specific programming language"

MORRISON | FOERSTER

Roger Denning
May 12, 2021
Page Eight

- Finjan appears to contend that there are content scanning engines in NGFW but cites no evidence that any engine is instantiated for a specific programming language. (*See, e.g.*, Appendix F-1 at 84-85.)
- For each of Finjan's theories, what specific feature or functionality is Finjan relying on as "a scanner for the specific programming language" and specifically when is it instantiated?

o "in response to said determining, the scanner comprising parser rules and analyzer rules for the specific programming language, wherein the parser rules define certain patterns in terms of tokens, tokens being lexical constructs for the specific programming language, and wherein the analyzer rules identify certain combinations of tokens and patterns as being indicators for potential exploits"

- Finjan's contentions fail to identify where in the accused products there are tokens, parser rules, and analyzer rules for specific programming languages. (*See, e.g.*, Appendix F-1 at 91-97, 107-130.)
- What specifically are the tokens and rules that Finjan is relying on?

o "identifying, by the computer, individual tokens within the incoming stream"

- Finjan states that "the stream based inline scanning that tokenizes and parses the incoming stream," but provides no explanation or evidence of the function or feature it is referring to or how "tokenization" occurs. (*See, e.g.*, Appendix F-1 at 131-132.)
- For each of Finjan's theories, what specific features or functions does Finjan allege perform the identification of "individual tokens," as recited in the claims?

o "dynamically building, by the computer while said receiving receives the incoming stream, a parse tree whose nodes represent tokens and patterns in accordance with the parser rules"

- How does Finjan contend the accused products are "dynamically building . . . a parse tree whose nodes represent tokens and patterns"?  Please also specify when this is occurring relative to other limitations.
- What does Finjan contend are "nodes" that represent tokens?

o "dynamically detecting, by the computer while said dynamically building builds the parse tree, combinations of nodes in the parse tree which are indicators of potential exploits, based on the analyzer rules"

- How does Finjan contend the accused products are "dynamically detecting . . . combinations of nodes in the parse tree" and when does this occur (e.g., with respect to the other limitations)?

**MORRISON** | **FOERSTER**

Roger Denning
May 12, 2021
Page Nine


- Infringement Claim Chart for the '494 Claim Chart (Appendix G-1)
  - Finjan's claim charts purports to map NGFW, WildFire, and Traps on to the asserted patents but Finjan provides no evidence for NGFW and Traps for the majority of the claim elements. "storing the Downloadable security profile data in a database"
    - If Finjan is accusing NGFW and Traps of infringing the asserted claims, what is Finjan's infringement theory for those products?

\*\*\*

     Palo Alto Networks' technology functions in fundamentally different ways from what is claimed in the asserted patents.  As a result, it is especially important that Finjan disclose now how it intends to map its claims to the accused products in this litigation.  Finjan's infringement contentions fall far short of providing this notice.


Sincerely,

/s/ *Diek Van Nort*

Diek Van Nort

ny-2101135