1   DARALYN J. DURIE (CA SBN 169825)
    DDurie@mofo.com
2   TIMOTHY CHEN SAULSBURY (CA SBN 281434)
    TSaulsbury@mofo.com
3   MATTHEW I. KREEGER (CA SBN 153793)
    MKreeger@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California 94105-2482
    Telephone: (415) 268-7000 / Fax: (415) 268-7522
6
7   *Attorneys for Defendant,*
    *PALO ALTO NETWORKS, INC.*
8   *Additional counsel on signature page*

9

10                  UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12  FINJAN LLC,                          Case No.   3:14-CV-04908-RS

13            Plaintiff,                 **PALO ALTO NETWORKS, INC.'S**
                                         **MOTION FOR SUMMARY**
14        v.                             **JUDGMENT**

15  PALO ALTO NETWORKS, INC.,
                                         Date:   November 14, 2024
16            Defendant.                 Time:   1:30 PM
                                         Courtroom:  3, 17th Floor
17                                       Judge:  Honorable Richard Seeborg

18

19

20

21        **REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED..................... 1

STATEMENT OF THE RELEVANT FACTS .............................................................. 3

I.      THE ASSERTED PATENTS ............................................................... 3

II.     THE ACCUSED PRODUCTS ............................................................. 5

III.    FINJAN'S INFRINGEMENT CONTENTIONS .................................. 6

ARGUMENT ............................................................................................................... 7

IV.     FINJAN CANNOT PROVE INFRINGEMENT OF THE '408 PATENT............. 7

        A.      NGFW Does Not Meet the "Determining" and "Instantiating" Limitations ........................................................................... 7

                1.      Finjan cannot prove that NGFW "instantiat[es] a scanner for the specific programming language"........................................... 7

                2.      Finjan cannot prove that NGFW "determine[s] . . . any specific programming language" before it "instantiat[es] a scanner for the specific programming language"........................ 8

        B.      Wildfire Does Not Meet the "Determining" and "Instantiating" Limitations ........................................................................ 10

                1.      Finjan cannot prove that WildFire "instantiat[es] a scanner for the specific programming language"........................................ 10

                2.      Finjan cannot prove that WildFire "determine[s] . . . any specific programming language" before it "instantiat[es] a scanner for the specific programming language"........................ 12

                3.      Finjan cannot prove that WildFire "determine[s] any specific one of a plurality of programming languages in which the incoming stream is written" ........................................ 13

V.      FINJAN CANNOT PROVE INFRINGEMENT OF THE '633 PATENT........... 14

VI.     FINJAN CANNOT PROVE INFRINGEMENT OF THE '731 PATENT........... 17

        A.      A "security profile cache" is a "memory for temporarily holding a security profile"........................................................................ 18

        B.      Finjan cannot prove that WildFire includes "security profiles" stored in a "security profile cache" ............................................ 19

                1.      WildFire Reports are not stored in a "security profile cache" ...... 19

                2.      AV Signatures are not "security profiles".................................... 20

        C.      WildFire's databases cannot meet the "security profile cache" limitation under the doctrine of equivalents.............................................. 21

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

VII.    FINJAN CANNOT PROVE PRE-SUIT WILLFUL INFRINGEMENT ............ 22

4

CONCLUSION ........................................................................................................... 23

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ansell Healthcare Prods LLC v. Reckitt Benckiser LLC*,
No. 15-cv-915-RGA, 2018 WL 620968 (D. Del. Jan. 30, 2018).....................................22, 23

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
No. 12-CV-00630-LHK, 2018 WL 905943 (N.D. Cal. Feb. 15, 2018)................................. 21

*AquaTex Indus., Inc. v. Techniche Sols.*,
479 F.3d 1320 (Fed. Cir. 2007)........................................................... 10, 14, 17, 22

*Asatek Danmark A/S v. CoolIT Sys., Inc.*,
No. 19-cv-00410-EMC, 2022 WL 21306656 (N.D. Cal. Oct. 25, 2022) ............................ 21

*Centricut, LLC v. ESAB Grp., Inc.*,
390 F.3d 1361 (Fed. Cir. 2004)............................................................ 10, 14, 17

*DynaCore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004).................................................................. 12, 13

*Finjan Inc. v. Juniper Networks, Inc.*,
No. Civ-17-05659 WHA, 2018 WL 905909 (N.D. Cal. Feb. 14, 2018).............................. 23

*Halo Elecs., inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016) ...................................................................................... 22

*MasterObjects, Inc. v. Amazon.com, Inc.*,
No. C20-08103 WHA, 2022 WL 4280640 (N.D. Cal. Sept. 15, 2022) ............... 10, 14, 17, 22

*Mformation Techs., Inc. v. Research in Motion, Ltd.*,
764 F.3d 1392 (Fed. Cir. 2014).......................................................................... 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008).......................................................................... 18

*Valjakka v. Netflix Inc.*,
No. 22-cv-01490-JST, 2022 WL 19975412 (N.D. Cal. Oct. 11, 2022)................................. 22

**Other Authorities**

Fed. R. Civ. P. 56 ......................................................................................... 1

