Juanita R. Brooks (CA SBN 75934) / brooks@fr.com
Roger A. Denning (CA SBN 228998) / denning@fr.com
Frank J. Albert (CA SBN 247741) / albert@fr.com
Jared A. Smith (CA SBN 306576) / jasmith@fr.com
Tyler R. Train (CA SBN 318998) / train@fr.com
Elliot N. Scher (CA SBN 343705) / scher@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070 / Fax: (858) 678-5099

Susan E. Morrison (*Pro Hac Vice*) / morrison@fr.com
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19801
Telephone: (302) 652-5070 / Fax: (302) 652-0607
Additional counsel listed on signature page

Attorneys for Plaintiff,
FINJAN LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| FINJAN LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>PALO ALTO NETWORKS, INC.,<br><br>       Defendant. | Case No. 3:14-cv-04908-RS<br><br>**FINJAN LLC'S OPPOSITION TO PALO ALTO NETWORKS, INC.'S MOTION TO EXCLUDE TESTIMONY OF DRS. ANGELOS KEROMYTIS AND ROBERT MANESS**<br><br>Date:  November 14, 2024<br>Time:  1:30  P.M.<br>Hon. Richard Seeborg<br>Ctrm. 3, 17th Floor<br><br>**REDACTED VERSION** |

1

### TABLE OF CONTENTS

2

**Page**

3

4 I. INTRODUCTION ...................................................................................................... 1

5 II. LEGAL STANDARD ................................................................................................ 2

6 III. DR. KEROMYTIS OFFERS QUALIFIED, RELIABLE OPINIONS ............................ 3

7      A. Dr. Keromytis Is Qualified to Offer the Opinions in His Report,
And Dr. Maness Properly Relies Upon Them ...................................................... 3

8

9         1. Dr. Keromytis offers qualified, supported opinions ................................ 4

        2. Dr. Maness properly relies on Dr. Keromytis's opinions ........................ 5

10      B. Dr. Keromytis Applies a Reliable Apportionment Methodology ........................ 7

11

12         1. Dr. Keromytis's feature analysis is unquestionably
detailed and sufficient .............................................................................. 7

13         2. Dr. Keromytis's weighting methodology is reliable ................................ 7

14            a. Courts have approved of attributing equal weights
to a multi-feature product ............................................................ 8

15

16            b. Dr. Keromytis provides reasonable adjustments to
certain product features ............................................................... 9

17 IV. DR. MANESS OFFERS RELIABLE DAMAGES OPINIONS ................................. 11

18      A. Dr. Maness's Royalty Base Opinions Are Admissible ....................................... 11

19         1. Dr. Maness provides a reliable apportionment analysis
that properly apportions patented from unpatented

20            features in the accused products ............................................................. 11

21            a. The law requires an apportionment analysis to
focus on patented and unpatented features ................................ 12

22

23            b. Dr. Maness properly excludes unpatented features
from his royalty base .................................................................. 14

24                i. The law does not require apportioning the
value of "conventional" from

25                "unconventional" patented features ............................... 14

26                ii. PAN fails to support its contention that the
accused hardware products are entirely

27                "conventional" and should be excluded ........................ 15

28         2. The dismissal of the '154 Patent does not undermine Dr.
Maness's opinions .................................................................................. 17

B.  Dr. Maness Properly Analyzes the *Georgia-Pacific* Factors and Finjan Licenses in Support of His Royalty Rate Opinions ................................ 18

  1.  Dr. Maness's *Georgia-Pacific* factor analysis follows Federal Circuit's and this Court's case law ............................ 19

  2.  Dr. Maness Has Analyzed Finjan's Past License Agreements and Shows They Are Technologically and Economically Comparable ..................................... 22

V.  CONCLUSION ........................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)................................................................................. 23

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)........................................................................... 12, 14

*DataQuill Ltd. v. High Tech Comput. Corp*,
   887 F. Supp. 2d 999, 1023–24 (S.D. Cal. 2011)................................................ 24, 25

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)............................................................................................... 2, 3

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014)................................................................................. 23

*Finjan LLC v. SonicWall, Inc.*,
   84 F.4th 963 (Fed. Cir. 2023)..................................................................................... 6

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018)......................................................................... *passim*

*Finjan, Inc. v. Cisco Sys. Inc.*,
   No. 17-CV-00072-BLF, 2020 WL 13180005 (N.D. Cal. Apr. 21, 2020)........... *passim*

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)......................................................................... *passim*

*Finjan, Inc. v. Sophos, Inc.*,
   No. 14-CV-01197-WHO, 2016 WL 4268659 (N.D. Cal. Aug. 15, 2016)........... *passim*

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)................................................................................... 19

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)..................................................................................................... 2

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)........................................................................... 12, 16

*MediaTek Inc. v. Freescale Semiconductor, Inc.*,
   No. 11-cv-5341-YGR, 2014 WL 2854890 (N.D. Cal. June 20, 2014)................. 20, 21

*NetFuel, Inc. v. Cisco Sys. Inc.*,
   No. 5:18-CV-02352-EJD, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)............ 10, 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Omega Pats., LLC v. CalAmp Corp.*,
 13 F.4th 1361 (Fed. Cir. 2021) .......................................................................... 12, 15

*Puff Corp. v. SHO Prod., LLC*,
 No. CV 22-2008-GW-KSx, 2024 WL 2208929 (C.D. Cal. Apr. 19, 2024) .................... 13, 15

*Realtime Data, LLC v. Oracle Am., Inc.*,
 No. 6:16-CV-88-RWS-JDL, 2017 WL 11574028 (E.D. Tex. Mar. 30, 2017) ........................ 9

*Stragent, LLC v. Intel Corp.*,
 No. 6:11-CV-421, 2014 WL 1389304 (E.D. Tex. Mar. 6, 2014) ........................................ 5, 9

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011) ................................................................................ 22

*Virnetx, Inc. v. Cisco Sys., Inc.*,
 767 F.3d 1308 (Fed. Cir. 2014) ........................................................................ *passim*

*Zimmer Surgical, Inc. v. Stryker Corp.*,
 365 F. Supp. 3d 466 (D. Del. 2019) .......................................................................... 24

**Other Authorities**

Fed. R. Evid. 702 .................................................................................................. 2, 3

1

## I.      INTRODUCTION

2      Finjan's experts offer detailed and thorough analyses on damages issues—well beyond what

3 this district and the Federal Circuit have previously required, and far from a case of "anything goes,"

4 as PAN suggests in its Motion to Exclude (Dkt. 305) ("Mot."). (Mot. at 1:14.)  Guided by the body

5 of past case law governing similar fact patterns, Finjan's experts apportion between the patented

6 and unpatented features of the infringing products and then apply a reasonable royalty rate.  PAN

7 offers no on-point authority to support the attacks it levies on Finjan's experts.  Each case that PAN

8 cites contains critically distinguishable facts that render the cases unhelpful for resolving PAN's

9 Motion.

10      Finjan's technical expert, Dr. Angelos Keromytis, performs a detailed feature analysis based

11 on the specific facts of this case.  In his report, Dr. Keromytis identifies 131 distinct features and

12 sub-features within PAN's accused products.  (*See* Mot., Ex. 2 (Keromytis Rpt., App'x G).)  He

13 then categorizes these features down to four levels of sub-feature for PAN's accused products and

14 performs a well-reasoned weighting methodology for each feature.  (*See generally* Mot., Ex. 1

15 (Keromytis Rpt.) ¶¶ 489-504.)  Dr. Keromytis begins at the top-level features and attributes weights

16 to each that add up to 100%.  (*Id.*)  Some experts in past cases (including cases that PAN relies on)

17 have stopped their analysis there without considering even a second level of sub-features.  Dr.

18 Keromytis repeats this process through four levels of sub-features, considering each level and sub-

19 feature separately in attributing weighted values.  (*Id.*)  Where some experts assign equal weights

20 across the board, Dr. Keromytis relies on documents, testimony, and his own experience in

21 determining whether the features and sub-features in this case should be weighted equally or

22 adjusted relative to other features at the same level.  (*Id.*)  PAN presents no legitimate challenge to

23 Dr. Keromytis's extensive technical analysis here.  Contrary to PAN's arguments, Dr. Keromytis

24 does not opine outside of his expertise, and he certainly does not pluck his analysis from "thin air."

