Juanita R. Brooks (CA SBN 75934) / brooks@fr.com
Roger A. Denning (CA SBN 228998) / denning@fr.com
Frank J. Albert (CA SBN 247741) / albert@fr.com
Jared A. Smith (CA SBN 306576) / jasmith@fr.com
Tyler R. Train (CA SBN 318998) / train@fr.com
Elliot N. Scher (CA SBN 343705) / scher@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Telephone: (858) 678-5070 / Fax: (858) 678-5099

Susan E. Morrison (*Pro Hac Vice*) / morrison@fr.com
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
P.O. Box 1114
Wilmington, DE 19801
Telephone: (302) 652-5070 / Fax: (302) 652-0607
Additional counsel listed on signature page

Attorneys for Plaintiff,
FINJAN LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| FINJAN LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>PALO ALTO NETWORKS, INC.,<br><br>        Defendant. | Case No. 3:14-cv-04908-RS<br><br>**FINJAN LLC'S OPPOSITION TO PALO ALTO NETWORKS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   November 14, 2024<br>Time:  1:30  P.M.<br>Hon. Richard Seeborg<br>Ctrm. 3, 17th Floor<br><br>**REDACTED** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED ..................... 1

II.    ARGUMENT ............................................................................................... 1

    A.    A Genuine Dispute of Material Fact Exists as to Whether PAN's
Accused Products Infringe the Asserted Claims of the '408 Patent ................... 1

        1.    Fact Disputes Exist Regarding Whether NGFW and
WildFire "Instantiate a Scanner for the Specific
Programming Language" ................................................................ 2

        2.    The Accused Products Determine a Programming
Language Before Instantiating a Scanner for the Specific
Programming Language ................................................................ 6

            i.    PAN's Arguments re "Instantiating" a Scanner
Before Determining a Programming Language
Should Be Rejected as Untimely and Waived ........................... 10

        3.    WildFire Determines Programming Languages ..................................... 11

    B.    A Genuine Dispute of Material Fact Exists as to Whether PAN's
Accused Products Infringe Claim 14 of the '633 Patent ..................................... 12

        1.    PAN Misinterprets the Court's Ruling on the
Construction of "Downloadable-Information Destination"
and Meaning of "User Device" .................................................. 13

        2.    A Genuine Dispute of Material Fact Exists as to Whether
PAN's WildFire Is a "Downloadable-Information
Destination" Under the Court's Construction ......................................... 16

    C.    A Genuine Dispute of Material Fact Exists as to Whether PAN's
Accused Products Infringe the Asserted Claims of the '731 Patent ................... 18

        1.    Fact Disputes Exists Regarding Whether the Accused
Products Temporarily Store Scan Results ............................................... 19

            i.    The Evidence Shows WildFire Stores Scan
Results Temporarily ................................................................ 19

            ii.   PAN's Remaining Arguments Regarding
"Temporary" Storage Highlight the Material
Dispute of Fact ................................................................ 21

        2.    Factual Disputes Exist as to Whether AV Signatures
Satisfy the Claims ................................................................ 24

        3.    Dr. Jakobsson's DOE Opinions Preclude Summary
Judgment ................................................................ 24

D.     Pre-Suit Willful Infringement ................................................................................. 25

III.    CONCLUSION ........................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*AFG Industries, Inc. v. Cardinal IG Co.*,
375 F.3d 1367 (Fed. Cir. 2004)............................................................................ 19

5

6

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................ 10

7

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
No. 12-CV-00630-LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014).................... 11

8

9

*Avendano-Ruiz v. City of Sebastopol*,
No. 15-CV-03371-RS, 2016 WL 3017534 (N.D. Cal. May 26, 2016)................... 20

10

11

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004)............................................................................... 6

12

*Cal. Sportfishing Prot. All. v. Pac. States Indus., Inc.*,
No. 15-CV-1482, 2015 WL 5569073 (N.D. Cal. Sept. 22, 2015) ......................... 20

13

14

*Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
482 F.3d 1347 (Fed. Cir. 2007)............................................................................ 11

15

16

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000)............................................................................. 20

17

*Dynetix Design Sols. Inc. v. Synopsys Inc.*,
No. 11-CV-05973-PSG, 2013 WL 1345718 (N.D. Cal. Apr. 2, 2013)................... 23

18

19

*Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*,
99 Fed. Appx. 911 (Fed. Cir. 2004) ..................................................................... 5

20

21

*Engel Indus. v. Lockformer Co.*,
96 F.3d 1398 (Fed. Cir. 1996)............................................................................. 25

22

*Finjan, Inc. v. Cisco Sys., Inc.*,
No. 17-CV-00072-BLF, 2018 WL 3537142 (N.D. Cal. July 23, 2018) .................. 14, 15, 18

23

24

*Fujifilm Corp. v. Motorola Mobility LLC*,
No. 12-CV-03587-WHO, 2015 WL 757575 (N.D. Cal. Feb. 20, 2015)................. 11

25

26

*Kolker v. VNUS Med. Techs.*,
No. 10-CV-00900-SBA, 2012 WL 161266 (N.D. Cal. Jan. 17, 2012)................... 20

27

*Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*,
370 F.3d 1354 (Fed. Cir. 2004)............................................................................. 6

28

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
    527 F.3d 1330 (Fed. Cir. 2008) ................................................................................. 10

*Nalco Co. v. Turner Designs, Inc.*,
    73 F. Supp. 3d 1096 (N.D. Cal. 2014) ...................................................................... 21

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    438 F. Supp. 3d 1031 (N.D. Cal. 2020) .................................................................... 23

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
    469 F.3d 978 (Fed. Cir. 2006) ........................................................................... 12, 25

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................................................................. 6

*Powell v. Home Depot U.S.A., Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011) ................................................................................. 8

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004) ................................................................................. 1

*SRI Int'l v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) (en banc) ................................................................. 1

*Taction Techs., Inc. v. Apple Inc.*,
    No. 21-CV-812-TWR-JLB, 2023 WL 5184977 (S.D. Cal. Aug. 11, 2023) ......................... 11

*Tevra Brands LLC v. Bayer HealthCare LLC*,
    No. 19-cv-04312-BLF, 2024 WL 1909156 (N.D. Cal. May 1, 2024) ............................... 5, 12

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ................................................................................. 5

*U.S. Water Services, Inc. v. Novozymes A/S*,
    843 F.3d 1345 (Fed. Cir. 2016) ........................................................................... 18, 21

**Other Authorities**

Fed. R. Civ. P. 56(a) ..................................................................................................... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED

PAN raises numerous contested factual disputes as part of its omnibus Motion for Summary Judgment ("Motion"). For the '408 Patent, whether the accused products instantiate programming language specific scanners, whether the accused products instantiate programming language specific scanners after determining the programming language of incoming content, and whether WildFire determines the programming language of content. For the '633 Patent, whether WildFire is a user device. For the '731 Patent, whether the accused products store scan results temporarily, whether temporarily storing scan results in a database satisfies the claims, whether AV signatures contain a list of computer commands, and whether DOE opinions preclude summary judgment.