1

## TABLE OF ABBREVIATIONS

2

3

| Abbreviation | Description |
|---|---|
| "Cao Dep. Tr." | Transcript of Deposition of Wei Cao<br>taken October 20, 2022 |
| "Jakobsson Dep. Tr" | Transcripts of Deposition of Dr. Markus Jakobsson,<br>taken March 15-16, 2023 |
| "Jakobsson Rpt." | Opening Expert Report of Dr. Markus Jakobsson,<br>dated January 27, 2023 |
| "Keromytis Dep. Tr." | Transcripts of Deposition of Dr. Angelos Keromytis,<br>taken March 16, 2023 |
| "Keromytis Rpt." | Opening Expert Report of Dr. Angelos Keromytis,<br>dated January 27, 2023 |
| "Min Dep. Tr." | Transcript of Deposition of Dr. Paul Min,<br>taken March 17, 2023 |
| "Min Rpt." | Opening Expert Report of Dr. Paul Min,<br>dated January 27, 2023 |
| "Ralston Dep. Tr." | Transcript of Deposition of Jesse Ralson,<br>taken October 17, 2022 |
| "Rubin Rpt." | Rebuttal Expert Report of Dr. Aviel Rubin,<br>dated February 24, 2023 |
| "Ex. __" | Exhibits to the Declaration of Michael DeStefano,<br>dated September 11, 2024 |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 14, 2024, at 1:30 pm, or as soon thereafter as counsel may be heard in the United States District Court for the Northern District of California, San Francisco Division, in Courtroom 3, 17th Floor before the Honorable Richard Seeborg, Defendant Palo Alto Networks, Inc. ("PAN") will and hereby does move for summary judgment of non-infringement pursuant to Federal Rule of Civil Procedure 56.

PAN moves for summary judgment that none of the accused products infringe any asserted claims and seeks entry of judgment in its favor on all claims.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED**

After ten years of litigation, this case is down to three patents: U.S. Patent Nos. 8,225,408 ("'408 Patent"), 7,647,633 ("'633 Patent"), and 7,418,731 ("'731 Patent") (collectively, the "Asserted Patents"). And it is down to two primary accused products that are alleged to infringe alone and in combination with certain associated software subscriptions: NGFW and WildFire. Finjan's case depends on NGFW and WildFire meeting, *inter alia*, the claim limitations raised in this motion and Finjan cannot prove that they do.

For the '408 Patent, all asserted claims require determining the specific programming language in which an incoming stream of computer code is written and picking a scanner specific to that programming language. But neither NGFW nor WildFire makes any determination about the programming language of an incoming stream before scanning that content. That is because both products have a single content scanner that analyzes all content, regardless of the programming language in which it is written. Accordingly, NGFW and WildFire cannot be found to infringe the asserted claims of the '408 Patent.

For the '633 Patent, the sole asserted claim, claim 14, requires a "downloadable-information destination." During claim construction, Finjan asked the Court to hold that a "downloadable-information destination" could be *any* device (*e.g.*, client and server computers) with the required functionality. The Court rejected that position and construed "downloadable-

information destination" to mean a "*user device* that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution."  (Dkt. No. 290 at 10-11 (emphasis added).)  Accordingly, in a client-server architecture, the construction covers the clients but not the servers.  Even so, Finjan accuses WildFire servers of being the downloadable-information destination.  But PAN's expert explains that the WildFire servers are not user devices and Finjan's expert does not contradict that point.  Instead, Finjan's expert contends only that WildFire servers could be a "downloadable-information destination" under the Finjan construction that was *rejected* by the Court.  To read the claim on an accused server, when that claim is limited to a "user device," simply fails as an infringement argument.  Accordingly, PAN cannot be found to infringe the sole asserted claim, Claim 14 of the '633 Patent.

As to the '731 Patent, all asserted claims require "a security profile cache" for storing "security profiles."  Finjan asked the Court to construe a "cache" to mean any memory, whether temporary or not.  The Court rejected Finjan's proposed construction and instead construed "file cache" to mean "a memory for temporarily holding a file."  (*Id.* at 5-7.)  A "security profile cache" thus means "a memory for temporarily holding a security profile."  Finjan's expert points to "WildFire Reports" and "AV Signatures" as possible "security profiles" stored in a "security profile cache."  But Finjan's expert does not opine that WildFire Reports are stored in a memory for temporarily holding them.  And Finjan's expert has now conceded that AV Signatures are "not security profiles," regardless of where they are stored.  Accordingly, PAN cannot be found to infringe the asserted claims of the '731 Patent.

Finally, Finjan could not prove pre-suit willful infringement of the '731 Patent even if it were able to show infringement because there is no evidence that PAN had any belief that it infringed any claims of that patent before Finjan filed this action.

In sum, the Court should grant summary judgment of non-infringement in PAN's favor on all claims and enter final judgment for PAN.

## STATEMENT OF THE RELEVANT FACTS

### I.    THE ASSERTED PATENTS

'408 Patent.  The '408 Patent is directed to scanning incoming program code using an analysis tailored to the specific programming language of that incoming code.  (Ex. 1 at 8:29-37.) The system first determines the programing language in which the incoming program code is written and then instantiates a scanner for that specific programming language.  (*Id.*, Claims 1, 22.)  For example, Figure 7 of the patent shows an HTML scanner, JavaScript scanner, and URI scanner stored in a scanner "repository":



'408 Patent, Fig. 7 (Ex. 1)

Once the programming language is determined, the appropriate scanner is requested and instantiated.  (*Id.* at 15:35-63.)  The scanner then analyzes the program code to detect possible malicious code.  (*See id.* at 15:58-60, *see also id.* at 1:59-64.)