25 As discussed below, Dr. Keromytis provides a qualified, substantiated, and well-reasoned feature

26 analysis for Finjan's damages expert to rely on in his apportionment theory.

27      Finjan's damages expert, Dr. Robert Maness, also presents reliable damages analyses for his

28 opinions relating to a reasonable royalty base and rate. <u>First</u>, Dr. Maness performs an economic

analysis of the features of the accused products, based on Dr. Keromytis's technical feature analysis. (*See generally* Mot., Ex. 6 (Maness Rpt.) § V.B.)  PAN's criticism of Dr. Maness's apportionment analysis—that he does not consider "conventional" components—is legally flawed for the same reasons as PAN's own damages theory.  The law requires apportionment between patented and unpatented features.  PAN argues, without legal support, for a second apportionment step that considers whether the patented features (despite being infringing features) are also "conventional" and, if so, excluding those patented, but purportedly conventional, features from the damages base as well.  PAN cites no authority to support such a requirement, and Finjan has found none.  <u>Second</u>, Dr. Maness provides a reasonable royalty rate opinion based on a thorough analysis of the widely-accepted *Georgia-Pacific* factors. (*See generally* Mot., Ex. 6 (Maness Rpt.) § VI.)  Dr. Maness's resulting opinion that the parties would have agreed to rates of ███████████ ████ finds support through numerous past licenses.  That PAN takes a different factual view of these licenses is not grounds for exclusion; PAN can raise its concerns on cross-examination. Finally, PAN criticizes Dr. Maness for relying on the very licenses that its own expert relies upon as purportedly not being "comparable."  As discussed below, these licenses ████████ ██████████████████ are comparable to the facts of this case, both technologically and economically.

In short, PAN's challenges are generally flawed for two reasons.  First, PAN's legal attacks misinterpret or disregard controlling authority and attempt to supplant it with plainly distinguishable case law.  Second, PAN's factual attacks challenge the *weight* of Finjan's experts' testimony (not its admissibility), which is not for determination at this stage.  For these reasons, as further discussed below, the Court should deny PAN's Motion.

## II.    LEGAL STANDARD

Under *Daubert*, the district court acts as a "gatekeeper" to ensure that expert testimony is relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Federal Rule of Evidence 702 requires that "expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.  "The focus [of a *Daubert* inquiry]

1  must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*,

2  509 U.S. at 595.  "So long as an expert's methodology is sound and his opinions satisfy the

3  requirements of Rule 702, underlying factual disputes and how much weight to accord the expert's

4  opinion are questions for the jury."  *Finjan, Inc. v. Cisco Sys. Inc.*, No. 17-CV-00072-BLF, 2020

5  WL 13180005, at *1 (N.D. Cal. Apr. 21, 2020) (hereinafter "*Cisco*") (citing *Micro Chem., Inc. v.

6  *Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir.

7  2010)).

8  **III.    DR. KEROMYTIS OFFERS QUALIFIED, RELIABLE OPINIONS**

9        **A.    Dr. Keromytis Is Qualified to Offer the Opinions in His Report, And Dr. Maness
            Properly Relies Upon Them**

10

11        Finjan presents its apportionment analysis through two expert reports.  First, Finjan's

12  technical expert, Dr. Keromytis, identifies 131 features and sub-features for PAN's accused products

13  to which he individually attributes weighted values.  (Mot., Ex. 1 (Keromytis Rpt.) ¶ 87 ("I have

14  been asked to determine and assign weights to various features of the accused products according

15  to their respective values to the overall products.").)  Dr. Keromytis summarizes this information in

16  Appendix G to his report.  (*See* Mot., Ex. 2 (Keromytis Rpt., App'x G).)  This technical analysis

17  represents the extent of Dr. Keromytis's contribution to the apportionment analysis.  (Mot., Ex. 1

18  (Keromytis Rpt.) ¶ 87 ("I understand that the apportionment analysis requires additional economic

19  analysis, for which I do not offer opinions. My opinions are limited to my technical analysis of

20  assigning weights to patented and unpatented features of the accused products.").)

21        Second, Finjan's damages expert, Dr. Maness, supplies the economic component to the

22  apportionment analysis.  Dr. Maness takes the weighted product features from Dr. Keromytis and

23  calculates a damages base by apportioning out the revenue attributable to the non-infringing

24  features, as identified by Finjan's technical experts.  (Mot., Ex. 6 (Maness Rpt.) ¶ 15 ("I use these

25  weights to apportion revenue of each accused PAN product into the amount that is attributable to

26  infringement and the amount attributable to non-infringing features.").)

27        Courts frequently approve of Finjan's apportionment process here: beginning with a

28  technical investigation and continuing with an economic analysis. *Finjan, Inc. v. Sophos, Inc.*, No.

14-CV-01197-WHO, 2016 WL 4268659, at *3 (N.D. Cal. Aug. 15, 2016) (hereinafter "*Sophos*")
("[The damages expert] relied on the opinions of [the technical expert], who conducted an
investigation into this issue that he lays out in his report. [The damages expert] is entitled to rely on
[the technical expert's] opinion."); *Cisco*, No. 17-CV-00072-BLF, 2020 WL 13180005, at *9 (N.D.
Cal. Apr. 21, 2020) ("[The damages expert] properly relied on Finjan's technical experts' opinion
that AMP has eight features of equal value."); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299,
1313 (Fed. Cir. 2018) (hereinafter "*Blue Coat*") (approving of damages expert's apportionment
opinion based on "her discussions with Mr. Medovic, a Finjan technical expert who explained the
use of architectural diagrams and identified certain components within the diagram that did and did
not infringe.").

### 1.   Dr. Keromytis offers qualified, supported opinions

PAN exploits a single paragraph of Dr. Keromytis's report to make two separate arguments
in its Motion asking to exclude the entirety of Dr. Keromytis's detailed, technical apportionment
analysis. (*See generally* Mot. at 8-10 (quoting Keromytis Rpt. ¶ 492).)  PAN cites to two references
to "consumer demand" to frame Dr. Keromytis as providing an economic opinion.  He does not.

PAN does not challenge Dr. Keromytis's technical qualifications or analyses.  (*See* Mot. at
8:6-7 ("an expert's technical experience may qualify them to testify about the features of a given
technology").)  Instead, PAN takes issue with Dr. Keromytis's statements that he (a) "understood
the consumer demand for PAN's accused products to be largely driven by their intended
functionality, e.g., preventing malware"; and accordingly (b) "assigned weights to each feature and
sub-feature based on that feature's or sub-feature's contribution to the consumer demand for the
overall product." (*See* Mot. at 8-10 (quoting Keromytis Rpt. ¶ 492).)  From this, PAN asks the
Court to exclude Dr. Keromytis's entire technical apportionment analysis.  As Dr. Keromytis makes
clear, he is not offering economic opinions—Finjan supplies those through its damages expert, Dr.
Maness. (Mot., Ex. 1 (Keromytis Rpt.) ¶ 87.)  The opinions that Dr. Keromytis provides are limited
to his weighted feature analysis, which is based on his technical analysis of the accused products'
***intended functionality***.  (*Id.* ¶ 87, 492.)  For example, Dr. Keromytis explains that he assigned
greater weight to features that are critical and prerequisites for other features, while he assigned

1    lower weight to features that are cosmetic or only useful in certain environments.  (*See, e.g.*, *id.* ¶¶

2    493-494.)  Dr. Keromytis also provides numerous citations to documents and testimony (discussed

3    *infra*) to support his opinions, which are closely tethered to the facts of the case.  (*Id.*)  These are

4    appropriate, substantiated opinions for a technical expert to present, as the cases discussed above

5    have held.  In fact, one of PAN's own cases demonstrates the need for such a technical feature

6    analysis, where the court in *Stragent, LLC v. Intel Corp.*, No. 6:11-CV-421, 2014 WL 1389304, at

7    *4 (E.D. Tex. Mar. 6, 2014), excluded the testimony of a damages expert who attributed values to

8    various features of the accused product without any technical or factual basis.