But to prevail, a movant must show that "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) "[T]he district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor . . . ." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985) (en banc). Here, PAN's Motion requires the court to resolve genuine factual disputes about how multiple limitations of the asserted claims of all three asserted patents apply to two different accused products. The Court should thus deny PAN's Motion.

### II.   ARGUMENT[1]

#### A.   A Genuine Dispute of Material Fact Exists as to Whether PAN's Accused Products Infringe the Asserted Claims of the '408 Patent

Each of PAN's arguments for summary judgment suffers from the same flaw: they ask the court to resolve the factual issue of whether a skilled artisan would conclude that the accused products meet the contested claim limitations, as construed by the Court. But that is a classic fact question for the jury. The "determination as to whether the claims, properly construed, read on the accused device is a question of fact," *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004). This is especially true where, as here, these factual questions are fiercely

---

[1] Because PAN moves for summary judgment on at least four distinct issues across three asserted patents, Finjan does not provide a single statement of the relevant facts; rather, it identifies and discusses the relevant facts for each issue in the issue-specific argument subsection below.

disputed and, in some instances, PAN's expert does not rebut the opinions of Finjan's expert.

### 1. Fact Disputes Exist Regarding Whether NGFW and WildFire "Instantiate a Scanner for the Specific Programming Language"

PAN's Motion fails to establish that the accused products do not practice the limitation "instantiating, by the computer, a scanner for the specific programming language." The record evidence demonstrates PAN's products do perform such an instantiation.

For NGFW, Dr. Min opined that "PAN's NGFW includes a scanner (e.g., ████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████) that is used as part of PAN's single pass architecture to satisfy this limitation." Ex. A (Min Op. Rpt.) ¶ 353. Dr. Min then corroborated this opinion with a thorough analysis of evidence, including source code, technical documents, and deposition testimony. *See, e.g.*, *id.* ¶¶ 385-392 (discussing NGFW source code showing programming language specific scanners); ¶¶ 353-383 (discussing NGFW technical documents supporting his opinions that NGFWs have programming language specific scanners). As just one example, Dr. Min cites source code demonstrating NGFW instantiates a scanner for the specific programming language that was previously determined. In this example, NGFW instantiates a scanner specific to HTML and other scanners specific to other programming languages, such as PowerShell, JavaScript and Visual Basic:



Ex. A (Min Op. Rpt.) ¶ 387 (emphasis added); *see also id.* ¶¶ 389-411 (discussing additional source code showing programming language specific scanners); ¶¶ 353-383 (discussing NGFW technical documents supporting his opinions). Each of these programming languages that PAN's NGFW instantiates specific scanners (*e.g.*, ████████████████ ████████████████ ████████████████) for are also programming languages explicitly identified in the '408 Patent.

Dr. Min similarly explains how WildFire instantiates a scanner for a specific programming language that was previously determined.



Ex. A (Min Op. Rpt.) ¶ 424.

Dr. Min likewise cites source code from WildFire that includes programming language specific scanning:



*Id.* ¶ 426.



*Id.* ¶ 427; *see also id.* ¶ 425 (identifying language specific scanners, such as ▮▮▮▮▮▮▮▮▮); ¶¶ 412-422 (discussing Wildfire technical documents evidencing infringement); ¶¶ 429-452 (discussing relevant WildFire source code with language specific scanners): *see also* Ex. B (Min Dep. Tr. Vol. II) at 523:8-18. None of the testimony PAN cites is inconsistent with these opinions.

PAN's Motion does not mention its source code that shows PAN's accused products have programming language specific scanners—much less explain why summary judgment of noninfringement is appropriate despite it or the other evidence cited throughout Dr. Min's report. Instead, PAN tries to create its own "evidence" of noninfringement. PAN's arguments are wrong and legally irrelevant.

First, PAN's "evidence" hardly demonstrates the lack of a dispute of material fact and instead shows a disagreement between experts. PAN cites two exhibits PAN's counsel asked Dr. Min to make during his deposition. Neither was intended to illustrate the type of detail needed to evaluate whether PAN's product satisfies this limitation. Rather, PAN's counsel selected high-

level documents as a starting point and asked Dr. Min to annotate the documents to identify the accused "scanner." The high-level diagrams did not illustrate all necessary details (such as the sub-components/modules Dr. Min identifies as the "scanner"), so Dr. Min annotated as best he could. But he never opined that the diagrams illustrated all components of the scanner.

Starting with NGFW, PAN cites Exhibit 38 from Dr. Min's deposition, which is a document with an incomplete illustration of the ███████, which PAN asked Dr. Min to annotate at his deposition. As explained by Dr. Min at his deposition, Exhibit 38 is not the same document he cited in his report to describe the infringing scanners. Ex. B (Min Dep. Tr. Vol. II) at 489:2-490:18. The figure from Exhibit 38 Dr. Min was asked about was cited in his report to provide a high-level depiction of other aspects of the ███████ performing the steps of the decoding, scanning, and threat detection. Ex. A (Min Op. Rpt.) ¶377. Dr. Min did not cite this figure to identify scanners in NGFW. Instead, he cited a different document describing the components (*e.g.*, ███████ ███████) of the ███████. *See, e.g.*, *id.* ¶ 364. When asked to identify a scanner in Exhibit 38 anyway, Dr. Min identified relevant components of the scanner depicted in the diagram and added by hand additional features (*e.g.*, APP-ID) not illustrated in the document. Ex. B (Min Dep. Tr. Vol. II) at 493:21-494:21. Dr. Min did not identify this markup of a high level diagram as a substitute for the more detailed opinions he provided in his report regarding the accused scanner. Ex. B (Min Dep. Tr. Vol. II) at 492:2-11 (testifying that the diagram only depicted part of the claimed scanner); *see also* Ex. A (Min Op. Rpt.) ¶¶ 347-383. PAN now cites Exhibit 38 as evidence that there is only a single scanner, when all it demonstrates is Dr. Min's best attempt to identify from among the high level key ███ components those comprising a scanner.

PAN's "evidence" in support of its argument for Wildfire fares no better. There, PAN cites a "workflow" document, which does not in fact illustrate components of Wildfire. When asked to annotate it, Dr. Min noted it did not illustrate all relevant functionality, such as ███████. Ex. B (Min Dep. Tr. Vol. II) at 518:2-4. And when asked to explain the diagram, Dr. Min confirmed that, consistent with his source code analysis, the items annotated in the workflow illustrated multiple scanners:

Ex. B (Min Dep. Tr. Vol. II) at 523:8-18 (testifying that WildFire has multiple scanners).