'633 Patent.  The '633 Patent is directed to protecting one or more personal computers from malicious operations embedded in a "downloadable" (also called "mobile code") received over a network.  (Ex. 2 at Abstract.)  A computer (*e.g.*, ISP server or corporate server) receives the downloadable, and then sends the "downloadable" along with "mobile protection code" to a "downloadable-information destination."  The downloadable can then be safely executed at that

1  destination.  (*Id.* at 7:1-21.)  The mobile protection code does this by loading the "downloadable"

2  at the destination, and then monitoring the Downloadable for, and protecting a computer against,

3  malicious activity.  (*Id.* at 19:65-20:10, Fig. 11.)  Figures 1b and 1c show how this works:  ISP

4  server 140a or corporate server 140b sends the mobile protection code (MPC) and the

5  downloadable (D) to user devices 145 "for execution by [those] client devices 145" (*id.*):



**FIG. 1b**          **FIG. 1c**

'633 Patent at Figs. 1b, 1c (Ex. 2)

15      The user devices 145 "include one or more devices or processes (such as email, browser

16  or other clients) that are capable of receiving and initiating or otherwise hosting a mobile code

17  execution."  (*Id.* at 7:58-62.)  Delivery of the mobile protection code along with the downloadable

18  can "protect[] a personal computer (PC)" from malicious code.  (*Id.* at 2:20-25.)

19      Consistent with the specification, the Court construed "downloadable-information

20  destination" to mean a "*user device* that includes one or more devices or processes that are

21  capable of receiving and initiating or otherwise hosting a mobile code execution."  (Dkt. No. 290

22  at 10-11 (emphasis added).)  The Court rejected Finjan's position that a "downloadable-

23  information destination" could be *any* device or process that can execute the mobile code.  (*Id.*)

24      ‾'731 Patent‾.  The '731 Patent discloses scanning a file, deriving a security profile for the

25  file, and then comparing the security profile to security policies to determine whether to restrict

26  transmission of the file to an intranet computer.  (*See* Ex. 3 at 2:12-34.)  A "security profile" is a

27  list of computer commands that the scanned file is programmed to perform, as shown in Table 1

28  of the '731 Patent:

'731 Patent at Table 1 (Ex. 3)

The scanned file, security profile, and security policy are stored in a "file cache," "security profile cache," and "security policy cache," respectively.  (*Id.* at 2:1-11.)  Caches are used to speed up processing times by storing information temporarily for faster retrieval.  (*Id.* at 1:64-67, 10:9-12 ("caching of web objects within the gateway computer's web cache eliminates significant network latency for client computers").)  The specification describes the importance of keeping the security profile cache current so that information can be retrieved quickly.  (*Id.* at 8:19-47.)  The Court rejected Finjan's position that "file cache" be construed to mean "a memory for holding a file, at least temporarily."  (Dkt. No. 290 at 5-7.)  The Court construed "file cache" to mean "a memory for temporarily holding a file."  (*Id.*)

## II.    THE ACCUSED PRODUCTS

The Accused Products are PAN's NGFW and associated subscriptions such as Threat Prevention and URL Filtering; WildFire, including both WildFire's Public Cloud and the WF-500 server (private cloud); and PAN's endpoint protection product "Traps" (also known as "Cortex XDR").

NGFW is a gateway that parses network traffic coming into an enterprise intranet to identify and block malicious content.  (Rubin Rpt. ¶¶ 36-37 (Ex. 4).)  NGFW analyzes incoming "packets" of network traffic without regard to file type or programming language using a single pass architecture.  (*Id.* ¶¶ 40-41.)  NGFW compares packet information to an enterprise's security policy and attempts to identify and block potentially malicious traffic.  (*Id.* ¶ 40.)

WildFire is a cloud-based threat analysis system that identifies malicious content and generates signatures, *i.e.,* strings of numbers or characters used to identify a unique file. (*See* Ralston Dep. Tr. at 64:16-66:5 (Ex. 5).) WildFire has both "static" and "dynamic" analyses. (Rubin Rpt. ¶ 49 (Ex. 4).) Static analysis looks for known indicators of a file being either benign or malicious and generates a "signature" if it can make that determination. (*Id.*) If it cannot, then the file is "dynamically" analyzed, *i.e.*, placed in the WildFire virtual machine that executes the file and records its behaviors. (*Id.* ¶ 50.) These behaviors are stored in a log that is made available to WildFire subscribers. (*Id.*) Traps runs on an end-user's computer and is integrated with Wildfire to identify and block malicious content. (*Id.* ¶¶ 51-52.)

### III.   FINJAN'S INFRINGEMENT CONTENTIONS

Finjan contends that PAN infringes the following claims of the Asserted Patents:

| Patent | Claims[1] | Accused Products |
|--------|-----------|------------------|
| '408 | **1**, 4-6, **22** | NGFW (alone or in combination with WildFire, Threat Prevention, or Traps |
| | | WildFire (alone or in combination with Traps) |
| '633 | **14** | WildFire (alone or in combination with NGFW or Traps) |
| '731 | **1**, 2, **14**, 15, **17** | WildFire (alone or in combination with NGFW, Traps, or NGFW + Threat Prevention) |

The Court has twice found Finjan's infringement contentions deficient and ordered Finjan to serve amended contentions complying with the Patent Local Rules. (Dkt. Nos. 146, 177.) Notwithstanding those Court orders, Finjan still has not served compliant contentions and, on October 11, 2022, PAN moved to strike Finjan's deficient contentions as to the '408 and '731 Patents. (Dkt. No. 195-3.) The Court terminated PAN's motion without prejudice on March 27, 2023, without ruling on the merits, and held that "PAN may renew its motion after claim construction, as developments warrant." (Dkt. No. 232.) Finjan's contentions remain deficient as to the '408 and '731 Patents. Because striking those contentions constitutes an alternative basis

---

[1] Independent claims bolded and underscored.