9         Dr. Keromytis's brief reference to consumer demand is to provide a contextual explanation

10   for his *understanding* (not opinion) that demand relates to intended functionality.  In other words,

11   Dr. Keromytis merely explains his logical understanding that customers buy PAN's products

12   because they work as intended.  Dr. Keromytis supports this understanding with a cite to PAN's

13   witness testifying "that the features PAN chooses to highlight in its materials are decided 'by what

14   we're seeing business need from our prospects and customers.'"  (Mot., Ex. 1 (Keromytis Rpt.) ¶

15   491 (citing Lee Dep. Tr.).)  PAN is wrong to suggest that "[t]his [understanding] serves as the basis

16   for his entire opinion."  (Mot. at 9:22-23.)  Dr. Keromytis's detailed feature analysis—set forth over

17   the next twelve paragraphs of his report and the appended tables and diagrams—in no way rises and

18   falls with this understanding.  To the extent PAN feels that Dr. Keromytis's understanding somehow

19   undermines the veracity of his feature analysis, then PAN is able to challenge that on cross-

20   examination.  *See Cisco*, 2020 WL 13180005, at *9.  It does not provide grounds to exclude Dr.

21   Keromytis's technical feature analysis in its entirety.

22                    **2.    Dr. Maness properly relies on Dr. Keromytis's opinions**

23        Dr. Maness's apportionment analysis properly applies Dr. Keromytis's technical analysis,

24   and conducts a further economic analysis based on that technical analysis.  First, Dr. Maness works

25   through each level of Dr. Keromytis's apportionment table to calculate feature-specific weights,

26   providing the following example:

27        NGFW's "Application Signature" sub-feature accounts for 20 percent of the App-
         ID subfeature, which itself accounts for 15 percent of the Scan Incoming Network
28        Traffic / Single-Pass Scanning sub-feature, which comprises 60 percent of the

Inspection/Classification/Reclassification: Malware Detection feature, which is given a 55 percent weight in NGFW. The "Application Signature" sub-feature thus makes up 20 percent x 15 percent x 60 percent x 55 percent = 0.99 percent of the overall NGFW product.

(Mot., Ex. 6 (Maness Rpt.) ¶ 50.)  Next, Dr. Maness "multipl[ies] the accused sales of PAN's products by their corresponding feature weights," which "gives the apportioned feature-specific sales base." (*Id.* ¶ 51.)  As Dr. Maness explains: "I apportion the base at the feature level because different features infringe different patents." (*Id.*)

PAN faults Dr. Maness's analysis here because he "adopts Dr. Keromytis's weighting scheme wholesale, without any adjustment or independent analysis." (Mot. at 15:1-2.)  PAN cites to no authority requiring a damages expert to make adjustments to a technical expert's technical feature analysis, nor would such an adjustment be appropriately within Dr. Maness's economic expertise.  Indeed, PAN almost certainly would have complained if Dr. Maness (a damages expert) made such adjustments to Dr. Keromytis's technical analysis.  As discussed above, courts have approved Dr. Maness's approach of relying on a technical expert's feature analysis as part of the overall apportionment analysis.  *See Sophos*, 2016 WL 4268659, at *3; *Cisco*, 2020 WL 13180005, at *9; *Blue Coat*, 879 F.3d at 1313.

The only case PAN cites in support of its argument here, *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 968, 975-77 (Fed. Cir. 2023) (hereinafter "SonicWall"), is expressly distinguishable from the facts in this case.  In *SonicWall*, the court excluded an expert apportionment analysis where the documents relied on by the plaintiff's experts divided "top-level functions" into "additional sub-features," but the experts "presented no analysis to assess the value of the sub-features[.]" 84 F.4th at 976.  Here, Drs. Keromytis and Maness perform the analysis that the expert in *Sonic Wall* did not.  Both of Finjan's experts consider the presence and value of numerous sub-features in their granular apportionment analyses.  *See* Mot., Ex. 2.

As set forth above, Drs. Keromytis and Maness each provide appropriate, supported analyses—based on their respective qualifications in technology and economics—that combine to make up Finjan's overall apportionment analysis.

1

**B.      Dr. Keromytis Applies a Reliable Apportionment Methodology**

2

Dr. Keromytis's methodology is neither "plucked out of thin air" nor "an arbitrary, black

3

box methodology," as PAN accuses.  (Mot. at 2:2, 10.)  On the contrary, PAN's brief itself

4

demonstrates the thorough nature of Dr. Keromytis's analysis.  Though PAN disparages Dr.

5

Keromytis's methods as "arbitrary," it dedicates a page and a half of its Motion to explain the

6

detailed analysis Dr. Keromytis performed.  (Mot. at 2:24-4:9.)  Dr. Keromytis's analysis reflects,

7

and goes beyond, what courts have previously held to be sufficient.

8

**1.      Dr. Keromytis's feature analysis is unquestionably detailed and sufficient**

9

10

As PAN describes, Dr. Keromytis provides an Appendix G that includes (1) a list of features

11

and sub-features in the accused products; (2) a list of the asserted patents with X marks to indicate

12

whether each feature and sub-feature infringes any of the asserted patents; and (3) Dr. Keromytis's

13

weighted values along with a level coding system for each of the features and sub-features.  (Mot.

14

at 3:9:24.)  In total, Dr. Keromytis identified and considered 131 features and sub-features across

15

five accused products, classified down to four sub-levels.  (*See* Mot., Ex. 2 (Keromytis Rpt., App'x

16

G).)  PAN does not, and cannot, dispute the sufficiency of the detailed technical analysis Dr.

17

Keromytis performed classifying the features in PAN's accused products.  Indeed, the Federal

18

Circuit and courts in this district have approved of similar, but less detailed, analyses of the technical

19

features of accused products.  *Blue Coat*, 879 F.3d at 1313 (Fed. Cir. 2018) (approving of an

20

apportionment analysis based on twenty-four top level features that were given equal weights);

21

*Cisco*, 2020 WL 13180005, at *9 (N.D. Cal. Apr. 21, 2020) (approving of an apportionment analysis

based on eight equally weighted features).

22

**2.      Dr. Keromytis's weighting methodology is reliable**

23

24

PAN's dispute with Dr. Keromytis's apportionment table relates to his weighting

25

methodology.  As with his feature analysis, Dr. Keromytis's weighting methodology is sound.  Dr.

26

Keromytis considered and weighed each of the 131 identified features and sub-features based on a

27

multi-step process.  (Mot., Ex. 1 (Keromytis Rpt.) ¶ 492.)  As Dr. Keromytis explains in his report:

"If there was no reason in PAN's documents or based on my experience to do otherwise, I weighted

28

each of the features at the same level equally." (*Id.*)  But where his "experience and the evidence

provided by PAN showed that certain features or sub-features were more valuable to consumer demand," Dr. Keromytis adjusted those features' weights up or down accordingly. (*Id.*) As discussed below, this weighting methodology goes above and beyond other weighting methods that have already garnered court approval.

### a.    Courts have approved of attributing equal weights to a multi-feature product

PAN first criticizes Dr. Keromytis's equal weight determinations as a "default arbitrary . . . black box methodology." (Mot. at 11:3-4.) But Dr. Keromytis did not simply divide the number of total features evenly to arrive at equal weights across the board. After individually considering each feature, Dr. Keromytis assigned equal weights to less than half of the total features, and did so only when he, in his technical opinion, determined there was no evidence showing that the features should be adjusted up or down. That is not an arbitrary analysis. It is a well-reasoned analysis from a qualified technical expert with decades of experience in the field.

The Federal Circuit and courts in this district have rejected the argument PAN makes here on multiple occasions as going to the weight, not admissibility, of the evidence. In *Blue Coat*, the Federal Circuit rejected the defendant's argument against the damages expert's opinion that each of twenty-four "functions" should be treated as equally valuable. 879 F.3d at 1313. In that case, it was the damages expert who made the decision to apply equal weights based on "her discussions with [plaintiff's technical expert]." *Id.* Based on these discussions, the court held that "[t]he jury was entitled to believe the plaintiff's expert." *Id.* Here, Finjan has provided not just discussions between the experts, but a full technical expert analysis for its damages expert to rely on. As in *Blue Coat*, PAN can cross-examine both Drs. Keromytis and Maness on the detailed analysis of technical features that Dr. Keromytis performed.