Even if PAN's "evidence" is to be credited (it should not), "[t]his is a classic example of dueling expert testimony that precludes summary judgment." *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-cv-04312-BLF, 2024 WL 1909156, at *10 (N.D. Cal. May 1, 2024). The jury, not the Court, should weigh the credibility of the experts and decide the winner of this "battle of experts." *See Edwards Sys. Tech., Inc. v. Digital Control Sys., Inc.*, 99 Fed. Appx. 911, 921–22 (Fed. Cir. 2004) (unpublished) ("[T]here seems to be a classic 'battle of the experts' which renders summary judgment improper."). Thus, granting summary judgment would be improper.

Second, even if there were no fact disputes on whether the accused products include a single scanner—which there are given the unrebutted testimony and analysis of Dr. Min—PAN's products would still infringe. The plain language of the claim, in the context of the specification, does not prohibit a single scanner from scanning multiple programming languages. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

In fact, the '408 Patent's specification explicitly discloses embodiments with a single scanner (*i.e.*, an adaptive rule-based scanner) that is capable of scanning all types of programming languages by instantiating different modules to handle each programming language:

> ***An ARB scanner is able to adapt itself dynamically to scan a specific type of content***, such as inter alia JavaScript, VBScript, URI, URL and HTML. ARB scanners differ from **prior art scanners that are hard-coded for one particular type of content**. In distinction, ***ARB scanners are data-driven, and can be enabled to scan any specific type of content by providing appropriate rule files***, without the need to modify source code.

Dkt. 112-6 ('408 Patent) at 1:66–2:6 (emphasis added).

> Reference is now made to FIG. 2, which is a simplified block diagram of an adaptive rule-based content scanner system 200, in accordance with a preferred embodiment of the present invention. ***An ARB scanner system is preferably designed as a generic architecture that is language-independent, and is customized for a specific language through use of a set of language-specific rules***. Thus, ***a scanner system***

***is customized for JavaScript by means of a set of JavaScript rules, and is
customized for HTML by means of a set of HTML rules.*** In this way, each set of
rules acts as an adaptor, to adapt the scanner system to a specific language.

*Id.* at 6:14–24 (emphasis added); *see also id.* at 15:31-32 ("ARB scanner factory
module 630 instantiates a scanner repository 640."); Figs. 6-7 (depicting an ARB scanner with
modules for scanning HTML, Javascript, and URI). As such, PAN's interpretation contradicts the
specification. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (explaining that
"claims must be read in view of the specification"); *Metabolite Labs., Inc. v. Lab. Corp. of Am.
Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the
proper context of claim terms is the patent specification wherein the patent applicant describes the
invention."); *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004)
(explaining that "a construction that excludes a preferred embodiment is rarely, if ever, correct.")
(internal quotations omitted).

### 2. The Accused Products Determine a Programming Language Before Instantiating a Scanner for the Specific Programming Language

PAN incorrectly asserts "the experts agree NGFW does not determine a programming
language *before* instantiating any 'scanner.'" Mot. at 10; *see also id.* at 12-13 (making the same
noninfringement argument for WildFire). In fact, Dr. Min offered detailed analysis explaining how
the accused products determine a programming language *before* instantiating a programming
language specific scanner, which PAN does not address.  PAN alleges there is no dispute of material
fact but fails to address the actual evidence (such as the source code analysis) relied upon by
Dr. Min.

Specifically, Dr. Min cites source code demonstrating PAN's NGFW determines a
programming language (source code identified in red) and instantiate a scanner "afterwards" (source
code identified in blue).



Ex. A (Min Op. Rpt.) ¶ 387; *see also id.* ¶ 385 (providing additional opinions regarding source code showing instantiating a scanner in response to determining a programming language) ¶¶ 353-383 (evidencing this operation through NGFW technical documents).

Dr. Min similarly identified WildFire source code demonstrating the determining of a programming language and instantiating of a scanner, and confirmed it works the same as NGFW:

*Id.* ¶ 426.

*Id.* ¶ 427; *see also id.* ¶¶ 424-425 (discussing WildFire source code with language specific scanners that are instantiated in response to determining the programming language); 429-452 (discussing relevant WildFire source code showing instantiating language specific scanners based on the determined programming language); ¶¶ 412-422 (discussing Wildfire technical documents); Ex. B (Min Dep. Tr. Vol. II) at 595:2-24 (confirming that WildFire operates similar to NGFW).

Thus, Dr. Min identifies different sub-components of the ▮▮▮▮▮▮ as satisfying the "determining" and "instantiating" claim limitations (*e.g.*, the ▮▮▮▮▮▮▮▮▮▮

1   ███████ for NGFW and █████████████████████████████████ and

2   ██████████ ████████

3      Importantly, PAN's expert, Dr. Rubin, does not dispute Dr. Min's opinion that the

4   determination of the programming language occurs before instantiating a language specific scanner.

5   PAN cites paragraphs 486, 502, 504, 505, 508 of Dr. Rubin's report to support its attorney argument

6   that the accused products do not determine any programming language before instantiating the

7   claimed scanner. Mot. 10. Dr. Rubin does not opine in any of these paragraphs that it is the timing

8   aspect of the claim limitation that precludes a finding of infringement. *See* Ex. C (Rubin Reb. Rpt.)

9   ¶ 486 (opining that the determining limitation is not satisfied without mentioning any timing issues

10  or instantiation by the scanner), ¶ 502 (opining that the instantiating limitation is not satisfied

11  without mentioning any timing issues or instantiating occurring before the programming language

12  is determined), ¶504 (opining that there is a single scanner but no mention of timing issues with

13  instantiating the scanner), ¶ 505 (opining that there is a single scanner but no mention of timing

14  issues with instantiating the scanner), ¶ 508 (opining that there is a single scanner but no mention

15  of timing issues with instantiating the scanner). Indeed, Dr. Rubin provided opinions that the

16  accused products do not contain multiple "scanners" for the determined specific programming

17  language ¶¶ 503-511, 518-522, and that they do not contain "parser rules" or "analyzer rules,"

18  ¶¶ 512-516, 523-527, but Dr. Rubin provided no opinion that PAN's products do not infringe

19  because they do not determine a programming language "before" instantiating a scanner.

20     Instead, PAN argues "NGFW does not determine any programming language *before*

21  instantiating a scanner because Dr. Min admits that the components that he believes determine the

22  programming language are *part of the alleged scanner.*" Mot. at 9. But this is an oversimplification

23  of Dr. Min's analysis, because Dr. Min opined and cited evidence (*i.e.*, PAN's documents and source

24  code) showing programming language specific scanners found in NGFW and WildFire that are

25  instantiated in response to determining the programming language of the incoming content as

26  discussed previously.[2] Even if PAN were correct, one component can perform multiple limitations

27  of a claim. *See, e.g.*, *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011)

28

---

[2] PAN makes the same argument for WildFire.