1   to enter judgment in PAN's favor on two of the three remaining patents, PAN has renewed its

2   motion to strike Finjan's contentions for the '408 and '731 Patents.

3   <u>**ARGUMENT**</u>

4   **IV.    FINJAN CANNOT PROVE INFRINGEMENT OF THE '408 PATENT**

5   Finjan cannot demonstrate that NGFW or Wildfire "determin[e] any specific one of a

6   plurality of programming languages in which the incoming stream is written" and "instantiat[e] a

7   scanner for the specific programming language, in response to said determining," as required by

8   all asserted claims of the '408 Patent.  (Ex. 1, Claim 22.)[2]  The parties' experts do not dispute the

9   structure and operation of NGFW and WildFire insofar as it relates to these limitations.  Because

10  there is no genuine dispute as to how NGFW and WildFire operate, and because Finjan cannot

11  prove that they satisfy the "determining" and "instantiating" limitations, PAN is entitled to

12  summary judgment of non-infringement of the '408 Patent.[3]

13  **A.    NGFW Does Not Meet the "Determining" and "Instantiating" Limitations**

14  **1.    Finjan cannot prove that NGFW "instantiat[es] a scanner for the
             specific programming language"**

15

16  Finjan cannot prove that NGFW "instantiat[es] a scanner for the specific programming

17  language," as required by all asserted claims.  That is because NGFW has only one scanner.

18  Indeed, Finjan's expert, ████████████████████████████████████████

19  ████████.[4]  ███████████████████████████████████████████████████████

20  ████████████████████

21

22

23

24  _____
    [2] Claim 1 is directed to a method and requires these steps be performed on a computer and
25  claim 22 is directed to "a computer readable storage medium."

    [3] ███
26  █████████████████████████████████████████  (*See, e.g.*, Min Rpt. ¶¶ 640, 654 (Ex. 9).)

27  [4] The Court granted PAN's motion to strike Dr. Min's reliance on the CTD Engine
    because Finjan failed to disclose that component in its infringement contentions (Dkt. No. 262),
28  but PAN's summary judgment motion should be granted regardless of whether the CTD Engine is
    considered.



(Ex. 7; *see also* Min Dep. Tr. at 495:13-18, 505:16-506:1 (Ex. 6).)

Q.

(Min Dep. Tr. at 508:25-509:3 (Ex. 6).)

Q.        . . .

(*Id.* at 509:4-7; *see also id.* at 511:8-15.)  PAN's expert, Dr. Rubin, also opined that NGFW

includes "a single general scanner irrespective of what it analyzes" and does not meet these

limitations.  (Rubin Rpt. ¶ 505 (Ex. 4); *see also id.* ¶¶ 502, 508.)  Because there is no dispute that

NGFW contains a single scanner for all types of code regardless of programming language,

Finjan cannot show that it "instantiates a scanner for the specific programming language."

Therefore, NGFW does not infringe the '408 Patent.

> **2.      Finjan cannot prove that NGFW "determine[s] . . . any specific programming language" before it "instantiat[es] a scanner for the specific programming language"**

Finjan also cannot prove that NGFW determines a programming language *before*

instantiating any "scanner," as required by all asserted claims of the '408 Patent.  Claim 1

requires, *inter alia*, the following:

> determining, by the computer, any specific one of a plurality of
> programming languages in which the incoming stream is written;

instantiating, by the computer, a scanner for the specific
programming language, *in response to said determining* . . . .

(Ex. 1, Claim 1 (emphasis added).)  Claim 22 includes similar limitations.[5]  The plain language of these limitations requires that these steps be performed in the order in which they are recited, *Mformation Techs., Inc. v. Research in Motion, Ltd.*, 764 F.3d 1392, 1398-400 (Fed. Cir. 2014), and Finjan's expert agrees (Min Dep. Tr. at 210:24-211:17, 216:23-217:5 (Ex. 6)).

As explained above, ████████████████████████████████████████ ████████████████  (*See supra* § IV.A.1.)  ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

████████████████████████████████████████████████

(Ex. 7; Min Dep. Tr. at 507:7-16 (Ex. 6) (discussing Ex. 7).)  ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████  ████████████████ ████████████████████████████████████  (*Id.* at 504:18-25, 507:7-16.)  ████████████████████████████████████ ████████████████████████████████████████████████ t ██ ████████████████████████████████████████████████ ████  (Ex. 7; Min Dep. Tr. at 507:7-16 (Ex. 6) (discussing Ex. 7).)  PAN's expert, Dr. Rubin,

[5] *See* Ex. 1, Claim 22 ("determining any specific one of a plurality of programming languages in which the incoming stream is written [and] instantiating a scanner for the specific programming language, in response to said determining. . .").

1    confirms that the single alleged NGFW "scanner" is used for all content and that NGFW does not

2    determine any programming language before instantiating any alleged "scanner."  (Rubin Rpt.

3    ¶¶ 486, 502, 504, 505, 508 (Ex. 4).)  In short, the experts agree that NGFW does not determine a

4    programming language *before* instantiating any "scanner."  Accordingly, NGFW cannot infringe

5    the '408 Patent.