This case is also analogous to *Cisco*, where the plaintiff's technical experts "identif[ied] eight features in the [accused product] and assign[ed] each feature equal weight," which the plaintiff's damages expert relied on for her apportionment analysis. 2020 WL 13180005, at *9. The defendant challenged both the technical experts' analysis and the damages expert's reliance on that analysis. *Id.* As to its challenge against the technical experts, the defendant provided "other

1    documents and testimony" that it purported to "contradict the *ipse dixit* conclusion that [the accused

2    product] has only eight features and that these features are equally valuable." *Id.*  The court rejected

3    this argument because "[d]isputes on the factual underpinnings of an expert's analysis go to its

4    weight, not admissibility." *Id.*  Here, PAN's challenge falls short of even that in *Cisco*.  PAN has

5    offered no evidence undermining or contradicting Dr. Keromytis's opinion.

6          PAN's only support is two out-of-circuit cases that are distinguishable and cannot supplant

7    the Federal Circuit and N.D. Cal. controlling authority discussed above.  In *Stragent*, the court

8    excluded the testimony of a ***damages*** expert who, without any technical or factual basis, attributed

9    equal weight to the various features of the accused product.  2014 WL 1389304, at *4.  In excluding

10   the opinion, the court noted the damages expert's admission that "I am not, nor do I hold myself out

11   to be, a technical expert in these technologies." *Id.*  This case—excluding a damages expert's

12   opinion based on his lack of technical knowledge—is inapposite to the situation here, where Finjan's

13   qualified technical expert has provided opinions well within the scope of his technical expertise.

14   PAN's other case, *Realtime Data, LLC v. Oracle Am., Inc.*, No. 6:16-CV-88-RWS-JDL, 2017 WL

15   11574028 at *6 n.2 (E.D. Tex. Mar. 30, 2017), did not even decide the issue related to feature

16   apportionment.  There, the court was similarly faced with a damages expert attributing equal weights

17   without technical support. *Id.* at *5.  But in that case, the court declined to reach the issue of equal

18   weighting, explaining (in the footnote that PAN cites): "given that the Court finds it appropriate to

19   strike Dr. Keller's 'starting-point apportionment' analysis altogether, the ***equal weighting*** of

20   features in that analysis ***is no longer at issue***." *Id.* at *6 n.2 (emphasis added).  This case simply

21   does not support—or even reach—the argument PAN makes here.

22                    **b.    Dr. Keromytis provides reasonable adjustments to certain
                            product features**

23

24          Given the controlling authority approving of prior expert opinions applying equal weights

25   across all features, Dr. Keromytis could have reasonably stopped his analysis by doing exactly that.

26   But Dr. Keromytis took another step to determine whether and which features should be given

27   greater or lesser value, finding over half of the 131 features to be deserving of adjustment.  It would

28   stand to reason that this would satisfy PAN's concerns of "default arbitrary equal weighting" (Mot.

at 11:3), but PAN again criticizes Dr. Keromytis's adjustments as "arbitrary" and "plucked from thin air." (Mot. at 13:22-24.) Not so. Dr. Keromytis provides in his report a feature-by-feature (and sub-feature-by-sub-feature) explanation for every adjustment he made in his weighting methodology, which he supports with his technical experience and PAN's own documents and deposition testimony from this case. (*See* Mot., Ex. 1 (Keromytis Rpt.) ¶¶ 493-504.) For example, Dr. Keromytis provides the following explanation for three sub-features of PAN's NGFW product:

> I assigned the greatest weight to Scan Incoming Network Traffic / Single-Pass Scanning (2.A.I – 60%) because it is a prerequisite for Sending Files to WildFire (2.A.II – 20%) and Activity Monitoring (2.A.III – 20%), which I split evenly. PAN has repeatedly touted Single-Pass Scanning as a critical feature of its products, and Mr. Lee testified that "a single-pass architecture will accelerate the ability to identify threats." Lee Dep. Tr. at 70:15-20; *see also id.* at 94:12-22 ("scanning once is more efficient than going through multiple passes"); PAN_FIN00681218 at 5.

(*Id.* ¶ 494.) Where other experts may have simply split the three sub-features evenly (or not even reached this level of sub-feature at all), Dr. Keromytis explains in the quoted passage above that Single-Pass Scanning should carry more weight because it is a prerequisite to the other sub-features, and PAN repeatedly touts it as a critical feature. (*Id.*) Also shown above, Dr. Keromytis then cites multiple deposition quotes and documentary evidence in support. (*Id.*) That is not an "arbitrary black box methodology" that he "plucked from thin air." It is a well-reasoned and substantiated analysis that is tethered to the facts of the case.

PAN frequently cites to *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-CV-02352-EJD, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020) to support its argument. As with PAN's other cited authority, *NetFuel* is inapposite. In that case, the plaintiff's technical expert provided high-level estimations (e.g., 33% and 50%) for what he believed to be the overall contributions of the infringing and non-infringing features of the accused products. *Id.* at *8. The court disagreed with this methodology because the expert "failed to explain the methodology underlying his percentage calculation and [] relied on vague assertions about the Accused Feature's value." *Id.* The court cited two examples: first, where the expert arrived at 70% based on his determination that the defendant's "infringing functionality is 'somewhat more than twice as valuable' as its non-infringing functionality"; and second, where the expert arrived at 40% because the defendant's

1    "non-infringing functionality 'slightly outweighs' its infringing functionality". *Id.* at *10. No other

2    analysis of the features was done. *Id.* Here, by contrast, Dr. Keromytis provides a far more detailed

3    and granular feature analysis and weighting methodology (considering 131 distinct features and sub-

4    features over four levels) that result in precise values.

5        Finally, PAN cites to Dr. Keromytis's deposition, where PAN quibbled with him over his

6    decision to attribute 55% to an NGFW feature, asking: "Why not put it at 65 percent"? (Mot. at

7    13:10-15.) Dr. Keromytis responded that he based his decision on what features he uses and relies

8    on most from his experience "us[ing] firewalls daily." (*Id.*) The Federal Circuit has made clear:

9    "we have never required absolute precision in this task; on the contrary, it is well-understood that

10   this process may involve some degree of approximation and uncertainty." *Virnetx, Inc. v. Cisco*

11   *Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). PAN's motion asks for absolute precision, taking

12   issue with any feature value that Dr. Keromytis does not point to an exact number to substantiate.

13   But that level of precision is not required by the law. Dr. Keromytis's well-reasoned approximations

14   are sufficient under the Federal Circuit's standard, and PAN's motion to exclude his opinions on

15   apportionment should be denied.

16   **IV.    DR. MANESS OFFERS RELIABLE DAMAGES OPINIONS**

17       **A.    Dr. Maness's Royalty Base Opinions Are Admissible**

18           **1.    Dr. Maness provides a reliable apportionment analysis that properly apportions patented from unpatented features in the accused products**

19

20       PAN's criticism of Dr. Maness's apportionment analysis seeks to bolster PAN's expert's

21   own unreliable methodology. As Finjan laid out in its Motion to Exclude Opinions of Stephen E.

22   Dell (Dkt. Nos. 318, 320-3), PAN's expert improperly excludes the revenue of the accused hardware

23   products because those hardware products are allegedly "conventional" and "non-inventive." Mr.

24   Dell excludes this revenue despite acknowledging that PAN's hardware products are, alone, accused

25   of infringement. (Dkt. No. 318 § III.A.) PAN now argues that Dr. Maness's apportionment analysis

26   is flawed because he did not exclude all "conventional hardware" sales. (Mot. at 15-20.) As

27   discussed below, PAN's argument is wrong and inconsistent with the law, and Dr. Maness's

28   opinions comport with the facts and the law.

a.   **The law requires an apportionment analysis to focus on patented and unpatented features**

This dispute arises out of PAN's incorrect understanding of the governing case law. PAN and its expert incorrectly insist that an apportionment analysis should focus on separating features in the accused products that are "conventional" from those that are "inventive" or "non-conventional"—without regard to which features are patented. Conversely (and correctly), Dr. Maness focuses on apportioning unpatented features from patented features, which follows a long line of Federal Circuit and Supreme Court precedent, including the cases cited by PAN. *See, e.g.*, *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (explaining an apportionment analysis must separate "between the patented feature and the unpatented features") (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) (same); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009) (same).