("[T]he specification teaches that the cutting box may also function as a 'dust collection structure' to collect sawdust and wood chips generated during the wood cutting process. It does not suggest that the claim terms require separate structures."). Nothing precludes the claimed "scanner" from both determining a programming language and subsequently instantiating or enabling a sub-component of the claimed "scanner" in response to that determination. As discussed before, the specification expressly discloses embodiments where a scanner "adapts itself dynamically" based on the programming language of the received content through the use of rule files within the scanner—*i.e.*, it determines a programming language and subsequently instantiates a scanner:

> ***An ARB scanner is able to adapt itself dynamically to scan a specific type of content***, such as inter alia JavaScript, VBScript, URI, URL and HTML. . . . ARB scanners are data-driven, and can be enabled to scan any specific type of content by providing appropriate rule files, without the need to modify source code.

Dkt. 112-6 ('408 Patent) at 1:66-2:6 (emphasis added).

> ***An ARB scanner system is preferably designed as a generic architecture that is language-independent, and is customized for a specific language through use of a set of language-specific rules***. Thus, a scanner system is customized for JavaScript by means of a set of JavaScript rules, and is customized for HTML by means of a set of HTML rules. ***In this way, each set of rules acts as an adaptor, to adapt the scanner system to a specific language***.

*Id.* at 6:14-24 (emphasis added); *see also id.* at 15:31-32 ("ARB scanner factory module 630 instantiates a scanner repository 640."); *see also id.* at Figs. 6-7 (depicting an ARB scanner with sub-modules for scanning HTML, javascript, and URI content, respectively).

   As such, the specification explicitly contemplates a single scanner capable of first determining the programming language of received content and adapting itself to scan the specific programming language, ██████████████████████████████████████████████████████████
████████. *See, e.g.*, Ex. A (Min Op. Rpt.) ¶¶ 385-390 (discussing NGFW source code showing language specific scanners that are instantiated after the programming language of the incoming content has been determined); ¶¶ 293-299 (discussing source code showing how the NGFWs determine a programming language in the incoming content using different modules/functions), ¶¶ 424-433 (discussing WildFire source code showing language specific scanners that are instantiated after the programming language of the incoming content has been determined); ¶¶ 306-309, 311-

340 (discussing WildFire source code showing how each version of WildFire determines a programming language at different lines in the code). And unlike PAN's argument, Dr. Min's analysis is consistent with the specification, which explains that a scanner can have various sub-modules to determine a programming language and instantiate programming language specific scanners as explained above. Thus, PAN's argument should be rejected.

Notwithstanding the above, it is an axiom of patent law that conflicting expert opinions create a genuine issue of material fact that precludes summary judgment. *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1339 (Fed. Cir. 2008) ("The conflict in declarations created a genuine issue of material fact that made summary judgment inappropriate."). However here, PAN presents no evidence in response to Dr. Min's **unrebutted** expert testimony. As Finjan is the non-moving party, and the only side to present expert testimony on this issue, the Court cannot grant summary judgment as PAN cannot meet its burden. In the alternative, even if the Court accepts PAN's attorney argument as constituting evidence—which it is not—surely, then, a genuine issue of material fact exists where patentee's expert opines that a limitation is met in a certain manner, and the accused infringer's expert is silent and relies only on attorney argument. To resolve the issue against Finjan where there is, at the very least, a fact issue, would deprive the jury of its core functions, credibility determinations and the weighing of the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

i.      **PAN's Arguments re "Instantiating" a Scanner Before Determining a Programming Language Should Be Rejected as Untimely and Waived**

PAN's Motion presents the Court with undisclosed claim construction and non-infringement positions (*i.e.*, the proper meaning of "instantiating" a scanner and that the claims are not satisfied because the programming language is not determined before the language specific scanner is instantiated), raised for the first time now during summary judgment, which effectively seek an eleventh-hour claim construction on the eve of trial. PAN's belated attempt at construing terms that were not selected by the parties for construction during the claim construction process runs afoul of both the local patent rules and established case law in this district. PAN therefore "waived any argument with respect to [the disputed] term[s] by failing to raise it during the claim construction

phase." *Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007); *see also Taction Techs., Inc. v. Apple Inc.*, No. 21-CV-812-TWR-JLB, 2023 WL 5184977, at *11 (S.D. Cal. Aug. 11, 2023) ("Sound practical reasons counsel against construing terms based on claim construction argument raised for the first time in summary judgment briefs or expert reports."). Thus, the Court should reject PAN's new arguments.

Indeed, courts in this district have routinely held that a district court is under no obligation to hear and rule on claim construction arguments presented for the first time in summary judgment briefs. *See, e.g.*, *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014); *Asetek*, 2022 WL 21306656, at *11; *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587-WHO, 2015 WL 757575, at *6 (N.D. Cal. Feb. 20, 2015). The "Federal Circuit has held that it can be error to engage in hypertechnical refinements of the meaning of claims following claim construction to support a grant of summary judgment." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *4 (N.D. Cal. Jan. 21, 2014) (citing *AFG Industries, Inc. v. Cardinal IG Co.*, 375 F.3d 1367 (Fed. Cir. 2004)). Consequentially, the Court's consideration of PAN's belated attempt at claim construction would be "at the risk of taking factual issues away from the jury." *Apple*, 2014 WL 252045, at *4. Thus, PAN's arguments should be rejected.

To the extent the Court is inclined to consider PAN's belated claim construction argument, it should do so only as "part of the infringement analysis." *Id.* at *4–5. At most, courts at this stage should simply determine whether a jury, "free to rely on the plain and ordinary meaning of the term," may conclude that the accused devices infringe. *Id.* at *5 (citing *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012)). A reasonable juror could conclude that the accused devices infringe based on the plain and ordinary meaning of the at issue limitation/term, thus, summary judgment should be denied. *See supra* Section II.A.2.

### 3.   WildFire Determines Programming Languages

PAN's Motion is premised on the false claim that Dr. Min testified WildFire does not determine a programming language and only determines ▮▮▮▮. Dr. Min never offered such testimony. Rather, he testified that WildFire, using the same process as NGFW (which PAN is not

challenging on this limitation) identifies the embedded programming language and using ▮▮▮▮▮ ▮▮▮▮▮▮▮ the process to determine the programming language. Ex. B (Min Dep. Tr. Vol. II) at 595:6-24. This testimony is consistent with his analysis, which shows WildFire determines the programming language of an incoming stream (the example below shows how WildFire determines that Java is the programming language):



Ex. A (Min Op. Rpt.) ¶ 310; *see also id.* ¶¶ 306-309, 311-340 (discussing how each version of WildFire determines a programming language); ¶¶ 301-305 (discussing WildFire documentation).