6                                    *    *    *

7         In sum, Finjan's expert concedes that NGFW operates in a way that does not meet the

8    "determining" and "instantiating" limitations and PAN's expert opined that NGFW does not meet

9    them.  There is no dispute among the experts on this point, and Finjan cannot solve that problem

10   by ditching its own expert because the claims are not easily understandable by a lay jury.  *See*

11   *MasterObjects, Inc. v. Amazon.com, Inc.*, No. C20-08103 WHA, 2022 WL 4280640, at *9 (N.D.

12   Cal. Sept. 15, 2022) (granting summary judgment of non-infringement where patentee did not

13   provide expert testimony that software met claim limitation and accused infringer offered expert

14   opinion of non-infringement); *Centricut, LLC v. ESAB Grp., Inc.*, 390 F.3d 1361, 1369-70 (Fed.

15   Cir. 2004) (reversing judgment of infringement where patentee did not proffer expert testimony

16   of infringement in case involving complex technology); *cf. AquaTex Indus., Inc. v. Techniche*

17   *Sols.,* 479 F.3d 1320, 1329 n.7 (Fed. Cir. 2007) ("expert infringement testimony is generally

18   required in cases involving complex technology").  Accordingly, PAN is entitled to summary

19   judgment that NGFW (and combinations based on NGFW) do not infringe the '408 Patent.

20        **B.    Wildfire Does Not Meet the "Determining" and "Instantiating" Limitations**

21             **1.    Finjan cannot prove that WildFire "instantiat[es] a scanner for the**

22                  **specific programming language"**

23        As with NGFW, Finjan cannot prove that WildFire "instantiates a scanner for the specific

24   programming language."  Finjan's expert, Dr. Min, ████████████████████████████

25   ████████████████████████████████████████████████ t███████████████

26   ███████

27

28



(Ex. 8; *see also* Min Dep. Tr. at 519:14-24 (Ex. 6)

   Q.

(Min Dep. Tr. at 524:5-12 (Ex. 6).)

   Q.

(*Id*. at 524:23-525:1.)  PAN's expert, Dr. Rubin, agreed that WildFire has only a single content

analysis structure and opined that WildFire does not meet the "instantiating" limitation.  (Rubin

Rpt. ¶ 517 (Ex. 4).)  Because there is no dispute that WildFire contains a single scanner that is

used regardless of the programming language, Finjan cannot show that it "instantiates a scanner

for the specific programming language."  Therefore, WildFire does not infringe any asserted

claim of the '408 Patent.

1

2
### 2. Finjan cannot prove that WildFire "determine[s] . . . any specific programming language" before it "instantiat[es] a scanner for the specific programming language"

3    Finjan also cannot prove that WildFire determines the programming language *before*

4  instantiating any "scanner."  The asserted claims can only be infringed if the accused product

5  "determine[s] any specific one of a plurality of programming languages in which an incoming

6  stream is written" *before* it "instantiat[es] a scanner for the specific programming language in

7  response to said determining. . ."  (*See supra* § IV.A.2.)  In his expert report, ████████████

8  ████████████████████████████████████████  Min Rpt. ¶¶ 412-425 (Ex. 9)), but

9  conclusory opinions do not create a genuine issue of material fact.  *See DynaCore Holdings Corp.*

10  *v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004) (unsupported opinion that claim

11  limitation is met cannot create a genuine issue of material fact sufficient to defeat summary

12  judgment of non-infringement).

13    Moreover, during his deposition, ███████████████████████████████████████

14  ██████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████████████

17  ████████

18

19

20

21

22

23

24

25

26

27

28

1   (Ex. 8; *see also* Min Dep. Tr. at 522:17-523:3 (Ex. 6) (discussing Ex. 8).)  As can be seen, ██

2   ████████████████████████████████████████████████████████████

3   (Min Dep. Tr. at 524:23-525:1 (Ex. 6).)  In sum, Dr. Min's own opinions confirm that ████

4   ████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ██████.  Accordingly, WildFire cannot infringe the '408 Patent.

7        **3.      Finjan cannot prove that WildFire "determine[s] any specific one of a**
             **plurality of programming languages in which the incoming stream is**
8            **written"**

9   Finjan's expert ████████████████████████████████████████████

10  ████████████████████████████████████████████.  *See*

11  *DynaCore*, 363 F.3d at 1278.  In fact, ████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████  Dr. Rubin agrees that WildFire

24  examines only *file type* and does not determine the programming language in which the incoming

25  stream is written.  (Rubin Rpt. ¶¶ 493-495 (Ex. 4).)  WildFire therefore cannot infringe the

26  '408 Patent.

27        Because Finjan's expert conceded that WildFire operates in a way that does not meet the

28  "determining" and "instantiating" limitations, and PAN's expert opined that WildFire does not

1    meet them, PAN is entitled to summary judgment that WildFire (and combinations based on

2    WildFire) does not infringe the '408 Patent.  *See MasterObjects*, 2022 WL 4280640, at *9;

3    *Centricut*, 390 F.3d at 1369-70; *cf. AquaTex*, 479 F.3d at 1329.[6]

4    **V.    FINJAN CANNOT PROVE INFRINGEMENT OF THE '633 PATENT**

5           Claim 14 of the '633 Patent requires "causing mobile protection code to be executed by

6    the mobile code executor at a downloadable-information destination."  (Ex. 2, Claim 14.)  The

7    Court construed "downloadable-information destination" to mean a "*user device* that includes one

8    or more devices or processes that are capable of receiving and initiating or otherwise hosting a

9    mobile code execution."  (Dkt. No. 290 at 10-11 (emphasis added) (rejecting Finjan's assertion

10   that it could be *any* device capable of performing the recited functionality)).)  Finjan contends that

11   the alleged "downloadable-information destination" is a WildFire Public Cloud server or a

12   WF-500 server, but Finjan does not offer evidence that either of these servers is the claimed "user

13   device."