The main case PAN cites in support of its position here, *Omega Pats., LLC v. CalAmp Corp.*, 13 F.4th 1361, 1377 (Fed. Cir. 2021), is not on point. There, the plaintiff presented an "entire market value" theory to the jury, arguing "it did not need to show apportionment at all". *Id.* at 1377. Under this theory, the plaintiff in *Omega* argued that "the multi-vehicle-compatibility feature of the [accused products] 'primarily, if not exclusively' drove sales." *Id.* at 1378. The court rejected this argument, finding that the accused products "would still have had value absent this feature," where the court identified three example "additional features" of the accused products that were not patented features. *Id.* Ultimately, the court held, "we conclude that the jury could not reasonably have found that the multi-vehicle-compatibility feature of the [accused products] drove demand for the entire [accused products]." *Id.*

Conversely here, Finjan's experts go to great lengths to identify and exclude non-infringing, unpatented features from the damages base. That analysis is done by determining the features of the products, determining how important those features are to the functionality of the products, and then apportioning out the value of unpatented features. At no point do Finjan's experts opine that

1   one or more of the patented features, by themselves, make up the entire market value of PAN's

2   accused products.

3         PAN's other cited cases—*Puff Corp. v. SHO Prod., LLC* and *VirnetX, Inc. v. Cisco Sys.,*

4   *Inc.*—are similarly distinguishable.  Both cases likewise consider damages opinions that apply the

5   entire market value rule and fail to apportion between specific patented and unpatented features.

6   This alone renders these cases non-analogous to Dr. Maness's apportionment analysis, which

7   apportions out the revenue related to unpatented features.  Moreover, both cases support Finjan's

8   position by applying the correct apportionment analysis, which focuses on patented and unpatented

9   features.  In *Puff Corp. v. SHO Prod., LLC*, No. CV 22-2008-GW-KSx, 2024 WL 2208929, at *7

10  (C.D. Cal. Apr. 19, 2024), PAN's own parenthetical makes this point.  As PAN explains, the court

11  there found the expert to have "failed to apportion between features ***covered by the asserted claims***

12  and ***unclaimed features*** like 'batteries, circuit boards, features related to wireless connectivity,

13  etc.'" (Mot. at 20:16-19 (quoting *Puff*, WL 2208929, at *7) (emphasis added).)  Almost identically,

14  the court in *VirnetX*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) explained that the plaintiff's damages

15  expert "did not even attempt to subtract any other ***unpatented elements*** from the base, which

16  therefore included various features ***indisputably not claimed*** by [the plaintiff], e.g., touchscreen,

17  camera, processor, speaker, and microphone, to name but a few." (Emphasis added).  Dr. Maness

18  did exactly what these cases require—separating the revenue from patented features and unpatented

19  features—something the experts in *Puff* and *Virnetx* failed to do.

20        Courts at all levels have consistently required an apportionment analysis to separate between

21  patented and unpatented features.  PAN has failed to cite any authority to suggest that the

22  apportionment analysis requires another step—that an expert must additionally consider whether

23  patented features are either "conventional" or "inventive."  Indeed, such a proposition would seem

24  to render worthless many patents that are novel combinations of "conventional" features.  Not even

25  PAN's own expert analyzes the products feature-by-feature to determine, first, whether they are

26  patented, and second, whether they are conventional.  In fact, PAN's expert fails to consider a single

27  feature of any of the accused products, instead broadly excluding an entire class of products because

28  they are "hardware."  *That* is an unreliable apportionment opinion—not Finjan's.

1

### b. Dr. Maness properly excludes unpatented features from his royalty base

2

3

#### i. The law does not require apportioning the value of "conventional" from "unconventional" patented features

4      PAN criticizes Dr. Maness for purportedly ignoring the contribution of "conventional and

5   non-infringing components," which PAN later generally relates to "hardware" revenue.   (Mot. at

6   15:8-9.)   PAN's argument has two major flaws.   First, PAN appears to conflate the terms

7   "conventional" with "non-infringing" in an attempt to jam the facts here into the cases it attempts

8   to rely upon.   But as discussed above, the law requires apportioning patented from unpatented

9   features.  *See Commonwealth Sci. & Indus.*, 809 F.3d at 1301.  It does not, as PAN argues, require

10  further apportioning "conventional" patented features from "unconventional" patented features.

11  Second, Dr. Maness does exactly what the law requires: he apportions the value of non-infringing

12  features out of the damages base through his reliance on Dr. Keromytis's detailed feature analysis

13  and weighting methodology.   Indeed, as to the "hardware" that PAN alleges is "conventional," Dr.

14  Maness, through his reliance on Dr. Keromytis, specifically accounts for those hardware features.

15  Nothing more is required.

16      While PAN challenges Dr. Keromytis's weighting of various features as described above, it

17  does not challenge the feature-by-feature infringement analysis in Appendix G.  (*See* Mot., Ex. 2

18  (Keromytis Rpt., App'x G).)   In that analysis, Finjan's technical experts considered whether each

19  of the 131 product features individually infringes each of the four then-asserted patents (prior to the

20  '154 Patent's dismissal)—comprising 524 total determinations.  (*Id.*)  For example, Finjan's experts

21  considering the NGFW product—a product PAN argues should be excluded from the damages

22  analysis in its entirety—found 20/42 features to infringe the '731 Patent, 15/42 features to infringe

23  the '408 Patent, and 5/42 features to infringe the '633 Patent.  (*Id.*)  In conducting their analysis,

24  one of the features of NGFW that Finjan's experts considered was "Hardware Only Features." (*Id.*

25  at 2.)  For each of the asserted patents, Finjan's experts determined that the "Hardware Only

26  Features" do not to infringe the asserted patents.  (*Id.*)  Based on that infringement analysis, Dr.

27  Maness excluded value of the non-infringing "Hardware Only Features" from the damages base.

28

1    Dr. Maness did the same thing for all other non-infringing features, excluding the value of those

2    features from the apportioned damages base.

3         Unlike in PAN's cited cases, where the courts specifically identified unpatented features that

4    should have been excluded (*see Omega*, 13 F.4th at 1377 (identifying three unpatented features: "a

5    '3-axis accelerometer,' the ability to 'detect hard braking, cornering[,] or acceleration,' and an

6    'industry leading on-board alert engine.'"); *VirnetX*, 767 F.3d at 1327 (identifying unpatented

7    "touchscreen, camera, processor, speaker, and microphone"); *Puff*, WL 2208929, at *7 (identifying

8    unpatented "batteries, circuit boards, features related to wireless connectivity")), PAN does not, and

9    cannot, point to a single unpatented feature that Dr. Maness improperly included in his apportioned

10   royalty base.  Instead, PAN broadly suggests that Dr. Maness should have excluded "hardware"

11   products entirely (as Mr. Dell does in his report).  (Mot. at 19-20.)  But PAN's accused "hardware"

12   encompasses multiple products, each of which have numerous features and sub-features.  For

13   example, PAN's NGFW product, which Mr. Dell excludes entirely as "hardware," has at least forty-

14   two features based on PAN's own marketing materials.  (Mot., Ex. 2 (Keromytis Rpt., App'x G) at

15   1-2.)  PAN does not mention a single one of these features by name, much less identify a specific

16   feature as being unpatented but improperly included in Dr. Maness's royalty base.  By PAN's own

17   admission, the asserted patent claims require hardware components.  (*See* Mot. at 20:1 ("the asserted

18   claims require nothing more than generic, conventional hardware").)  Given that, PAN is only left

19   to criticize Dr. Maness for not "attempt[ing] to ***apportion out*** the value of any portion of any

20   ***infringing features*** of any of the asserted patents as conventional."  (*Id.* at 16:12-13 (emphasis

21   added).)  The law requires apportioning out unpatented, non-infringing features from the royalty

22   base—leaving the patented, infringing features.  Thus, PAN's criticism of Dr. Maness for not

23   excluding infringing features is unwarranted.  PAN cites to no case that requires excluding

24   infringing features from a royalty base.