As Dr. Min's analysis in his report and testimony demonstrate, determining ▮▮▮▮▮ is only a portion of the process for determining the programming language. While PAN's expert disagrees with Dr. Min's opinions that using ▮▮▮▮ as part of the process to determine a programming language (*e.g.*, javascript, java, PDF, etc.) in WildFire satisfies the claim limitation, that is a question of fact for the jury to decide. *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 985 (Fed. Cir. 2006) ("Infringement, whether literal or under the doctrine of equivalents, is a question of fact."); *see also Tevra*, 2024 WL 1909156, at *10. Thus, PAN's argument should be rejected.

**B.** **A Genuine Dispute of Material Fact Exists as to Whether PAN's Accused Products Infringe Claim 14 of the '633 Patent**

PAN previously acknowledged that what constitutes a "user device" in the accused products is a question that would be decided based on expert testimony—*i.e.*, a factual inquiry and *not* a legal one. During the *Markman* hearing, Finjan expressed concern about adding "user device" to the construction of "downloadable-information destination." Finjan explained this addition could confuse the jury, as it might cause them to rely on their own lay understanding of "user device," limiting it to common end-user devices like cell phones, laptops, and tablets:

> MR. SMITH: So I'm going to start by pointing out something that was said
> somewhat in passing but I think is very telling to what Finjan thinks is the juror

confusion point that we wanted to point to here.

> Counsel said ***end user device***, ***implying a – or what a layperson, a juror might interpret to be a phone, a laptop, an iPad, and that's what their understanding of user device is***. So that's not what is claimed in claim 14.

Dkt. 289 (*Markman* Hr'g Tr.) at 41:25-42:7 (emphasis added); *see also id*. at 37:9-13 (MR. MOONEY: The difference, Your Honor, is the device on which this process resides. And as Judge Freeman found, the specification is clear that it resides on a user device . . . . An ***end user device***.") (emphasis added). PAN downplayed this concern, arguing that juror confusion was unlikely and assured the Court that any ambiguity over the meaning of "user device" would be clarified by expert testimony at trial:

> MR. MOONEY:  . . . On the jury confusion point, we don't believe there will be any confusion over user device. We don't believe that jurors are going to believe that iPhones are the only user devices. ***But of course there will be technical experts that are going to testify to assist the jury in that regard***.

*Id*. at 45:20-24 (emphasis added). Thus, rather than address the legal bounds of the term "user device," PAN argues that question was appropriate for experts—meaning it was factual in nature.

After convincing the Court to include "user device" in the claim construction under the pretense that expert testimony would clarify the term, PAN now seeks summary judgment of noninfringement based solely on the parties' competing expert opinions concerning "user device." Mot. at 14-17. PAN has no excuse, as expert discovery—including expert reports and depositions—was completed in March 2023, more than 14 months before the *Markman* hearing. PAN was fully aware of Dr. Keromytis's infringement opinions regarding "user device" when it assured the Court that expert testimony would address any potential confusion.

The Court should deny PAN's Motion as to the '633 Patent for this reason alone. But even on the merits, PAN has not demonstrated the absence of disputed facts.

### 1. PAN Misinterprets the Court's Ruling on the Construction of "Downloadable-Information Destination" and Meaning of "User Device"

The Court's Claim Construction Order does not support PAN's assertion that the Court rejected Finjan's position or Dr. Keromytis's opinion on the scope of "user device" as used in the '633 Patent. *Compare* Mot. at 14 *with* Dkt. 290 at 10-11. As PAN admitted during the *Markman* hearing, that issue was left to the experts. Dkt. 289 (*Markman* Hr'g Tr.) ("We don't believe that

1    jurors are going to believe that iPhones are the only user devices. But of course there will be

2    technical experts that are going to testify to assist the jury in that regard.). Indeed, the Court noted

3    that while Finjan raised concerns about potential juror confusion, Finjan did not argue that including

4    "user device" created an unsupported limitation. Dkt. 290 at 11 ("Although Finjan complains

5    including a reference to 'user device' is potentially confusing, it does not contend it creates an

6    unsupported limitation or is otherwise incorrect.").

7         To the extent the Court's Order addressed this issue, however, it in fact resolved it in favor

8    of Finjan's position, not PAN's. During claim construction, PAN advanced the construction adopted

9    in *Cisco*. *Id.* at 10-11 ("PAN's construction, identical to that adopted in *Cisco*, will be utilized

10   here."). The *Cisco* court, however, found that a "user device" in the context of the '633 Patent

11   included devices such as firewalls or servers:

12         ***More importantly, the specification explicitly equates "information-destination"***
         ***with "user device,"*** and describes that a "user device" can include "one or more
13         devices or processes (such as email, browser or other clients) that are capable of
         receiving and initiating or otherwise hosting a mobile code execution." *Id.* at 7:58–
14         62. ***In addition, the specification discloses that [*"*]a "user device" can operate as***
         ***a firewall/server."*** *Id.* at 7:50. The Court thus finds that Cisco's reading of the
15         specification is too narrow.

16   *Finjan, Inc. v. Cisco Sys., Inc.*, No. 17-CV-00072-BLF, 2018 WL 3537142, at *20 (N.D. Cal.

17   July 23, 2018) (J. Freeman) (internal marks and citations omitted) (emphasis added). Cisco's

18   argument that the "downloadable-information destination" must be the "final destination of a

19   downloadable"[3]—or in other words, an 'end user device'—was found unpersuasive, as it relied on

20   only one embodiment:

21         ***Cisco contends that the "information-destination of the downloadable-***
         ***information" must be the final destination of a downloadable*** on the grounds that
22         the specification describes that an unexecutable Downloadable is sent to the client
         that originally requested the downloadable. ***The Court finds this argument***
23         ***unpersuasive.*** Even if Cisco's characterization of the specification is correct
         (which the Court does not decide), the portions cited by Cisco pertain only to one
24         embodiment disclosed in the '633 patent. On the other hand, as Finjan asserts, the
         specification contains other disclosures that support Finjan's proposal. For
25         example, the specification describes that mobile protection code can be sent to

26

27   ─────────────────────
     [3] Cisco's proposed construction for "downloadable-information destination" was "client(s) that
28   originally requested, and is the final destination for, the downloadable-information." While Finjan
     proposed adopting the *Proofpoint* construction (*i.e.*, "a device or process that is capable of receiving
     and initiating or otherwise hosting a mobile code execution."). *Cisco*, 2018 WL 3537142, at *18.

multiple destinations. *See* '633 patent at 10:11–15.

*Id.* at *20 (internal marks and citations omitted) (emphasis added). Thus, the *Cisco* court construed "downloadable-information destination" as "user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution." *Id.* Here, the Court did not take issue with any of the *Cisco* court's reasoning and adopted its construction without modification. Dkt. 290 at 10-11.

PAN's assertion (at 16) that Dr. Keromytis's understanding of "user device" in the context of the '633 Patent was "rejected by the Court" is wrong. Dr. Keromytis, relying on much of the same portion of the specification as the *Cisco* court, opines that the '633 Patent describes a "user device" as "a receiving device or process" and may operate as a "firewall" or "server":

> The term "user device" as used in the '633 Patent is quite broad. For example, the patent describes a "user device" as "***a receiving device or process***" ('633 Patent at 3:51-62), and that "***a user device [may] operat[e] as a firewall/server***" ('633 Patent at 7:47-54).