14          Finjan's expert, Dr. Angelos Keromytis, points only to ███████████████████████

15   ████████████████████████████████████████████████████  ███████████████

16   ███████████████████████████████████████████████████████████████████████

17   (Keromytis Rpt. ¶¶ 150-152, 201, 204, 212, 225, 437 (Ex. 11)); and (2) that ██████████████

18   ████████████████████████████████████████████████████████████████████

19   █████████████████████  *id.* ¶ 150 n.6).  Thus, according to Dr. Keromytis, ██████████

20   ███████████████████████████████████████████████████████████████████

21   (*Id.* ¶¶ 150 n.6, 433, 444.)  These server locations are shown in red below:

22

23

24

25

26

27          ───────────────

       [6] Dr. Min offers a conclusory opinion that the "parser" and "analyzer" rules aspects of the
28   "instantiating" limitation are satisfied under the doctrine of equivalents (Min Rpt. ¶¶ 573-576
     (Ex. 9)) but does not opine that the aspects of the asserted claims at issue in this motion are
     satisfied under the doctrine of equivalents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17    In its contentions, Finjan merely states that ███████████████████████

18 ███████████████████████████████████

19 ███████████████████████████████████

20 (Ex. 12 at 87 (emphasis added).)  Dr. Keromytis ████████████████

21 ███████████████████████████████████

22 ███████████████████████████████████

23 ███████████████████████████████████

24 ███████████████████████████████████

25 ███████████████████████████████████

26 ███████████████████████████████████

27 ████████████████

28

Even if Dr. Keromytis did opine ███████████████████████

██████████████████████████████████████████████████

█████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

█ ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

The only expert opinion about whether these WildFire servers are actually "user devices,"
construed in a manner consistent with the Court's claim construction order, is that of PAN's
expert, Dr. Rubin.  (Rubin Rpt. ¶¶ 715-719 (Ex. 4).)  Dr. Rubin explains why WildFire cloud-
based servers are not "user devices":

> Wildfire virtual machines are implemented as a cloud-based solution, and are not
> devices which provide direct user interaction, let alone being client endpoint
> devices.  For example, the below diagram which Dr. Keromytis relies on in his
> report shows that WildFire is a "cloud location" in a separate networked location
> from any user device.



(*Id.* ¶ 718.)  Dr. Rubin also explains that the WildFire WF-500 server is not a "user device":

> Similar to the cloud-based deployment of WildFire, the WildFire Appliance is not
> implemented on a user device, and therefore is not a downloadable-information
> destination. The WildFire Appliance is a private cloud appliance, which is a

1    dedicated device separate from a user device/client device which implements the
2    WildFire cloud. (*Id.*)

3 (*Id.* ¶ 719 (Ex. 4).)

4      In sum, there is no factual dispute about how the WildFire servers operate, Finjan's expert

5 ███████████████████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████ Accordingly,

7 the Court should grant summary judgment of non-infringement in PAN's favor. *See*

8 *MasterObjects*, 2022 WL 4280640, at *9; *Centricut*, 390 F.3d at 1369-70; *cf. AquaTex*, 479 F.3d

9 at 1329.[7]

## VI.    FINJAN CANNOT PROVE INFRINGEMENT OF THE '731 PATENT

11      The asserted claims of the '731 Patent all require "security profiles" comprising lists of

12 computer commands from the scanned file to be stored in a "security profile cache":

- Claim 1. "a scanner for scanning incoming files from the Internet and deriving *security profiles* for the incoming files, wherein each of the security profiles comprises a list of computer commands that a corresponding one of the incoming files is programmed to perform" and "a *security profile cache* for storing the security profiles derived by the scanner"

- Claim 14. "deriving a *security profile* for the retrieved file, the security profile including a list of at least one computer command that the retrieved file is programmed to perform" and "storing the security profile for the retrieved file within a *security profile cache* of the network gateway for future access,

- Claim 17. "deriving a *security profile* for the retrieved file, the security profile including a list of at least one computer command that the retrieved file is programmed to perform" and "storing the security profile for the retrieved file within a *security profile cache* for future access"

22 (Ex. 3, Claims 1, 14, 17 (emphasis added).)  Consistent with the Court's construction of "file

23 cache," a "security profile cache" should be construed to mean "a memory for temporarily

24 holding a security profile."  (*See* Dkt. No. 290 at 5-7.)

25      Finjan appears to propose two different theories of infringement based on different alleged

26 "security profiles": ███████████████████████████████████████████████

27

28      [7] Dr. Keromytis does not offer any opinion that PAN's accused products include a "downloadable-information destination" under the doctrine of equivalents.

1  ████████████████████████████.[8]  Both theories fail.  ████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████

4  ████████████  Finally, Finjan  ████████████████████████

5  ████████████████████████████████████████████

**A.     A "security profile cache" is a "memory for temporarily holding a security profile"**

The Court's rationale for construing "cache" as "memory for temporarily holding" information applies equally to both "*file* cache" and "*security profile* cache."  Accordingly, consistent with the Court's construction of "file cache" to mean "a memory for temporarily holding a file" (Dkt. No. 290 at 6-7), a "security profile cache" is "a memory for temporarily holding a security profile."