25        ii.    **PAN fails to support its contention that the accused hardware products are entirely "conventional" and should be excluded**

26

27   As discussed above, Drs. Maness and Keromytis acknowledge that PAN's NGFW product

28   comprises certain features, some of which are patented and some of which are not.  In response,

1    Dr. Maness appropriately excludes the unpatented, non-infringing features from his royalty base,

2    including "Hardware Only Features."  PAN, on the other hand, contends that the entire NGFW

3    product should be excluded as "conventional."  (*See* Dkt. No. 320-4 (Dell Rpt.) Attach. 4A-B.)  This

4    is not a case where PAN's accused hardware is simply a metal box that does nothing.  As Dr.

5    Keromytis sets forth in his report, PAN's NGFW product, alone, performs the infringing

6    functionality of the '408 Patent.  As a matter of law, this accused product must be included in the

7    damages analysis.  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("The

8    hypothetical negotiation [] assumes that the asserted patent claims are valid and infringed.").  That

9    PAN also separately sells software that is accused of infringement does not mean that PAN's

10   hardware products, which are also accused of infringement on their own, should be excluded.

11        Even if PAN's interpretation of the law—that it could be proper to exclude entire accused

12   products—were correct (it is not), PAN provides no evidentiary support for its argument that any

13   infringing features are "conventional" and should be excluded.  As of the grant of the '408 Patent

14   (which Finjan asserts against NGFW), the patent office found at least some or a combination of its

15   claimed features to be novel and inventive.  Even if PAN were legally permitted to exclude certain

16   of those claimed features as "conventional," it has not presented any analysis parsing what it

17   considers to be the "conventional" as opposed to "inventive" features of the '408 Patent's claims.

18   Instead, PAN and its expert exclude the entirety of the accused hardware products—and criticize

19   Dr. Maness for not doing the same.  Under any legal interpretation, this cannot be allowed.

20        Finjan's experts engaged in a thorough, detailed apportionment process that individually

21   considered, parsed, and weighed numerous product features and sub-features.  PAN does not

22   identify any of these specific features or sub-features as "conventional," much less provide evidence

23   to support such a claim.  So under any legal interpretation, Finjan's apportionment analysis must be

24   sufficient to present to the jury.  To the extent PAN considers any of Finjan's experts' feature

25   determinations to be factually incorrect, that goes to the weight not admissibility of the opinions.

26   *See Cisco*, 2020 WL 13180005, at *9.  But at this stage, PAN has presented no argument, legal or

27   factual, that can properly challenge the admissibility of Finjan's experts' apportionment analyses.

28

1

2

          **2.**      **The dismissal of the '154 Patent does not undermine Dr. Maness's opinions**

3

4

5

6

7

8

9

10

11

12

      PAN's argument regarding Dr. Maness's consideration of the '154 Patent is difficult to follow.  Without explicitly stating it, PAN appears to accuse Dr. Maness of double counting.  (*See, e.g.*, Mot. at 18:4-5 (arguing that "Dr. Maness [] attributes the full value of a given feature to each individual patent.").)  The only case PAN cites to support its argument, *Finjan v. Sophos*, expressly considers a situation where an expert was accused of double (and even triple) counting.  2016 WL 4268659, at *3 ("Sophos moves to exclude Layne-Farrar's testimony on the grounds that she improperly inflated the royalty base by **double or triple counting** revenue attributable to certain features of the accused products.") (emphasis added).  Therefore, PAN's argument either relies on the assumption that Dr. Maness double counts (which he does not), or PAN's argument is devoid of legal support.

13

14

      To be sure, Dr. Maness does not double count any revenue in his analysis, and he explains in his report the steps he takes to avoid doing so:

15

16

17

> For features that infringe multiple patents, I measure accused sales as all sales of the accused product starting from the earliest date of first infringement for all infringed patents and ending on the last expiration date of the infringed patents.  **This avoids double counting.**

18

19

20

21

22

23

24

(Mot., Ex. 6 ¶ 51 (emphasis added).)  In other words, Dr. Maness counts each infringing feature once, whether it infringes one or more patents.  The adjustment he then makes for features that infringe multiple patents is to the time period so that his calculations consider the infringing features for the time that they infringe at least one asserted patent.  This is a different approach than the one applied in *Sophos* where the court found that the expert "counts the revenue attributable to certain features **multiple times** in calculating her royalty base".  2016 WL 4268659, at *3 (emphasis added).  That is simply not what Dr. Maness does.

25

26

27

28

      PAN argues that the dismissal of the '154 Patent somehow undermines Dr. Maness's opinion, contending that Dr. Maness cannot attribute the full value of a feature that was accused to infringe the '154 Patent along with two other asserted patents.  (Mot. at 7-16.)  This argument suggests that the value of a feature should be discounted if it is alleged to infringe multiple patents,

1    as compared to a feature that is only alleged to infringe one patent.  PAN cites no legal authority to

2    support its argument, and it defies common sense.  Doubling down on its flawed argument, PAN

3    appears to contend that every product feature alleged of infringing the '154 Patent has now been

4    exonerated of infringement as of that patent's dismissal.  (Mot. at 18:10-12.)  Not so.  A finding of

5    infringement requires every limitation of a patent claim to be met.  So a single feature of a product

6    could practice similar limitations across multiple patents, even where the overall product may not

7    infringe one of the patents for lack of an entirely separate limitation.

8        Demonstrative of PAN's flawed logic is its example of the Static Analysis feature from the

9    accused NGFW product.  (*See* Mot. at 17-18.)  Finjan's technical experts determined that Static

10   Analysis was an infringing feature for the '731, '408, and '154 Patents. (*See* Mot., Ex. 2 (Keromytis

11   Rpt., App'x G) at 2.)  Separately, Dr. Keromytis determined a weighted value for the Static Analysis

12   based on its value to the overall NGFW product.  (*Id.*)  By PAN's incorrect theory, this feature

13   should be given a different value (and potentially none) depending on whether it is found to infringe

14   one, two, or three of these asserted patents.  Conversely, under Dr. Maness's correct approach, the

15   Static Analysis feature is counted exactly once according to its value (as long as it remains an

16   infringing feature of at least one asserted patent), and adjustments are made to the start and end dates

17   of infringement based on which patents are ultimately found to be infringed.  (Mot., Ex. 6 (Maness

18   Rpt.) ¶ 51.)

19       PAN can cross-examine the experts on that at trial regarding the weight given to various

20   features.  *See Cisco*, 2020 WL 13180005, at *9.  But PAN has presented no evidence or authority

21   to suggest that Dr. Maness's methodology is legally inadmissible.

22   **B.    Dr. Maness Properly Analyzes the *Georgia-Pacific* Factors and Finjan Licenses
23          in Support of His Royalty Rate Opinions**

24       Dr. Maness analyzes all of the *Georgia-Pacific* factors, and concludes that the result of a

25   hypothetical negotiation would have been a royalty rate of ████████████████████████

26   ████████████████████████.  (Mot., Ex. 6 (Maness Rpt.) ¶¶ 66-137, 153-189.)  Like the

27   analyses that courts in this district have previously found acceptable, Dr. Maness spends over 100

28   paragraphs across approximately fifty pages explaining how the parties' past licenses and the other

1    *Georgia-Pacific* factors informed his analysis and conclusion.  Dr. Maness also explains his

2    conclusion that Finjan's past licenses are technologically and economically comparable to this case,

3    including why those agreements support his opinions as to the appropriate royalty rate.  In fact,

4    PAN's expert, Dr. Dell relies on these same licenses as technologically and economically

5    comparable to the license that would result from the hypothetical negotiation.  (*See* Dkt. No. 320-4

6    (Dell Rpt.) ¶ 284.)  PAN's criticisms of Dr. Maness's analysis are not critiques of his methodology,

7    but instead are complaints about the outcome of that methodology that can be fully explored on

8    cross-examination.