Ex. D (Keromytis Op. Rpt.) at ¶ 381, n. 87 (emphasis added); *see also* Ex. E (Keromytis Dep. Tr. Vol. 1) at 138:9-20 (opining that the patent defines "user device" as "a device or process for receiving information"). The Court did not define "user device" beyond that it must "include[] one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution" in accordance with the Court's construction of "downloadable-information destination." *See generally* Dkt. 290 at 10-11.

The Court did not address the parties' competing proposals to clarify the scope of "user device." To the extent the Court rejected Finjan's proposed clarification, it also rejected PAN's proposal that it should be limited to "a*n end* user device":

> Alternative Clarifications
>
> "[a] suitable information-destination or 'user device' can further include one or more devices or processes **(such as email, browser, or other clients)** that are capable of receiving and initiating or otherwise hosting a mobile code execution" (*'633 Patent at 7:58-61*)
>
> "a**n end** user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution"

Ex. F (PAN's *Markman* Demonstratives) at 12 (emphasis in original); *see also* Dkt. 289 (*Markman* Hr'g Tr.) at 41:19-21 ("[T]here are ways to clarify the term without reading out 'user device.' A couple of those appear on slide 12."). Presumably, the Court relied on PAN's assurance that expert testimony would resolve any potential juror confusion on this issue, as discussed earlier.

Importantly, PAN does not dispute that a "user device" in the context of the '633 Patent can be a firewall or server. *See, e.g.*, Dkt. 289 (*Markman* Hr'g Tr.) at 45:13-16 ("MR. MOONEY: . . . I heard over and over here that a user device can be a firewall, a user device can be a server. ***No dispute***.") (emphasis added).

Therefore, the Court should deny PAN's Motion, as it is based entirely on a misinterpretation of the Court's Claim Construction Order.

> **2.      A Genuine Dispute of Material Fact Exists as to Whether PAN's WildFire Is a "Downloadable-Information Destination" Under the Court's Construction**

PAN's argument (at 15-17) that Dr. Keromytis has not provided any opinion that WildFire is a "user device" consistent with the Court's construction is incorrect. Dr. Keromytis does in fact opine that WildFire is a "downloadable-information destination" under the Court's construction— *i.e.*, "user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution."

Dr. Keromytis defines the relevant accused products as WildFire Cloud Basic, WildFire Cloud Subscription, and WildFire Appliance (WF-500) (collectively, "WildFire Accused Products" or "WildFire"). Ex. D (Keromytis Op. Rpt.) at ¶¶ 94, 156-166, 169, 180. He specifically opines that WildFire infringes limitation 14[c], including the "downloadable-information destination" element:

> Claim limitation 14[c] recites "causing mobile protection code to be executed by the mobile code executor at ***a downloadable-information destination*** such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code." ***The Accused Products, including i) WildFire alone***, ii) NGFW in combination with WildFire, and iii) Traps in combination with WildFire, ***meet this claim limitation***.

*Id*. at ¶ 376 (emphasis added). Further, Dr. Keromytis opines that WildFire infringes limitation 14[c] under PAN's proposed construction for "downloadable-information destination," which the Court adopted:

> I understand the parties dispute how the Court should construe the term "downloadable-information destination." I further understand Finjan's proposed construction for this term is "a device or process that is capable of receiving and initiating or other hosting a mobile code execution." ***I further understand PAN's proposed construction for this term is "user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution."*** As I explain below, ***i) WildFire alone***, ii) NGFW in combination with WildFire, and iii) Traps in combination with WildFire each ***satisfy both parties' proposed constructions for this term***.

*Id*. at ¶ 379 (emphasis added).

Moreover, Dr. Keromytis explicitly opines that WildFire is a downloadable-information destination" because it is a "user device," as that term is used in the '633 Patent, that "includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution":

> As explained in greater detail below, ***WildFire is a downloadable-information destination because it is a device—a user device[87] or otherwise—that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution***. *See, e.g.*, PAN_FIN00000623 at 634 ("WildFire executes the suspect files it receives in a virtual environment and observes the behavior for signs of malicious activities….").

*Id*. at ¶ 381 (emphasis added); *see also* Ex. E (Keromytis Dep. Tr. Vol. 1) at 284:16-285:11 (opining that WildFire Cloud and WF-500 each meet the "downloadable-information destination" element). PAN's attempt to create ambiguity using the word "otherwise" from the above excerpt fails, as it overlooks Dr. Keromytis's clear opinion that WildFire is, at minimum, a "user device." Ex. D (Keromytis Op. Rpt.) at ¶ 381.

Additionally, contrary to PAN's claim (at 15), Dr. Keromytis expressly identifies "WildFire servers" as the "downloadable-information destination," which the Court construed to mean "a user device that includes one or more devices or processes that are capable of receiving and initiating or otherwise hosting a mobile code execution":

> [T]he Wildfire VM and the analyzers comprise a mobile code executor that causes mobile protection code to be executed at ***downloadable-information destination (Wildfire servers)*** such that one or more operations of the executable code at the destination, if attempted, will be processed by the mobile protection code.

*Id*. at ¶ 433 (emphasis added); *id*. at ¶ 444 (same).

In contrast, Dr. Rubin opines that WildFire is not a "user device." For WildFire Cloud, PAN

relies on Dr. Rubin's opinion that "*WildFire virtual machines* are implemented as a cloud-based solution, and *are not devices which provide direct user interaction, let alone being client endpoint devices*." Dkt. 306 at 16 (quoting Dkt. 306-4 (Rubin Op. Rpt.) at ¶ 718) (emphasis added). Similarly, for the WF-500, PAN relies on Dr. Rubin's opinion that "*WildFire Appliance is a private cloud appliance, which is a dedicated device separate from a user device/client device* which implements the WildFire cloud." Dkt. 306 at 16-17 (quoting Dkt. 306-4 (Rubin Op. Rpt.) at ¶ 719) (emphasis added). However, as previously discussed, the *Cisco* court expressly rejected this narrow reading, and this Court did not limit "user device" to devices that provide direct user interaction, client endpoint devices, or client devices. Dkt. 290 at 10-11.

In summary, Dr. Keromytis and Dr. Rubin provide opposing opinions on whether WildFire is a "user device." As this represents a genuine dispute of material fact, the Court should deny PAN's Motion as to the '633 Patent and allow the parties' experts to present their opinions to the jury, as PAN previously assured the Court would occur.