There is no reasonable debate on this point.  As Finjan stated during claim construction in *Blue Coat I*, the term "[c]aching relates to the use of a cache (*i.e.*, temporary storage) of content." (Ex. 15 at 5.)  Moreover, the specification shows that the "security profile cache," like the claimed "file cache," is directed to temporary memory and must be updated to keep the cache "current." (Ex. 3 at 8:11-16 ("It may be appreciated that the various caches within the gateway computer 110 security profile cache 150, web cache 160 and security policy cache 170, must be managed in order to be kept current as files on the Internet are replaced with newer versions").) The specification also describes different ways to keep the "security profile cache" current, including purging content and replacing content without reference to permanent storage of the content.  (*Id.* at 8:20-21, 8:11-16.)  If Finjan argues otherwise, this issue must be resolved by the Court and is not a fact dispute that could preclude summary judgment.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).[9]

---

[8] ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

During the parties' claim construction term exchange, Finjan proposed that the terms "file cache," "security profile cache" and "security policy cache" count as three of the required

**B.** **Finjan cannot prove that WildFire includes "security profiles" stored in a "security profile cache"**

Finjan, through its expert Dr. Jakobsson, ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████. (*See, e.g.,* Jakobsson Rpt. at ¶¶ 620, 640, 659, 821, 824 (Ex. 14).)  But Finjan cannot prove (1) that the Wildfire Reports are stored in a "security profile cache" or (2) that the AV signatures are "security profiles."

**1.** **WildFire Reports are not stored in a "security profile cache"**

Dr. Jakobsson suggests that ███████████████████████████████

███████████████████████████████████████████████████

████████████████████ (Jakobsson Rpt. ¶ 806 (Ex. 14); *see also id.* ¶¶ 645-646, 807, 808, 816.)  Dr. Jakobsson also ███████████████████████████████

██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

(*Id.* ¶ 748 (emphasis added).)  But the Court already rejected Finjan's argument that a "cache" is a memory for holding information "at least temporarily."  (*See* Ex. 16 at 4:22-12:25; Dkt. No. 290 at 6.)  The only specific WildFire database that Dr. Jakobsson suggests stores anything temporarily is ████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ (Jakobsson Rpt. ¶ 812 (Ex. 14).)  Dr. Jakobsson does not opine that █████████████████████████.[10]

---

ten terms to be construed.  PAN disagreed and believed these should all be construed together consistently since the operative dispute was on the term "cache."  PAN memorialized its request to have all three cache-related terms be construed together in the parties' Joint Claim Construction Statement.  (Dkt. No. 164 at 2, n. 2.)

[10] Dr. Jakobsson vaguely opines ████████████████████████████████████

███████████████████████████████████████████████

PAN's expert, Dr. Rubin, explains that Central DB, Virus DB, and disk storage are *not* temporary storage: [11]



Dr. Rubin also explained that ███████████████████ "*before* files have been transmitted to WildFire for analysis."  (*Id.* ¶ 338.)  Dr. Rubin further explains that WildFire does not have "security profiles" that are stored in a "security profile cache."  (*Id.* ¶ 355.)  Thus, the undisputed evidence shows that WildFire Reports are not stored in temporary storage.

### 2. AV Signatures are not "security profiles"

Finjan's alternative theory is that the AV Signatures are the claimed "security profiles" that are stored in a "security profile cache."  But the experts agree that ██████████████ ███████████████████████████████████████████████████.

Dr. Jakobsson testified that █████████████████████████████████████ ████████████████

(*See* Jakobsson Rpt. ¶ 806) 

Dr. Jakobsson testified that ███████████████████████████████████████ █████████████████████████████ (Jakobsson Dep. Tr. at 158:12-24 (Ex. 17). *see also* Rubin Rpt. ¶ 334 (Ex. 4) (explaining the difference between volatile and non-volatile storage).)

(Jakobsson Dep. Tr. at 139:21-140:8 (Ex. 17).)

Dr. Rubin opined that AV Signatures are hashes (a single string of characters created by a cryptographic function), do not comprise a list of one or more computer commands, and therefore cannot constitute the claimed "security profiles."  (Rubin Rpt. ¶¶ 361 (Ex. 4) (signatures generated by WildFire's static and dynamic analysis are not "security profiles" because they do not contain a list of computer commands), 367 (opining that signatures do not contain a list of computer commands), 424 (same).)

### C.    WildFire's databases cannot meet the "security profile cache" limitation under the doctrine of equivalents

Finjan alleges that ███████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

████████  *See Asatek Danmark A/S v. CoolIT Sys., Inc.*, No. 19-cv-00410-EMC, 2022 WL 21306656, at *16-17 (N.D. Cal. Oct. 25, 2022) (finding that doctrine of equivalents would vitiate limitation requiring "curved" blades under theory that "linear" blades infringed); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-CV-00630-LHK, 2018 WL 905943, at *14-16 (N.D. Cal. Feb. 15, 2018) (holding doctrine of equivalents would vitiate claim limitation requiring detection of a structure to occur "before selection" when patentee sought to extend infringement to products which detected structure "after selection").

Moreover, Dr. Rubin, PAN's expert, opines that this limitation is not met under the doctrine of equivalents.  (Rubin Rpt. ¶¶ 438-442 (Ex. 4) (explaining that WildFire's storage does not meet the "security profile cache" limitation under the doctrine of equivalents because the system is designed to generate and provide long-term storage related to signatures for signature

matching).)  In the face of Dr. Rubin's unrebutted expert testimony, there is no genuine dispute of material fact, and summary judgment is appropriate.  *See Aquatex*, 479 F.3d at 1329-30 (failure to provide expert testimony on a limitation-by-limitation basis supporting doctrine of equivalents analysis insufficient to survive summary judgment); *MasterObjects*, 2022 WL 4280640, at *9 (granting summary judgment where patentee expert failed to address whether "cache" limitation was satisfied under court's construction and accused infringer's expert opined that limitation was not met).