9          **1.    Dr. Maness's *Georgia-Pacific* factor analysis follows Federal Circuit's
10               and this Court's case law**

11         Dr. Maness analyzes each of the fifteen *Georgia-Pacific* factors and their interactions to

12    reach his conclusions on royalty rates.  (Mot., Ex. 6 (Maness Rpt.) ¶¶ 152–189.)  PAN is wrong to

13    suggest that Dr. Maness's opinion "begins and ends" with rates from the *Secure Computing* jury

14    verdict, or that Dr. Maness relies only on Finjan's Chairman to support those rates.  (Mot. at 21.)

15    Instead, Dr. Maness first reviews the terms of twenty-three Finjan agreements (Mot., Ex. 6 (Maness

16    Rpt.) ¶¶ 63-137) and eight PAN license agreements (*id.* ¶¶ 138-151).  He then analyzes those

17    agreements in the context of *Georgia-Pacific* Factors 1 and 2, including the technological and

18    economic similarities and differences between those agreements and the hypothetical negotiation.

19    (*Id.* ¶¶ 153-157.)  Finally, he further analyzes the remaining *Georgia-Pacific* factors and their impact

20    on the rate that would have been agreed upon at the hypothetical negotiation.  (*Id.* ¶¶ 159-188.)

21    Based on that evidence and analysis, Dr. Maness concludes that the parties would have arrived at a

22    royalty rate of ███████████████████████████ at the hypothetical negotiation.  (*Id.* ¶ 189.)

23         The Federal Circuit has "consistently upheld experts' use of a hypothetical negotiation and

24    *Georgia-Pacific* factors for estimating a reasonable royalty," and held that disagreements to the

25    expert's conclusions from the *Georgia-Pacific* factors "go to the weight, not admissibility, of his

26    opinion."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).  When the expert

27    report indicates that the expert relies on a number of *Georgia-Pacific* factors in reaching an opinion

28    on a reasonable royalty rate, criticism on how the expert quantifies the underlying facts "are

1    appropriate for cross-examination and not a basis for exclusion of [the expert's] testimony."

2    *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No. 11-cv-5341-YGR, 2014 WL 2854890, at *4

3    (N.D. Cal. June 20, 2014) (admitting the expert's royalty rate opinion that used a 1% royalty starting

4    point for two sets of patents and concluded a 1% royalty for one set and 10% royalty for the other,

5    with allegedly "nearly the same" *Georgia-Pacific* analyses).

6         Dr. Maness addresses each license Finjan produced for the asserted patents, related patents,

7    and other cybersecurity patents in Finjan's portfolio.  (Mot., Ex. 6 (Maness Rpt.) ¶¶ 62–137.)  He

8    details the reasons why he concludes each agreement is economically relevant and informative (*id*.)

9    and specifies what circumstances make a specific license less comparable or result in impacts to the

10   royalty rates, if any exist (*e.g.*, *id*. at ¶¶ 76, 85, 97, 102, 105, 116, 120, 136).  Dr. Maness further

11   evaluates the effects of the other *Georgia-Pacific* factors to the hypothetical negotiation and adjusts

12   the resulting royalty rates accordingly.  For example, at *Georgia-Pacific* Factor 6, Dr. Maness

13   considers how PAN's product portfolio drives its sales based on the testimony of PAN's witnesses,

14   internal and third-party marketing documents, and the timeline of PAN's product expansion.  (Mot.,

15   Ex. 6 (Maness Rpt.) ¶¶ 162-63.)  Based on that analysis, he concludes that the factor would be

16   neutral to the hypothetical negotiation.  (*Id.*)  As another example, for Factor 11, Dr. Maness

17   analyzes PAN's marketing materials and investor calls to consider how the accused products

18   improve efficiency for customers.  (*Id.* at ¶ 179.)  From that analysis, he concludes that PAN's use

19   of the invention would favor the licensor in a hypothetical negotiation.  (*Id.*)  Dr. Maness reaches

20   his conclusion of ███████████ only after analyzing the royalty rates in Finjan's prior licenses

21   in conjunction with the other evidence regarding the *Georgia Pacific* factors.  (*Id*. at ¶¶ 188–89.)

22        Dr. Maness specifically enumerates the evidence supporting his ███████████, and

23   does not merely rely on Finjan's Chairman, as PAN suggests. (Mot. at 21:21-22.)  As PAN admits,

24   the *Secure Computing* jury awarded damages to Finjan by applying royalty rates of 8% for hardware

25   and 16% for software.  (Mot. at 21; *id.*, Ex. 6 (Maness Rpt.) ¶ 69.)  Next, the *Sophos* jury heard

26   Finjan's damages expert's opinion of a 6 to 8% royalty rate on hardware, an 8 to 16% royalty on

27   software, and a total reasonable royalty of between $8.7 and $16.1 million. (Mot., Ex. 6 (Maness

28   Rpt.) ¶ 75.)  Ultimately, the jury awarded $15 million in damages to Finjan, which fell within the

1    expert's estimated range and suggests a royalty rate consistent with the 8% and 16% rates utilized

2    in *Secure Computing*. *Id.*   Further, Dr. Maness ███████████████████████████████████

3    ████████████████████████████████████████████████████████████████. (*Id.*,

4    Ex. 5A; *e.g.*, *id.* ¶ 120.)   For example, ████████████████████████████████████

5    ████████████████████████████████████████████████████████████████████████

6    ███████████████████████████████████. (*Id.* ¶ 104.)  In other licenses,

7    ████████████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████████

10   ████. (*See, e.g.*, Mot., Ex. 6 (Maness Rpt.) ¶¶ 76, 81, 83–84, 87–88, 90–91, 93, 111–113, 115–

11   117, 120, 122–123, 125–126, 127, 131, 136; *see also id.*, Ex. 5A.)  PAN's assertion that Dr. Maness

12   does not show how Finjan's licenses apply these rates ignores all of this evidence.  (Mot. 21:20-21.)

13   Moreover, PAN's critiques about Dr. Maness's application and quantification of these ███████

14   ██████████  do not support exclusion, but instead, are proper for cross-examination. *See MediaTek*,

15   2014 WL 2854890, at *4.

16          PAN's arguments are similar to those rejected by other courts in this district, denying

17   motions seeking to exclude ████████████████████████████████. In *Cisco*,

18   the court allowed the 8% and 16% royalty rates to go to the jury when the expert "analyze[d] the

19   particular circumstance surrounding Finjan's license agreements with third parties as well as the

20   relationship between the parties and other relevant factors."  2020 WL 13180005, at *7.  As

21   described above, that is exactly what Dr. Maness has done here.  Similarly, in *Sophos*, the court was

22   "convinced" that the expert did not rely exclusively on the *Secure Computing* rates as her calculation

23   considered many different factors.  2016 WL 4268659, at *5.  Here, Dr. Maness similarly analyzes

24   the particular circumstances surrounding the previous licenses and other relevant factors.

25          PAN's reliance on the exclusion of plaintiff's expert in *Blue Coat* is inapposite.  There,

26   plaintiff's expert had concluded that the appropriate reasonable royalty was $8-per-user.  While the

27   Federal Circuit criticized that $8 per user rate, those criticisms ████████████████████

28   ██████████████████████████. Moreover, as discussed above, Dr. Maness supports his

1    opinions with specific analyses of Finjan's licenses and the *Georgia-Pacific* factors.  As a result,

2    *Blue Coat* does not support exclusion here.

3              Finally, PAN's reliance on *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir.

4    2011) to suggest that the royalty rate analysis in *Secure Computing* applied the now rejected "rule

5    of thumb" (Mot. at 23:15-16) is a misinterpretation of Federal Circuit precedent.  In *Secure*

6    *Computing*, the Federal Circuit first recognized that the expert "*considered a variety of factors* to

7    conclude that the parties in a hypothetical negotiation would have agreed upon a 'one-third/two-

8    third split' of operating profit margins."  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197,

9    1209 (Fed. Cir. 2010) (emphasis added).  The Federal Circuit went on to explain that the expert

10   "considered the custom in the industry, history of prior licenses, competitiveness of the parties, and

11   the importance of the patented technology, among other factors, in concluding that the parties would

12   have agreed that the plaintiff was entitled to 33% of the operating profit margin."  *Id*. at 1210–11.