### C.    A Genuine Dispute of Material Fact Exists as to Whether PAN's Accused Products Infringe the Asserted Claims of the '731 Patent

PAN's argument boils down to its expert's disagreement with Finjan's expert, Dr. Markus Jakobsson, about what constitutes temporary storage and security profiles. PAN argues "security profile cache" should be construed as the Court construed "file cache" with focus on the term "cache" but PAN did not propose the term "cache" be construed despite having the opportunity to do so. PAN also ignores that the Court already rejected its contention that temporary storage must represent a particular time-period. In its Claim Construction Order, the Court agreed with Finjan's argument that "'temporarily' should not be seen as implying any particular time period," noting that "[n]othing in this construction order is to the contrary." Dkt. 290 at 6-7. Even if "security profile cache" were to be construed as PAN belatedly proposes, record evidence demonstrates that the "security profile cache" in PAN's accused products satisfies PAN's proposed construction. Moreover, PAN ignores what Dr. Jakobsson identifies as a "security profile cache" in NGFW or in WildFire, nor does PAN address Dr. Jakobsson's analysis of those accused features. As such, summary judgment is not appropriate here, as there is evidence showing satisfaction of the claim limitation under the plain meaning and PAN's proposed construction. *See U.S. Water Services, Inc.*

*v. Novozymes A/S*, 843 F.3d 1345, 1351–52 (Fed. Cir. 2016) (explaining that where "record evidence demonstrates that there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party, . . . summary judgment [is] inappropriate.") (internal quotation and citation omitted); *AFG Industries, Inc. v. Cardinal IG Co., Inc.*, 375 F.3d 1367, 1371 (Fed. Cir. 2004) ("[A] trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary.").

### 1. Fact Disputes Exists Regarding Whether the Accused Products Temporarily Store Scan Results

#### i. The Evidence Shows WildFire Stores Scan Results Temporarily

PAN's Motion must be denied because PAN's own documents demonstrate that the features in WildFire accused of infringement temporarily store scan results. Dr. Jakobsson opines that the ███████ serves as the "security profile cache" because it saves the scan results (*i.e.*, security profiles) in the ███████ temporarily:



Ex. G (Jakobsson Op. Rpt.) ¶ 825 (quoting and citing PAN_FIN00008333 at 337) (emphasis added).

PAN apparently disputes this storage is temporary, but its own documents state otherwise:



Ex. H (PAN_FIN00008333) at 337 (highlighting added).

PAN criticizes the thoroughness of Dr. Jakobsson's opinions, but the weighing of evidence is not appropriate for summary judgment. Moreover, Dr. Jakobsson provides detailed analysis

supported by record evidence that ███████ serves as a security profile cache, which PAN fails to address. For example, using PAN's technical documentation as corroborating evidence, he opines

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████ Ex. G (Jakobsson Op. Rpt.) ¶ 828 (citing PAN_FIN00008329 at 329-330). This is not a one-off document. He cites additional documentation to show how ████████ temporarily stored scan results:



Ex. G (Jakobsson Op. Rpt.) ¶ 826 (citing PAN_FIN00008325 at 327); *see also id.* at ¶ 820.

PAN fails to address Dr. Jakobsson's opinions and this evidence he cited in his report regarding ██████ in its Motion and should not be allowed to address it with new arguments in its reply. Indeed, PAN is estopped from raising any new arguments in its reply brief to remedy its failure to address such technical documentation in its original Motion. *See, e.g.*, *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n. 4 (9th Cir. 2000) ("[I]ssues cannot be raised for the first time in a reply brief."); *Avendano-Ruiz v. City of Sebastopol*, No. 15-CV-03371-RS, 2016 WL 3017534, at *9 (N.D. Cal. May 26, 2016) ("Parties may not raise new arguments in reply briefs, and consideration of such arguments is improper."); *Cal. Sportfishing Prot. All. v. Pac. States Indus., Inc.*, No. 15-CV-1482, 2015 WL 5569073, at *2 (N.D. Cal. Sept. 22, 2015) ("Raising new arguments in a reply brief is classic sandbagging . . . ."); *Kolker v. VNUS Med. Techs.*, No. 10-CV-

00900-SBA, 2012 WL 161266, at *6 (N.D. Cal. Jan. 17, 2012) ("It is improper for a moving party to introduce in a reply brief new facts or different legal arguments than those presented in the moving papers."). PAN's failure to address its own documentation and Dr. Jakobsson's opinions is misleading as it ignores plainly relevant evidence of infringement, but also dooms its Motion.

PAN argues its expert opined ███████ cannot serve as the claimed security profile cache because it stores files before they have been transmitted to WildFire for analysis. Mot. at 20. Contrary to PAN's assertion, PAN's expert does not rebut Dr. Jakobsson's analysis of the ███████ serving as the security profile cache. Instead, PAN's expert's opinion pertains to the "file cache" limitation as is shown by the full opinion in the paragraph cited by PAN. *See* Ex. C (Rubin Op. Rpt.) ¶ 338 (distinguishing the ███████ from the "file cache"). As such, Dr. Jakobsson's opinion, as supported by PAN's own technical documentation, demonstrates PAN cannot meet its burden as the movant. *See U.S. Water Services, Inc. v. Novozymes A/S*, 843 F.3d 1345, 1351–52 (Fed. Cir. 2016) (explaining that where "record evidence demonstrates that there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party, . . . summary judgment [is] inappropriate.") (internal citation omitted). Thus, summary judgment is not warranted.

### ii. PAN's Remaining Arguments Regarding "Temporary" Storage Highlight the Material Dispute of Fact

PAN's arguments regarding databases, such as ████████████████████ ███████ fare no better as each simply highlight questions of fact. Dr. Jakobsson explained multiple times that "████████████████████████████████████████ ████████████████." *See, e.g.*, Ex. G (Jakobsson Op. Rpt.) ¶ 748. PAN's expert simply disagrees. *See, e.g.*, Mot. at 20 ████████████████████████ ████████████████████████████ (citing its expert's opinion). Indeed, each of PAN's arguments at their core are that its expert does not agree with Finjan's expert and the evidence relied upon to support Finjan's expert's opinion, which are quintessential disputes of fact. *Nalco Co. v. Turner Designs, Inc.*, 73 F. Supp. 3d 1096, 1099–100 (N.D. Cal. 2014) (denying motion for summary judgment based on disputes of fact "evidenced by dueling expert testimony"). For example, Dr. Jakobsson opined that the ███████ serves as the security profile cache

because it stores scan results (*i.e.*, security profiles) and cited PAN's documentation in support of his opinion:

Ex. G (Jakobsson Op. Rpt.) ¶ 810 (citing PAN_FIN00010230 at 244) (highlighting added).

*Id.* ¶ 811. PAN's expert disagrees. Mot. at 19-20.