## VII.    FINJAN CANNOT PROVE PRE-SUIT WILLFUL INFRINGEMENT

Finjan contends that PAN began willfully infringing the '731 Patent before Finjan filed this action.[12]  To prove pre-suit willful infringement, Finjan must prove, *inter alia*, pre-suit knowledge of the patent and that PAN's infringement was egregious, *i.e.*, willful, wanton, or malicious.  *Halo Elecs., inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103-104 (2016).  Pre-suit knowledge of a patent is not, by itself, enough.  *Id.*; *see also Ansell Healthcare Prods LLC v. Reckitt Benckiser LLC*, No. 15-cv-915-RGA, 2018 WL 620968, at *7 (D. Del. Jan. 30, 2018).  Finjan cannot meet that standard.

Finjan's claim of pre-suit willfulness appears to be grounded in a June 20, 2014 email from Finjan's VP of IP Licensing, Ivan Chaperot, to PAN's in-house counsel Michael Ritter.  (Ex. 19 at 28 (Resp. to Interrog. 12); Ex. 20.)  Mr. Chaperot identifies six Finjan patents (including the '731 Patent) and "representative product families" for each patent.  (Ex. 20 at -2068.)  Mr. Chaperot identified "Palo Alto Networks Firewalls and WF-500 Appliance" as representative products for the '731 Patent and offered to send a claim chart if and only if PAN agreed to an NDA that would keep the charts confidential and enter PAN and Finjan into a standstill agreement.  (*See id.*)  But Mr. Chaperot did not state that PAN was infringing any specific claims of the '731 Patent, let alone provide any support for that claim.  (Ex. 20.)  And a communication of a mere list of patents, without more, is not legally sufficient to establish willfulness.  *Valjakka v. Netflix Inc.*, No. 22-cv-01490-JST, 2022 WL 19975412, at *2 (N.D. Cal.

---

[12] Finjan does not assert pre-suit willfulness for the '633 or '408 Patents.

1    Oct. 11, 2022) (dismissing pre-suit willful infringement claim where knowledge of infringement

2    was premised on a letter identifying patent and claiming defendant was a "potential licensee").

3         Finjan's position that PAN can be found to have willfully infringed the '731 Patent merely

4    because it did not "play ball" with Finjan, ask for claim charts, and agree not to let those claim

5    charts be seen by other Finjan targets is insufficient.  That conduct does not, as a matter of law,

6    rise to the level of egregious misconduct.  As the Court found in *Finjan Inc. v. Juniper Networks,*

7    *Inc.*, Finjan cannot have it both ways, *i.e.,* refuse to disclose an infringement allegation and claim

8    charts that could be used against it in other cases, but then later turn around and argue that it told

9    PAN how it was infringing Finjan's patent.  No. Civ-17-05659 WHA, 2018 WL 905909, at *4

10   (N.D. Cal. Feb. 14, 2018) ("Finjan had no right to insist that [PAN] sign an NDA instead of

11   telling other targets how Finjan construed its patents (so that inconsistencies in Finjan's position

12   could see the light of day.)").

13        Because Finjan cannot establish anything beyond knowledge of the '731 Patent before this

14   action was filed, PAN is entitled to judgment in its favor on Finjan's claim for pre-suit willful

15   infringement of the '731 Patent.  *See Ansell Healthcare*, 2018 WL 620968, at *7 (granting

16   summary judgment of no pre-suit willfulness where patentee did not identify any egregious

17   conduct after alleged infringer learned of patent).

18                                     **<u>CONCLUSION</u>**

19        For all of the reasons set forth above, PAN respectfully requests that the Court grant

20   summary judgment of non-infringement of the '408, '633, and '731 Patents, and summary

21   judgment of no pre-suit willful infringement.

22

23

24

25

26

27

28

1  Dated:  September 11, 2024               */s/ Kyle W.K. Mooney*
2                                          Daralyn J. Durie (CA SBN 169825)
                                           DDurie@mofo.com
3                                          Timothy Chen Saulsbury (CA SBN 281434)
                                           TSaulsbury@mofo.com
4                                          Matthew I. Kreeger (CA SBN 153793)
                                           MKreeger@mofo.com
5                                          MORRISON & FOERSTER LLP
                                           425 Market Street
6                                          San Francisco, California 94105-2482
                                           Phone: (415) 268-7000
7                                          Fax: (415) 268-7522

8                                          Kyle W.K. Mooney (*Pro Hac Vice*)
                                           KMooney@mofo.com
9                                          Michael J. DeStefano (*Pro Hac Vice*)
                                           Mdestefano@mofo.com
10                                         MORRISON & FOERSTER LLP
                                           250 West 55th Street
11                                         New York, New York 10019-9601
                                           Phone: (212) 468-8000
12                                         Fax: (212) 468-7900

13                                         Rose S. Lee
                                           RoseLee@mofo.com
14                                         MORRISON & FOERSTER LLP
                                           707 Wilshire Boulevard
15                                         Los Angeles CA 90017-3543
                                           Phone: (213) 892-5200
16                                         Fax: (213) 892-5454

17                                         *Attorneys for Defendant*
                                           *PALO ALTO NETWORKS, INC.*

18

19

20

21

22

23

24

25

26

27

28