13   The court finally pointed out that the jury awarded lower total damages than the expert

14   recommended, and thus did not "blindly adopt[]" the expert's analysis.  *Id*. at 1212.  These facts

15   from *Secure Computing* were not in question in *Uniloc*, and PAN's reliance on *Uniloc*'s dicta

16   discussion of *Secure Computing* to frame that analysis as "rule of thumb" is inapposite.  (Mot. at

17   23:15–20); *see Uniloc*, 632 F.3d at 1314.

18              **2.      Dr. Maness Has Analyzed Finjan's Past License Agreements and Shows**
                          **They Are Technologically and Economically Comparable**
19

20              Dr. Maness analyzes whether each of Finjan's license agreements is technologically and

21   economically comparable, and "account[s] for differences in the technologies and economic

22   circumstances of the contracting parties," as required by Federal Circuit precedent.  *See VirnetX*,

23   767 F.3d at 1330; (*see, e.g.*, Mot., Ex. 6 (Maness Rpt.) ¶¶ 63, 68, 70, 73, 76, 78, 81, 84-85, 88, 91,

24   94, 96, 97, 100, 102, 105, 107, 109, 112-13, 115-16, 120, 123, 126, 129, 131, 133, 136, 137.)  PAN's

25   criticism of Dr. Maness's conclusion that most of these licenses are technologically and

26   economically comparable goes to the weight of Dr. Maness's opinion, not its admissibility.  *See*

27   *Sophos*, 2016 WL 4268659, at *5.  PAN's criticism is also undermined by its own damages expert's

28

1    reliance on these same licenses as technologically and economically comparable in his analysis.

2    (*See e.g.*, Dkt. No. 320-4 (Dell Rpt.) ¶ 284.)

3           The Federal Circuit "has recognized that licenses may be presented to the jury to help the

4    jury decide an appropriate royalty award." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227

5    (Fed. Cir. 2014). "Prior licenses, however, are almost never perfectly analogous to the infringement

6    action" because they may cover, for example, "more patents than are at issue in the action." *Id.*

7    Thus, "[t]estimony relying on licenses must account for such distinguishing facts when invoking

8    them to value the patented invention." *Id.* However, "[t]he degree of comparability of the [prior]

9    license agreements as well as any failure on the part of [the] expert to control for certain variables

10   are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo*

11   *Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

12          Dr. Maness evaluates the licenses' technological comparability, and points out that the

13   licenses cover the same technology and frequently the same patents as those at issue in this case.

14   For example, ███████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████

17   ██████████████████████████████████████████████████████████████.

18   (Mot., Ex. 6 (Maness Rpt.) ¶ 68.) ██████████████████████████████████

19   ███████████████████████████████████████████████████████████████

20   ████████████████████████████ Dr. Maness thus finds these licenses are technologically

21   comparable to the hypothetical negotiation. (Mot., Ex. 6 (Maness Rpt.) ¶¶ 73, 76, 78, 81, 84, 88,

22   91, 94, 96, 97, 100, 102, 112-13, 115-16, 120, 123, 126, 129, 131, 133, 136.)

23          Dr. Maness, unlike the expert in *Blue Coat*, does not limit his analysis "to the fact that the

24   infringing products in *Secure Computing* were also in the computer security field," and that the

25   parties in the licenses were PAN's competitors. *Blue Coat*, 879 F.3d at 1312. ██████████████

26   ██████████████████████████████████████████████████████

27   ████████████████████████. Dr. Maness's analysis is much more specific than the

28

1    "surface similarity" rejected by the Federal Circuit, and is sufficient as the basis for a reasonable

2    royalty calculation. *See id.*

3              Further, Dr. Maness details the analysis that led to the conclusion the licenses he relies upon

4    are economically comparable. (*See, e.g.*, Dkt. No. 320-4 (Dell Rpt.) ¶ 284.)  Dr. Maness considers

5    the difference between a portfolio license and a license for only the asserted patents, and concludes

6    that the resulting royalty rate would have been unaffected by the number of patents that were subject

7    to the negotiation. (Mot., Ex. 6 (Maness Rpt.) ¶ 59; *see also id.* ¶¶ 73, 76, 78, 81, 84, 88, 91, 94,

8    96, 97, 100, 102, 112-13, 115-16, 120, 123, 126, 129, 131, 133, 136.)  To the extent PAN argues

9    that Dr. Maness has not done a complete economic comparability analysis because many of the

10   license agreements he relies upon included patents in addition to those at issue here, that argument

11   has already been considered and rejected by a court in this district.  In *Sophos*, the court declined to

12   exclude the opinion of plaintiff's expert on this point, stating that "[w]hile it may be the case that a

13   patent portfolio and an individual patent would have different royalty rates, it is not logically or

14   legally impossible for them to be similar or the same." *Sophos*, No. 14-cv-01197-WHO, 2016 WL

15   4268659, at *5.

16             PAN's cases are, once again, distinguishable.  In *Zimmer Surgical, Inc. v. Stryker Corp.*, the

17   expert's opinion was excluded because he "engage[d] in no analysis of the underlying litigation and

18   how it may have affected the royalty rate," and failed to "address the effect of the fixed payments

19   in addition to the royalty rate, the effect of multiple patents being included in the license, or the fact

20   that this license was one of a series of licenses."  365 F. Supp. 3d 466, 496 (D. Del. 2019).  In

21   *DataQuill Ltd. v. High Tech Comput. Corp.*, the plaintiff's expert "only stated that the 'significant

22   patent agreements' and the license at issue in this case cover similar technology" while the defendant

23   showed that one of the "significant patent agreements" appeared to be "radically different" because

24   it covered "a broad range of inventions" and hundreds of patents.  887 F. Supp. 2d 999, 1023–24

25   (S.D. Cal. 2011).  Here, as discussed above, Finjan's previous licenses are not "radically different"

26   from the license that would result from the hypothetical negotiation because they cover the same

27   technology, the same subject matter, and often the same patents.  Moreover, Dr. Maness analyzes

28   the licenses and their relevance to the hypothetical negotiation by delineating the similarities and

differences between those licenses and the hypothetical negotiation.  (Mot., Ex. 6 (Maness Rpt.) ¶¶ 67–69, 74–76, 78–80, 85, 102, 105, 116, 118–20, 135–136.)  PAN fails to articulate any specific difference Dr. Maness does not address. (Mot. at 24:28–25:11.)  As the court in *DataQuill* required, Dr. Maness presents "evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement[s]," and the Court should allow his opinion.  *DataQuill*, 887 F.Supp.2d at 1023–24.

## V.    CONCLUSION

PAN's challenges against Finjan's experts are legally unsupported, factually unsupported, go to the weight of the testimony, or all three. Based on the foregoing, Finjan requests the Court deny PAN's Motion to Exclude Testimony of Drs. Keromytis and Maness.

Dated:  October 2, 2024                    Respectfully Submitted,

                                            */s/ Tyler R. Train*
                                            Juanita R. Brooks (CA SBN 75934)
                                            brooks@fr.com
                                            Roger A. Denning (CA SBN 228998)
                                            denning@fr.com
                                            Frank J. Albert (CA SBN 247741)
                                            albert@fr.com
                                            Jared A. Smith (CA SBN 306576)
                                            jasmith@fr.com
                                            Tyler R. Train (CA SBN 318998)
                                            train@fr.com
                                            Elliot N. Scher (CA SBN 343705)
                                            scher@fr.com
                                            FISH & RICHARDSON P.C.
                                            12860 El Camino Real, Suite 400
                                            San Diego, CA 92130
                                            Telephone: (858) 678-5070 / Fax: (858) 678-5099

                                            Aamir Kazi (*Pro Hac Vice*)
                                            kazi@fr.com
                                            Lawrence Jarvis (*Pro Hac Vice*)
                                            jarvis@fr.com
                                            FISH & RICHARDSON P.C.
                                            1180 Peachtree Street NE, 21st floor
                                            Atlanta, GA  30309
                                            Telephone: (404) 892-5005 / Fax: (404) 892-5002

Susan E. Morrison (*Pro Hac Vice*)
morrison@fr.com
FISH & RICHARDSON P.C.
222 Delaware Ave., 17th Floor
P.O. Box 1114
Wilmington, DE  19801
Telephone: (302) 652-5070 / Fax: (302) 652-0607

*Attorneys for Plaintiff FINJAN LLC*