As another example, Finjan's expert opined that the ▮▮▮▮▮▮▮ serves as the security profile cache because it stores scan results (*i.e.*, security profiles) and explained how it is synced with the ▮▮▮▮▮ with citations to PAN's documentation to support his opinions:

Ex. G (Jakobsson Op. Rpt.) ¶ 812 (emphasis added); *see also id.* ¶ 827 (citing PAN_FIN00008325 at 328) (stating "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

1

2  ████████████████████████████████████████████████████████████

3  *Id.* ¶ 828 (citing Ex. I PAN_FIN00008329 at 329) (depicting "████████████████

4  ████████████████████████). PAN's expert disagrees. *See, e.g.*, Mot. at 20 ("██

5  ████████████████████████").

6        Yet another example, Dr. Jakobsson explained how the source code for NGFW and WildFire

7  shows the security profile is stored after a scan is complete:

8

9  

10

11  Ex. G (Jakobsson Op. Rpt.) ¶ 837 (discussing NGFW source code for the security profile cache).

12

13

14

15

16

17

18

19

20

21  *Id.* ¶ 837 (discussing WildFire source code for the security profile cache) (emphasis added). PAN's

22  expert simply disagrees. Ex. C (Rubin Reb. Rpt.) ¶¶ 356, 364. A jury, however, should be allowed

23  to make credibility determinations and weigh the evidence. *Dynetix Design Sols. Inc. v. Synopsys*

24  *Inc.*, No. 11-CV-05973-PSG, 2013 WL 1345718, at *3 (N.D. Cal. Apr. 2, 2013) ("This is a classic

25  'battle of the experts' on a material issue of fact. It is the jury's province to resolve such issues, not

26  the court's."); *see also NetFuel, Inc. v. Cisco Sys. Inc.*, 438 F. Supp. 3d 1031, 1038–39 (N.D. Cal.

27  2020) ("Their disputes amount to a "battle of the experts" over material facts, precluding summary

28  judgment."). Thus, PAN's motion should be denied.

2.      **Factual Disputes Exist as to Whether AV Signatures Satisfy the Claims**

Contrary to PAN's representations to the Court, the experts ***do not*** agree. PAN relies on cherry-picked portions from Dr. Jakobsson's deposition and ignores opinions offered by Dr. Jakobsson in his report. With the proper context, this is yet another example of PAN's expert simply disagreeing with Finjan's expert, a classic "battle-of-the-experts" situation which precludes summary judgment.

Dr. Jakobsson did not testify that infringing ███████████████████████ ████████████████, and are not "security profiles" as PAN incorrectly asserts. Rather, the cited testimony pertained to questions about the signatures in general, not the infringing AV Signatures. *See* Mot. at 20-21 (citing Dr. Jakobsson deposition testimony regarding "[t]ypical signatures"). The question for this Court is not whether "typical signatures" infringe, but whether the specific accused AV Signatures infringe. On that question, Dr. Jakobsson never disavowed his opinion on AV signatures, nor did he say that AV signatures are not security profiles. And in his report, Dr. Jakobsson identifies various PAN technical documents which explain how "AV Signatures" ██████████████████████████:



Ex. G (Jakobsson Op. Rpt.) at ¶ 640 (emphasis added); *see also id.* at ¶¶ 821-824.

PAN's reliance on its own expert, Dr. Rubin, is further unavailing and simply illustrates the underlying factual disputes the jury must resolve, *e.g.*, whether AV Signatures comprise a list of computer commands. For these reasons, summary judgment is not appropriate.

3.      **Dr. Jakobsson's DOE Opinions Preclude Summary Judgment**

PAN is incorrect that Dr. Jakobsson's opinions are "untenable as a matter of law" because Dr. Jakobsson does not point to "non-temporary" storage as "temporary" storage as PAN claims. As explained above in Section II.C.1, PAN has ignored its own technical documentation which shows that it utilizes temporary storage (*e.g.*, through the use of ████████). PAN's failure to account for this technical documentation dooms its arguments with respect to DOE.

1    Nor is Dr. Rubin's testimony un-rebutted as PAN claims. Dr. Jakobsson described in detail

2    throughout his report how PAN's accused products include temporary storage, *e.g.*, ██████

3    ███████████████. *See, e.g.*, Ex. G (Jakobsson Op. Rpt.) at ¶¶ 861-864, *see also id.* ¶¶

4    748, 775, 825. PAN's expert responded by disagreeing with Dr. Jakobsson's analysis. Ex. C (Rubin

5    Reb. Rpt.) ¶¶ 438-442. In reality, this is yet another case of dueling experts as evidenced by

6    Dr. Jakobsson's DOE analysis which PAN itself cites. *See* Mot. at 21. The jury should be free to

7    evaluate both experts' testimony and make credibility evaluations as necessary to properly resolve

8    whether PAN infringes under the doctrine of equivalents.

9    Because "[i]nfringement under the doctrine of equivalents is an issue of fact," PAN's

10   argument should fail. *See Engel Indus. v. Lockformer Co.*, 96 F.3d 1398, 1406 (Fed. Cir. 1996); *see*

11   *also Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 985 (Fed. Cir. 2006).

12   **D.    Pre-Suit Willful Infringement**

13   Finjan will not pursue a pre-suit willful infringement theory at trial. To the extent PAN

14   argues that Finjan choosing to not oppose this summary judgment argument is improper such

15   allegations lack merit. Despite not being required by the Local Rules, Finjan identified each of its

16   *Daubert* and summary judgment arguments to PAN and offered to meet and confer before

17   submission of summary judgment and *Daubert* motions to avoid burdening the Court, but PAN

18   declined Finjan's offer to meet and confer and did not identify any of its arguments.

19   **III.    CONCLUSION**

20   For the reasons set forth above, the Court should deny PAN's Motion for Summary

21   Judgment.

22

23   Dated:  October 2, 2024                        Respectfully Submitted,

24                                                  */s/ Juanita R. Brooks*
                                                    _____
25                                                  Juanita R. Brooks (CA SBN 75934)
                                                    brooks@fr.com
26                                                  Roger A. Denning (CA SBN 228998)
                                                    denning@fr.com
27                                                  Frank J. Albert (CA SBN 247741)
                                                    albert@fr.com
28                                                  Jared A. Smith (CA SBN 306576)

jasmith@fr.com
Tyler R. Train (CA SBN 318998)
train@fr.com
Elliot N. Scher (CA SBN 343705)
scher@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Ste. 400
San Diego, CA 92130
Telephone: (858) 678-5070 / Fax: (858) 678-5099

Aamir Kazi (*Pro Hac Vice*)
kazi@fr.com
Lawrence Jarvis (*Pro Hac Vice*)
jarvis@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree St. NE, 21st floor
Atlanta, GA  30309
Telephone: (404) 892-5005 / Fax: (404) 892-5002

Susan E. Morrison (*Pro Hac Vice*)
morrison@fr.com
FISH & RICHARDSON P.C.
222 Delaware Ave., 17th Floor
P.O. Box 1114
Wilmington, DE  19801
Telephone: (302) 652-5070 / Fax: (302) 652-0607

*Attorneys for Plaintiff FINJAN LLC*