Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge Presiding

FINJAN, LLC,                          )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 )   **NO. 3:14-cv-04908-RS**
                                      )
PALO ALTO NETWORKS, INC.,             )
                                      )
            Defendant.                )
_____      )
                                _

                              San Francisco, California
                              Thursday, November 14, 2024

                   **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                        FISH & RICHARDSON PC
                        12860 El Camino Real - Suite 400
                        San Diego, California  92130
                **BY:  ROGER DENNING**
                      **JUANITA BROOKS**
                      **TYLER TRAIN**
                      **ATTORNEYS AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

STENOGRAPHICALLY REPORTED BY:
Kelly Shainline, CSR No. 13476, RPR, CRR
Official Reporter

1   **APPEARANCES**:  (CONTINUED)

2   For Defendant:

3                                  MORRISON & FOERSTER LLP
                                   425 Market Street
                                   San Francisco, California  94105
4                       BY:  **TIMOTHY SAULSBURY**
                             **MATTHEW I. KREEGER**
5                            **JOHN DOUGLASS**
                             **ATTORNEYS AT LAW**

6
                                   MORRISON & FOERSTER LLP
7                                  250 W 55th Street
                                   New York, New York  10019
8                       BY:  **KYLE W.K. MOONEY**
                             **ATTORNEY AT LAW**

9
    Also Present:          **Andrea Gothing, Finjan In-House Counsel**
10                         **Ann Taylor, Finjan IP Specialist**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - November 14, 2024**</u>                          <u>**2:05 p.m.**</u>

P R O C E E D I N G S

---000---

    **THE CLERK:** Calling Case 14-cv-4908, Finjan vs.
Palo Alto Networks.

    Counsel, please come forward and state your appearances.

    **MR. SAULSBURY:** Good afternoon. On behalf of
Palo Alto Networks you have Tim Saulsbury from the Morrison
Foerster firm. I'm joined by my colleagues Kyle Mooney, John
Douglass, and Matt Kreeger.

    **THE COURT:** Good afternoon.

    **MR. DENNING:** Good afternoon, Your Honor. Roger
Denning of Fish & Richardson on behalf of the plaintiff Finjan.

    **MS. BROOKS:** And also Juanita Brooks of Fish &
Richardson on behalf of Finjan.

    **MR. DENNING:** We have our colleague Tyler Train from
Fish & Richardson here as well; as well as Andrea Gothing,
in-house counsel for Finjan; and Ann Taylor, in-house IP
specialist for Finjan.

    **THE COURT:** Good afternoon.

    **MR. DENNING:** Good afternoon.

    **THE COURT:** So we are here on motions for summary
judgment and at this juncture in this long-lived case, which
has been touched by several of my colleagues, I believe, we
have, I think, three patents remaining -- the '408, the '633,

1    and the '731 -- and there are various arguments with respect to

2    each of these different patents.

3        So why don't I go ahead.  I was going to start with the

4    moving party, as I usually do, so -- but I would actually

5    encourage counsel for Finjan to step up because we can do this

6    patent by patent as opposed to going through all three and then

7    you go going through all three.

8        So whoever wants to speak can come on up, but I'll look

9    first to the moving party.

10        **MR. SAULSBURY:**  Thank you, Your Honor.

11        And just a brief housekeeping item.  I think we're going

12    to be able to address the issues without asking to close the

13    courtroom or anything of that nature, notwithstanding that they

14    get into technical issues.

15        I wasn't sure if there was anybody still on the Zoom link.

16        **THE COURT:**  Well, this is where we probably have

17    some -- this is an open courtroom.  I'm not sealing the

18    courtroom.

19        **MR. SAULSBURY:**  Surely, Your Honor.

20        **THE COURT:**  And I also don't have a problem with

21    somebody on Zoom.  And I think I've, in this case, given you my

22    spiel about oversealing, but I feel particularly strongly that

23    the courtroom does not get sealed.  So there we are.  So if

24    somebody is listening, they can listen as far as I'm concerned.

25        **MR. SAULSBURY:**  Okay.

1    **THE COURT:**  All right?

2    **MR. SAULSBURY:**  Thank you, Your Honor.

3    **THE COURT:**  Okay.  So whoever wants to discuss this,

4    come on up.  I assume there's somebody on that side.

5    **MR. MOONEY:**  Kyle Mooney, Your Honor.

6    **THE COURT:**  Okay.

7    **MR. MOONEY:**  I've got some slides.  If I could hand

8    those up.

9    **THE COURT:**  Of course, because this is a patent case

10   and no motion has ever been argued without PowerPoints in a

11   patent case.

12   **MR. MOONEY:**  I'll try to limit it, Your Honor.

13   **THE COURT:**  Thank you.

14   Okay.  Off you go.

15   **MR. MOONEY:**  Again, Kyle Mooney, Morrison & Foerster,

16   representing Palo Alto Networks, Your Honor.

17   And we want to begin with the '408 patent in our motion

18   for summary judgment of noninfringement of that patent.

19   Appreciate your patience, Your Honor.

20   The '408 patent -- we're going to have to go with the --

21   **THE COURT:**  Listen, I've got it in --

22   **MR. MOONEY:**  Hard copy.

23   **THE COURT:**  You've given it to me in paper form.

24   Let's just --

25   **MR. MOONEY:**  Let's just do the paper, Your Honor.

1          THE COURT:  -- barrel ahead.

2          MR. MOONEY:  If you could turn to Slide 3, Your Honor.

3          THE COURT:  Okay.

4          MR. MOONEY:  And the '408 patent, as Your Honor heard

5     a few months ago, is directed to an allegedly more efficient

6     way to scan for malicious program code.

7          Finjan's original claims for this patent were directed to

8     analyzing different programming languages using different

9     rules, different parser and analyzer rules.  The PTO rejected

10    those claims as obvious based on prior art, and so Finjan

11    amended the claims to the current claims that we're dealing

12    with today; and those claims require that a computer first

13    determine what programming language code is written in and then

14    based on that determination, instantiate or start a scanner for

15    that particular programming language.

16         And so, for example, in Figure 7 of the patent, there are

17    three different scanners for three different programming

18    languages -- HTML, JavaScript, and URI -- and then each of

19    those scanners include the rules and the analyzers for that

20    particular language.

21         And on the next slide, Slide 4, we have Claim 1.  And

22    these requirements are built into the claims.  Claim 1 and

23    Claim 22 are the independent claims, and these claims require

24    that the computer first determine -- this is the yellow

25    highlight -- any specific one of a plurality of programming

1  languages in which the incoming stream is written, and then

2  instantiate or start a scanner for that specific programming

3  language in response to said, that is after said, determining.

4      Finjan cannot prove that the accused products, NGFW or

5  WildFire, meet these limitations, and the reason for that is

6  that both of them allegedly include a single scanner that

7  handles multiple different programming languages.

8      And so beginning with NGFW, this is on Slide 5, I asked

9  Dr. Min, Finjan's technical expert, at his deposition what the

10 alleged scanner in NGFW was.  And I handed Dr. Min what is

11 Exhibit 38 shown on the left of this slide without the red and

12 the blue markings, and I asked Dr. Min to identify the alleged

13 NGFW scanner that he relied on.  And Dr. Min did that with the

14 red pen and he included the entirety of the blue box, which is

15 titled "CTD Engine" at the top and he also wrote "App ID" and

16 circled that.

17     And Dr. Min's also got some red handwriting at the top.

18 Again, all of the writing on this exhibit is that of Dr. Min,

19 Finjan's expert.  And his testimony on this slide is very

20 clear.  This was the alleged scanner that he relied on for

21 NGFW, that is the CTD engine and App ID, and he did not rely on

22 any other scanner for that product.

23     And so on the next slide, this is Slide 6, Dr. Min

24 acknowledged that this NGFW scanner that he relied on, the only

25 one he relied on, could handle multiple different programming

1  languages.  Accordingly, NGFW does not instantiate and Finjan

2  cannot show it instantiates a scanner for a specific

3  programming language.

4      Next slide, Slide 7.

5      And because it has a single scanner that handles multiple

6  different programming languages, NGFW also does not need to and

7  does not determine a programming language before it

8  instantiates or starts a scanner for that language.  That's

9  clear based on the last testimony and it's doubly clear based

10 on the testimony on this Slide 7.

11     And here on Slide 7 on Exhibit 38 I asked Dr. Min to

12 identify using a blue marker the parts of NGFW determining

13 programming languages.  And as Your Honor can see, all of those

14 parts that determine programming language are part of the

15 scanner itself.  Dr. Min circled two modules inside the CTD

16 engine, those are his two blue circles; and he also circled

17 App ID.  All of these are part and parcel of the scanner

18 itself.  Accordingly, NGFW doesn't determine any programming

19 language before it starts or instantiates the scanner.

20     Now, Finjan had a couple of responses here.  First, they

21 pointed to Dr. Min's expert report suggesting, I guess, that he

22 had different opinions in that report; but if you look at that

23 report beginning on Slide 8, Dr. Min's opinions there are

24 consistent.

25     Dr. Min -- and I want to be clear about this -- Dr. Min

1    does not have any opinion that NGFW first determines a

2    programming language and then instantiates a scanner for that

3    specific programming language.

4         To the contrary, all the programming language, specific

5    rules, or analyzers that Dr. Min identifies are part of or

6    inside the alleged NGFW scanner that you saw him identify on

7    Exhibit 38, all of them.  And so, for example, paragraph 353 on

8    Slide 8, which is one of the paragraphs that Finjan called out

9    in its brief, here Dr. Min opines that there is a scanner, a

10   single scanner, that comprises parser rules and analyzer rules

11   for different languages.  Well, that was the prior art and

12   that's not what the claims require in this case.

13        On Slide 9 there are other examples of Dr. Min identifying

14   a single scanner that has different rules for different

15   languages.  Even if that were true, that is not what the claims

16   require and, again, that's exactly what the prior art had in it

17   before Finjan amended the claims around it.

18        Slide 10.  Finjan understands, I think, that Dr. Min's

19   admissions effectively foreclose their infringement theory, and

20   so Finjan devotes a good amount of its opposition to asking

21   this Court to rewrite the claims in this case.

22        And so Finjan now is arguing for the first time that the

23   claims of the '408 patent actually cover a situation where you

24   have a single scanner that handles multiple different

25   programming languages and that determines and adapts to

programming languages after it is started, after it is
instantiated.

The Court shouldn't rewrite the claims for Finjan.  First
slide at Slide 11, as an initial matter, that's not what the
claims say.  The claims on their face, Claim 1, clearly
requires that the computer determine a programming language and
then, and only then, in response to that determination start a
scanner for that specific language.

The order of operations is 100 percent clear in Claim 1
and Claim 22; and, moreover, some of the dependent claims refer
to specific individual programming languages rather than
encompassing a situation where there are multiple languages.

In Slide 12, Finjan's current position was contradicted by
its expert.  More than a year before, it argued for its
interpretation to Your Honor in its opposition brief.

I asked Dr. Min about 18 months ago at his deposition [as
read]:

        "Does a computer that instantiates a scanner before
    it has determined any programming language of the incoming
    stream meet Claim 1 or Claim 22 of the '408 patent?"
And Dr. Min responded [as read]:

        "And I -- I just told you it has to be in response to
    determining, so it would not meet the scope."
So Dr. Min a year and a half ago contradicted the
interpretation that Finjan is now stepping forward with.  And

1    Dr. Min certainly doesn't have any opinions the claims should

2    be interpreted otherwise or that there be infringement under

3    the interpretation he clearly was not taking.

4        And, lastly, on Slide 13, Finjan's position is not only

5    contradicted by its technical expert in this case, it's also

6    contradicted by Finjan's own arguments in another case.

7        Finjan took the opposite position just a few years ago in

8    the *Rapid*7 case before Judge Noreika in Delaware.  In that

9    case, *Rapid*7, the defendant argued something along the lines of

10   what Finjan is arguing here, and that is that Claims 1 and 22

11   of the '408 were directed to a single scanner that handled

12   multiple different programming languages and that could adapt

13   to those languages.

14       *Rapid*7 cited many of the same specification disclosures

15   that Finjan relies on here; but in that case a couple of years

16   ago, Finjan said, "No."  Finjan said that that is not right,

17   that is not how the claims should be interpreted and it argued

18   against that interpretation.  Instead, Finjan argued that the

19   claims require that the instantiated scanner be for the

20   specific programming language, and Judge Noreika accepted that

21   information.

22       And so Finjan is likely judicially estopped, as we argue

23   in our papers.  Even if they are not, it's clear on the record

24   that the position Finjan takes today is 180 degrees from the

25   position they took in another case a year and a half ago.

1    And so in sum, NGFW can't meet and Finjan cannot show it

2  meets those two limitations.

3    The next product, Your Honor, is WildFire, Slide 14.

4  Finjan can't show that WildFire meets these limitations either.

5  Again, at his deposition I asked Dr. Min to identify the

6  WildFire scanner that he is relying on to prove infringement,

7  and Dr. Min circled in red on Exhibit 43 -- again, all the

8  markings on this exhibit are Dr. Min's using markers at his

9  deposition -- Dr. Min circled the static analyzer, that's top

10  left, and the dynamic analyzer, that's in the middle of the

11  page.  And Dr. Min confirmed that the static analyzer together

12  with the dynamic analyzer is the scanner he relied on.  Very

13  clear, Your Honor.

14    I asked him [as read]:

15      "So you've identified in Exhibit 43 the only scanner

16    that you rely on in forming opinions about WildFire?"

17    And he told me then [as read]:

18      "Yes.  What I identified in Exhibit 43 is the scanner

19    that I identified."

20    The same problems exist with respect to this scanner,

21  Your Honor.  And so on Slide 15 I asked Dr. Min the same

22  question about WildFire, the WildFire scanner, that I asked

23  about NGFW.  I asked whether this WildFire scanner he relied on

24  can handle multiple different languages, and he said, "Yes."

25    And so, again, the WildFire scanner, much like the prior

art, can handle multiple different languages.  Finjan cannot

prove that it is instantiating a scanner for a specific

programming language.

And, again, because of that, on Slide 16, Finjan can't

prove that it determines a programming language before it

instantiates a scanner for that language.  They can't prove

that because it doesn't do that because it doesn't have to

because it handles multiple different languages.

And, again, just for clarity, on Slide 16 I asked Dr. Min

to circle the parts of WildFire that determine programming

language; and, once again, all of those parts that he

identified in blue are inside of the scanner itself showing

that the scanner handles multiple languages, not a single

programming language.

Finjan had a couple of responses on the WildFire point.

Also, they pointed again to Dr. Min's expert report.  It was

effectively the same problem, Your Honor.  Dr. Min does not

have any opinion that WildFire first determines a programming

language and then instantiates a scanner for that specific

programming language.

Again, the programming language specific rules, the

analyzers, the other components that Finjan now points to in

Dr. Min's report to try to save its claim are all part of and

inside the alleged scanner that Dr. Min told me was the only

one that he relied on, and that's true of paragraph 424 and on

 1   the next slide this is true also of paragraphs 426 and 427.

 2        And so in sum, Your Honor, Finjan cannot prove

 3   infringement of the determining and instantiating limitations

 4   of the asserted claims for any of the accused products in this

 5   case.

 6        **THE COURT:**  Thank you.

 7        Mr. Denning, do you want to talk about '408?

 8        **MR. DENNING:**  I'm sorry, Your Honor?

 9        **THE COURT:**  Do you want to talk about '408?

10        **MR. DENNING:**  I absolutely do.  I'm sorry.  I just

11   couldn't hear you.

12        To set the table to remind us where we are, this is a

13   summary judgment hearing.  The issue that we're faced with is

14   whether any reasonable jury could find infringement based on

15   the opinions expressed in Dr. Min's report.  So I want to focus

16   on what Dr. Min actually said with regard to these limitations.

17        PAN argues that the NGFW and WildFire contain a single

18   scanner rather than one for each of the different programming

19   languages.  That entire argument is based on those two figures

20   that they showed Dr. Min in his deposition, two very high-level

21   block diagrams of NGFW and WildFire.  He says:  Yeah, scanner,

22   there's a lot that happens inside of that scanner.  There's a

23   lot that happens inside of WildFire.  They never addressed

24   that.

25        Dr. Min did in detail.  He looked in detail at the PAN

1   documents, he looked in detail at the PAN source code to see

2   what happens when they get a new file in.  What does the

3   scanner do at that point?  And he unequivocally said it

4   determines the programming language and then instantiates a

5   scanner based on that language.

6        **THE COURT:**  So go over for me again why you think

7   it's -- when he does one circle, that that's not indicative of

8   him saying it's one scan.

9        **MR. DENNING:**  Sure.  So that's the thing that does --

10  the thing he circled is the thing that gets the incoming file,

11  it determines the programming language, and then it

12  instantiates a scanner that then continues on the analysis as

13  it goes down.

14     That scanner that's -- that is -- I'm blanking on the

15  word.  I've said it a million times this week --

16  instantiated --

17       **THE COURT:**  It is a strange word.

18       **MR. DENNING:**  I looked it up.  I looked it up on

19  Webster's.

20       **THE COURT:**  Right.

21       **MR. DENNING:**  Like, what does this mean?

22       **THE COURT:**  Yeah, no, it's straight.

23       **MR. DENNING:**  It's basically create a new instance of

24  or something along those lines.

25       **THE COURT:**  Okay.

1          **MR. DENNING:**  It creates a new instance of a scanner

2    for HTML or a scanner for, you name it, JavaScript, a scanner

3    for Visual Basic.  It makes a new scanner based on the language

4    of the file that's coming in.

5          **THE COURT:**  So it's just your miscommunication; they

6    didn't understand what you were trying to impart?

7          **MR. DENNING:**  Miscommunication is one way to put it,

8    but I think that's not what Dr. Min meant and it's in complete

9    contravention to what he said in his expert report repeatedly.

10     I'm shocked to hear representations that Dr. Min never

11   said that NGFW determines the programming language and then

12   instantiates a scanner based on it because he said it dozens of

13   times in his expert report, and I'm willing to talk you through

14   those and show you exactly where it is.

15         **THE COURT:**  Well, he can't create his own issue by

16   being inconsistent.  So --

17         **MR. DENNING:**  I think it was --

18         **THE COURT:**  -- in the questions -- I mean, there's not

19   like -- it's not a trick question here.  These questions are

20   pretty straightforward.  So I'm not sure I follow why you think

21   I should disregard what your counterpart has said about his

22   answers.  Because there's no, you know, "I don't understand

23   what you're saying.  Could you be more specific?"  It's he's

24   answering it and he makes these circles.

25         **MR. DENNING:**  I think -- I think he's saying:  What

1   does the scanning?  This block.  It happens in there.

2       Now, there's a different scanner based on each programming

3   language.  That happens within that block.  So what's the

4   scanner?  Here it is.

5       But it's in software --

6           **THE COURT:**  It's somewhere in here and it may be more

7   than one?

8           **MR. DENNING:**  It's somewhere in here and it's created

9   a new -- every time there's a new file, it has to create a new

10  scanner for every new file.  It's not like there's a scanner

11  there and it's the same one that's used over and over and over

12  and over.  This is software.  This is source code.  It creates

13  a new one.  For every file that comes in, it instantiates a new

14  scanner.  It never uses an old one.  It's a new one.

15      And just as a reminder, the parties agreed -- and this was

16  in Docket 1641, one of the claim construction agreed-upon

17  terms -- that scanner can be, quote, "software, hardware, or a

18  combination of both for scanning."

19      So software that does the scanning that's instantiated

20  because I know this is HTML, so instantiate an HTML software

21  scanner, that's exactly what happens.  Sure, that happens in

22  this big thing that Dr. Min circled and generally said, "That's

23  the scanner," but there's a new one for each of these

24  languages, and I'm happy to talk you through.

25      I was at the *Markman* hearing and heard Your Honor loud and

1  clear about your dislike of demonstratives, so I didn't prepare

2  any for this but I'm happy to talk you through in our --

3      **THE COURT:**  It -- I hope people -- the bar doesn't

4  say, you know, "Seeborg doesn't like demonstratives."  Actually

5  demonstratives are great and they're very useful in trial and

6  other things like that.

7      And my only comment was, and I don't want it to be

8  taken -- I don't want you to run with it, it's almost an aside

9  that seems like there's no motion in a patent case that doesn't

10  have PowerPoints, but I'm not -- I'm not hostile to them.  I'm

11  not trying to, you know, do in them, but I also think you can

12  make your arguments without them.

13      So, you know, don't worry if you think, "Oh, my God, they

14  got a demonstrative on the other side and he didn't get mad at

15  them, so we should have done a demonstrative."  Don't worry

16  about that.  It's -- but also, going forward I'm not, you

17  know -- if you want to use a demonstrative, go ahead and use

18  it.

19      Go ahead.

20      **MR. DENNING:**  Thank you, Your Honor.

21      You know who's most happy to hear that?  Ms. Brooks, my

22  colleague, who has demonstratives --

23      **THE COURT:**  Okay.

24      **MR. DENNING:**  -- and will be showing you those a

25  little bit later.

1    But the things that I want to point out to you are in our

2  opposition brief, and so I don't need demonstratives.  You can

3  read them yourself.

4    For instance, all of the things that PAN has ignored where

5  Dr. Min looks under the hood to say, "Well, how does this thing

6  that I called a scanner actually do the scanning," are

7  contained in his expert report with lines like, and this is on

8  page 2 of our opposition [as read]:

9        "PAN's NGFW includes a scanner (e.g., the content

10       threat detection engine and its components decoder and

11       detecter pattern match) that work in conjunction with the

12       application engine APID" -- which he wrote on one of those

13       slides -- "to analyze a stream."

14    Okay?  It's going to analyze the stream of data.

15    How does it do that?  Well, he points to a function that's

16  called the panav__init__state function.  It's a software

17  function.  And this is, again, on page 2 of our opposition.

18  That function instantiates a scanner for the specific

19  programming language corresponding to the file type, and it

20  does so by calling other functions.

21    And so the panav__init__state function will call the

22  panav__parse__html function to instantiate an HTML scanner, the

23  panav__parse__powershell to instantiate a PowerShell scanner.

24  Same thing for JS, that's JavaScript; VBS, that's Visual Basic.

25        Dr. Min said:  That's -- first it's determining what the

1   language is and then it's instantiating an instance --

2   right? -- a new scanner that's going to -- that's going to then

3   process the rest of that.

4           THE COURT:  And your fundamental point is his answers

5   in the deposition are not inconsistent.

6           MR. DENNING:  Not inconsistent, just --

7           THE COURT:  Because if they are inconsistent, then the

8   fact that he may have set out a very detailed description in

9   his expert report doesn't mean he can't in his deposition go

10  the other way and effectively take himself out.

11          MR. DENNING:  Sure.  I think his answers at deposition

12  were at a much higher level of abstract than what he put into

13  his source code analysis, for instance.  So when they said,

14  "Where's the scanner," he has no problem, "Sure, here's the

15  scanner," because that's what executes all of these many, many

16  functions below.

17      And, Your Honor, at pages 2, 3, 4, I won't belabor the

18  point, but it is just chocked full of statements from Dr. Min

19  about how the NGFW scanner does exactly that.

20      The WildFire scanner does the same thing.  It has a

21  function that's called static analysis, and at line 194 of that

22  function it calls a function called static analyzer factory to

23  determine the programming language in which the incoming stream

24  is written.  And that's on page 3, lines 9 through 11, of our

25  opposition is the snippet from Dr. Min's expert report where he

talks about these precise functions.

And then a little further down on lines 13 through 16 is more from Dr. Min's report where he says:  Okay.  After static analyzer factory determines the programming language, it then calls a function -- oh, the function dynamic -- I'm sorry -- static analyzer factory to then instantiate the specific static analyzer.

It does the same thing for dynamic analysis.  It has a function called dynamic__analysis__retry, which determines the programming language and then instantiates a specific virtual machine or a scanner and corresponding dynamic analyzer specific to the programming language, Java, Android, PDF.  He shows the source code as well for that.

So there's nothing inconsistent with his deposition and his expert report, but to draw conclusions from his high-level deposition testimony that ignore what he says about the low-level functionality in the guts of the source code is inaccurate.  They work together, but you can't say, "Oh, he said one scanner so forget everything he said down here about how there are multiple scanners that get instantiated."

PAN doesn't cite any evidence showing that NGFWs and WildFires do not do that.  Their argument is based on this line of questioning from Dr. Min's deposition, but they don't say the opposite.  All they do is they point to one conclusory opinion from Dr. Rubin that says "NGFW includes a single

scanner," but that's it on the other side in contravention to
Dr. Min's page after page of source code analysis.

A reasonable jury could decide to believe Dr. Min.  Based
on that analysis, summary judgment is inappropriate.

I have more that I can go to --

**THE COURT:**  You do have the burden of infringement.

**MR. DENNING:**  We do have the burden of infringement,
and we will bear that burden at trial, but today PAN bears the
burden of showing no reasonable jury could find infringement.
That's a very different burden, and I submit they have not met
it.

One last thing I will point Your Honor to is on page 6 and
7 of our brief, we put a big snippet from Dr. Min's expert
report and color-coded it to give a little bit of insight into
what part he thinks is doing the determining of the language
and what part is doing the instantiating of the scanner.  It's
well laid out there.

There was talk about rewriting the claim.  That's not our
position.  The claim does not need to be rewritten.  The claim
is fine the way it is.  PAN infringes the way it is.  It's a
scanner is instantiated based on the programming language that
is determined.

I think PAN has inaccurately represented what Finjan said
in the *Rapid*7 case.  In the *Rapid*7 case, Rapid7 wanted to add
limitations into the construction; and Finjan said, "There's no

1   need for that, no need to narrow the claim by adding those

2   limitations.  This is already in the claim."

3       But we're not asking the Court to do that.  We're not

4   asking the Court to rewrite the claim so I'm not going to spend

5   much time on that argument.  I don't think PAN characterized

6   the comments accurately, but that's not -- we don't think the

7   Court should rewrite the claims to begin with.  We think

8   they're just fine the way they are.

9       With that, I'll stop.

10          **THE COURT:**  Okay.  Very briefly, and then we'll go on

11   to the '633.

12          **MR. MOONEY:**  Thank you, Your Honor, very briefly.

13      First, counsel pointed to some evidence -- some excerpts

14   from Dr. Min's report about the WildFire static analyzer.  I

15   think it was 426 and 427 of Dr. Min's report.  Those do not

16   establish that these elements are met.  The claims require

17   determining a language and then instantiating.

18      And, in fact, what Dr. Min's report makes clear is that

19   the static analyzer itself handles multiple different

20   programming languages and so it can't be the scanner even if

21   that's the new position.

22      Number two, there's discussion at the beginning about the

23   drawings that Mr. -- Dr. Min was shown, how they were high

24   level, perhaps confusing.  The drawings that Dr. Min was shown

25   were drawings that he used in his expert report at, for

1   example, paragraphs 131, 377, 585, 658, and 749.  He was

2   familiar with those, and his testimony was 100 percent clear,

3   and it was the testimony that Your Honor saw and not a

4   different version of that testimony that we're hearing today.

5       And, lastly, as Your Honor noted, this is Finjan's burden

6   to prove noninfringement, not ours; but Dr. Rubin did, in fact,

7   testify, and it's in our papers, that these limitations are not

8   met.

9       Thank you, Your Honor.

10          **THE COURT:**  Okay.  The '633.

11          **MR. SAULSBURY:**  Thank you, Your Honor.

12      We have a brief set of demonstratives.  May I please

13  approach?

14          **THE COURT:**  Thank you.

15      Okay.

16          **MR. SAULSBURY:**  Thank you, Your Honor.

17      The argument on the '633 is fairly straightforward here.

18  As you'll recall, at claim construction the dispute was over

19  whether a downloadable-information destination was merely a

20  device that can perform the recited functions or whether it had

21  to be a user device.  The Court concluded that the term should

22  be construed to be a user device not merely a device.

23      The Court also rejected Finjan's alternative proposal,

24  which would have allowed the Court to construe it as user

25  device but include a caveat that a user device can be any

device.  And so that was rejected at *Markman* as well.  And so
we know that to meet the requirements of asserted Claim 14,
Finjan was required to identify a user device.

And the problem with Finjan's infringement case -- if we
could please turn to Slide 4 -- is that for neither of the two
WildFire products they accuse do they have any expert analysis
showing that they have a user device.

The two products at issue are the WF-500 that is a
physical server product and the second accused device is the
WildFire Public Cloud.

And if we take a look at the evidence that Finjan cites in
its opposition in support of its argument that it sufficiently
identified a user device, with respect to the WF-500 -- again,
this is the physical device -- they point to the testimony of
its expert, Dr. Keromytis.  And we've highlighted here what
Finjan relies on its opposition where Dr. Keromytis says, with
respect to the WF-500 appliance [as read]:

"So that is a -- when it is used, that is a
downloadable-information destination."

Under Federal Circuit law, this type of parroting of the
claim language without any analysis is not sufficient to oppose
summary judgment.  We've cited a variety of cases in our
briefing for this and the point appears to be undisputed.

The other thing Finjan relies on with respect to WF-500 is
this testimony later in the same excerpt where Dr. Keromytis

says [as read]:

> "So paragraph 384, that says it's the same functionality; and then in my analysis, I didn't see a distinction so I didn't feel the need to actually say, 'Well, yeah, it's also the same for WF-500."

This is where he's relying on some analysis that he did for the Public Cloud to assert the WF-500 infringes. Ultimately, he said [as read]:

> "I do include the WF-500 in the list of products that infringe."

Again, that sort of conclusory assertion that something infringes under circuit law cannot defeat summary judgment.

THE COURT:  Don't you -- you also offer up Dr. Rubin in this context as providing effectively a contrary position to Dr. Keromytis.

MR. SAULSBURY:  Keromytis.

THE COURT:  Keromytis.  Remind me of that.

MR. SAULSBURY:  That is true, Your Honor.  Dr. Rubin comes to an alternative conclusion, and his conclusion is based upon evidence explaining why neither the WF-500 nor the WildFire Public Cloud are user devices.  He actually addresses this issue whether they're user devices as distinct from just devices generically.

THE COURT:  You say that's what Dr. Keromytis doesn't do?

1    **MR. SAULSBURY:** That's exactly right. Dr. Keromytis

2  just asserts that the products meet the limitations of the

3  claim. That's not sufficient.

4      Under the *Sony* case that we cite in our briefing, the

5  Federal Circuit has said that in order to oppose summary

6  judgment, a patentee's expert actually has to have a fact-based

7  analysis that's tied to logic that explains why the accused

8  instrumentality actually meets the claim as construed. We

9  don't have that here. We just have a bare assertion that the

10  limitation is met.

11      Turning to Slide 5, this is the paragraph -- this is

12  paragraph 384, the paragraph that Dr. Keromytis referenced in

13  his deposition testimony. As you can see, there's nothing here

14  that explains how the WF-500 is a user device as distinct from

15  any device. He merely says that the WF-500 appliance sandboxes

16  all files locally and analyzes them for malicious behaviors

17  using the same engine used by WildFire Cloud. He's just

18  saying, "My analysis is the same for Public Cloud." He doesn't

19  attempt to explain how it's a user device.

20      Turning to page -- turning to Slide 6, this is Finjan's

21  opposition evidence in support of its assertion that the

22  WildFire Public Cloud is a user device.

23      Again, there's no actual expert analysis addressing how

24  the WildFire Public Cloud, which is cloud infrastructure, is a

25  user device as distinct from just a device generically. He

1    merely asserts the accused products, including WildFire alone,

2    NGFW in combination with WildFire, and Traps in combination

3    with WildFire meet this limitation.  That's the highlighted

4    portion of the first excerpt.  Conclusory assertion doesn't

5    satisfy their burden opposing summary judgment.

6        The next excerpt at the bottom, it's of the same nature.

7    It's a conclusory assertion that the accused products meet the

8    claim term.  The Federal Circuit has said that's not enough.

9        Finally, we get to Slide 7.  This is the last of the

10   excerpts from Dr. Keromytis' report that Finjan relies on.

11   Here, Dr. Keromytis says [as read]:

12       "WildFire is a downloadable-information destination

13       because it is a device -- a user device or otherwise --

14       that includes one or more devices or processes that are

15       capable of receiving and initiating or otherwise hosting a

16       mobile code execution."

17       This suffers from the same problem that we identified

18   earlier.  That's the -- there's a couple problems with this,

19   but the first is it's merely a conclusory assertion that the

20   claim limitation is met.  He doesn't make any attempt to

21   explain how the WildFire Public Cloud is somehow a user device

22   as distinct from any other sort of device.

23       Additionally, if we take -- if we take a look at what he's

24   literally saying, he says that it's a device, a user device or

25   otherwise, which means -- which, as a logical matter, means

1    he's not even taking the position that it's a user device.

2        It's like saying the accused animal is a mammal, a cat or

3    otherwise; right?  It's not -- he's not actually taking the

4    position that it is, in fact, a user device.  And so that is a

5    second problem beyond the more foundational problem, that he

6    has no analysis supporting his bare assertion that it's a user

7    device.

8        I think that's compounded by his Footnote 87, which

9    Dr. Keromytis acknowledges that he's interpreting the term

10   "user device" extremely broadly in a manner that's inconsistent

11   with how the Court construed it.

12       He says [as read]:

13           "The term 'user device' as used in the '633 patent is

14       quite broad.  For example, the patent describes 'user

15       device' as a receiving device or process."

16       That's essentially the construction that Finjan sought.

17   They sought a construction under which a user device is a

18   device that can perform a variety of functions, including

19   receiving and processing.

20       But the Court rejected that construction and additionally

21   included the term "user."  Finjan was required to give some

22   significance to the term "user."  It hasn't.  Dr. Keromytis has

23   essentially read it out of the claims and, therefore, Palo Alto

24   Networks is entitled to summary judgment on the '633 patent.

25           **THE COURT:**  Mr. Denning.

1          **MR. DENNING:**  Yes, Your Honor.  Thank you.

2      I think it's interesting when we look at paragraph 381,

3  which is the one that is up on the screen now, and contrast it,

4  you have to put it in context of Dr. Keromytis' report.

5      So if we can go to the slide before that, Slide 6, please.

6      This one shows paragraph 379, two paragraphs before the

7  one that we were just looking at.  And here's what

8  Dr. Keromytis says there.  He says [as read]:

9          "I understand the parties dispute how the Court

10         should construe the term 'downloadable-information

11         destination.'  I further understand Finjan's proposed

12         construction for this term is a device or process that is

13         capable of receiving and initiating or other hosting a

14         mobile code execution."

15     And then he says [as read]:

16         "I further understand PAN's proposed construction for

17         this term is a user device that includes one or more

18         devices or processes that are capable of receiving and

19         initiating or otherwise hosting a mobile code execution."

20     And then he said [as read]:

21         "As I explain, WildFire and NGFW and Traps in

22         combination with WildFire each satisfied both parties'

23         proposed constructions for this term."

24     Now, ultimately the Court did include user device as was

25  in PAN's proposed construction.  Dr. Keromytis said, before the

1  Court ever ruled on this, because these reports were done

2  several years ago, said, "I think it meets that under the PAN's

3  proposed construction as well."

4      So when we then go to Slide 7, two paragraphs later, the

5  same page in Dr. Keromytis' report, and he says [as read]:

6          "WildFire is a downloadable-information destination

7      because it is a device -- a user device or otherwise --

8      that includes one or more devices of processes and carries

9      on."

10     Clearly when he says "a user device or otherwise," he's

11 meaning under PAN's proposed construction or under Finjan's

12 proposed construction.  It's right after he just said, "Under

13 both of those proposals, I think it meets the limitation."

14     So he is not here making some sort of logical

15 insufficiency.  He's just saying, "Under this one or under that

16 one, I think it meets the limitation."

17     He -- it is not insignificant that Dr. Keromytis then

18 drops the footnote and talks about the use of the term "user

19 device" within the '633 patent; and, indeed, the '633 patent

20 uses the term "user device" very broadly.  It talks about it as

21 a receiving device or process.  It says that a user device --

22 user device may operate as a firewall/server.  So something

23 that's a firewall and a server can be a user device in the '633

24 patent.  It describes that in the specification.  Dr. Keromytis

25 is recognizing that as he is applying that term to WildFire.

1      Dr. Keromytis was also asked in deposition, and this is in

2   Exhibit E, page 284, line 16, to 285, line 11, whether WildFire

3   servers are a, quote, "client device," and he said they are.

4   Counsel for PAN never asked him if he thought that they were a

5   user device, but he testified they are a client device.

6      In contrast, Dr. Rubin's opinions that WildFire is not a

7   user device are based on very narrow meaning of "user device"

8   that was rejected by the Court and adds additional limitations.

9      PAN points to Dr. Rubin's opinion that WildFire virtual

10  machines are implemented as a cloud-base solution and are not

11  devices which provide direct user interaction, let alone being

12  client endpoint devices.  There's nothing in the Court's

13  construction about providing direct user interaction or being a

14  client endpoint device.  Dr. Rubin's opinions are beside the

15  point here.

16      Similarly, for WildFire 500, Dr. Rubin said [as read]:

17          "WildFire appliance is a private cloud appliance

18       which is a dedicated device separate from a user

19       device/client device while user device can be separate

20       from another user device."

21      Dr. Rubin's opinion is not relevant to the point at hand.

22  Dr. Keromytis' opinion stands in contrast.  And that's really

23  the issue; that the jury should listen from both of these

24  gentleman and make a decision about what a -- whether this is a

25  user device or not.

This was a discussion we had during the *Markman* hearing a few months ago when this -- when this term was being discussed and counsel for PAN said, when we expressed some concern that a jury might think "user device" and think their iPhone or their laptop, and we said [as read]:

"The specification has a much broader use of the term 'user device' and we're worried that a lay juror is going to be confused by the term 'user device.'"

Counsel for PAN said [as read]:

"Your Honor, that's an issue that the experts will address."

Counsel said on the jury confusion point [as read]:

"We don't believe there will be any confusion over user device. We don't believe the jurors are going to believe that iPhones are the only user devices but, of course, there will be technical experts that are going to testify to assist the jury in that regard."

That's what counsel for PAN argued to this Court trying to persuade this Court to include user device in the construction. This Court did so. And now when Finjan's expert is prepared to testify that WildFire is a user device, as that term is used in the '633 patent, PAN is trying to preclude the jury from ever hearing that opinion.

Finally, it's worth spending one minute reminding how we got to that construction at the *Markman* hearing. There was

a -- Judge Freeman construed the same term in the *Cisco* case,
and Your Honor found that you would adopt the same construction
that Judge Freeman adopted, and that included user device.

But it's worth noting that in Judge Freeman's order that
construed that claim, she recognized -- the Court recognized
that "user device" is not a narrowly defined term.
Judge Freeman said [as read]:

> "Cisco contends that the information destination of
> the downloadable information must be the final destination
> of a downloadable on the grounds that the specification
> describes that an unexecutable downloadable is sent to the
> client that originally requested the downloadable.  The
> Court finds this argument unpersuasive."

And then the Court went on to say [as read]:

> "More importantly, the specification explicitly
> equates information with user device and describes that a
> user device can include one or more devices or processes,
> such as e-mail, browser, or other clients that are capable
> of receiving and initiating or otherwise hosting a mobile
> code execution.  In addition, the specification discloses
> that a user device can operate as a firewall and server."

So when this Court adopted the *Cisco* construction, that
just gives some context to how the *Cisco* court came to that
construction "user device" doesn't mean just your phone.
Dr. Keromytis has opined with support that WildFire is a

1  downloadable device.

2      Now, maybe there's some interesting cross-examination that

3  counsel for PAN will have for Dr. Keromytis at trial, but he's

4  laid out the basis for his opinion, and that is enough to

5  defeat summary judgment at this stage.

6      **THE COURT:**  Very briefly.

7      **MR. SAULSBURY:**  Yes, Your Honor.

8      So I'll note that we still have not heard anything about

9  what makes the accused WildFire devices user devices as

10  distinct from devices generally.

11      We were pointed by counsel to Slide 6 where Dr. Keromytis

12  says he thinks there's infringement under either party's

13  construction.  That's a bare assertion.  It's precisely the

14  type of bare assertion the Federal Circuit rejected in the

15  *Intellectual Science* case, *DynaCore Holdings* case, and *Schwing*

16  cases that we cited in our briefing.

17      We've -- we heard from counsel that the specification

18  acknowledges that a user device can be configured to be a

19  firewall or a server.  Our position isn't inconsistent with

20  that at all; but in order for there to be infringement, their

21  expert still needed to show that whatever firewall or server

22  they were contending was a user device, was a user device in

23  the first place that was then configured to be a firewall or

24  server, much like one could argue that when I turn my iPhone

25  into hotspot mode, it has been configured to be a gateway but

1    there's no analysis of that whatsoever.  There's no analysis of

2    how it's a user device to begin with.

3        And counsel also suggested this is an issue for the jury.

4    Their expert should be permitted to explain to the jury how the

5    accused WildFire devices are user devices.  But, again, he has

6    nothing to explain to them because he has done nothing to

7    analyze what makes these devices a user device.

8        And so for that reason, we're entitled to summary judgment

9    on the '633 patent.

10           **THE COURT:**  Okay.  Let's go on to '731.

11           **MR. SAULSBURY:**  Certainly, Your Honor.

12           **MR. DENNING:**  Your Honor, on this point, I spoke with

13    counsel for PAN before the hearing.  We had a couple different

14    infringement theories that we were pursuing in this case.  One

15    of them involved something called the AV Signature; and to

16    streamline the case and to streamline the presentation at

17    trial, we do not intend to pursue that particular infringement

18    theory.

19           **THE COURT:**  Okay.

20           **MR. DENNING:**  And so I don't think we need to address

21    it today.

22           **THE COURT:**  Okay.

23           **MR. SAULSBURY:**  Thank you, Your Honor.

24        And if I may approach, I have handouts for the '731.

25           **THE COURT:**  Okay.

1          **MR. SAULSBURY:**  They do contain slides on the

2     AV Signature issue.

3          **THE COURT:**  So you're going to skip over those?

4          **MR. SAULSBURY:**  Exactly right, Your Honor.  We

5     understand that they're out of the case.

6          **THE COURT:**  Okay.

7          **MR. SAULSBURY:**  So for the '731 patent, as Your Honor

8     knows from the *Markman* hearing, there are two main limitations

9     that really matter here.  The claims -- all asserted claims

10    require a security profile, which the asserted claims

11    explicitly say comprises a list of computer commands or some

12    other claims say comprises a list of one or more computer

13    commands.  But the point is, there has to be a security

14    profile; it has to have at least one computer command.

15         The other requirement found in all asserted claims is that

16    there has to be a security profile cache for storing the

17    security profiles that we just talked about.

18         So the net of those two requirements is that Finjan in

19    order to show infringement had to show the presence of a

20    security profile containing at least one computer command that

21    was present in a security profile cache.

22         Now, we also know from the claim construction hearing that

23    a cache is temporary storage.  In Finjan's opposition, it noted

24    that "security profile cache" was not the precise term that the

25    Court construed.  We note that it is a term that was proposed

for construction.  Regardless, I don't think there's a dispute.

Finjan doesn't actually argue that the cache in security

profile cache should encompass permanent storage.  I think it's

understood that a security profile cache is temporary storage

just like the cache that Your Honor construed at *Markman*.

And so turning to page -- it's at Slide 4, as we can see,

there's -- just to reiterate, there's two different

requirements.  There has to be the security profile with one or

more computer commands and that security profile has to be in

temporary storage.

Now, when we got here, there were a couple of different

theories.  I think we're down to essentially two plus doctrine

of equivalents, and so we'll address them in turn.

The first is WildFire reports.  And Finjan's expert took

the position that WildFire reports are the security profile.

The problem with the WildFire reports theory is that there is

no evidence that WildFire reports, even if they can be

considered as having computer commands, are present in

temporary storage.

And so in Finjan's opposition brief, what it points to is

the temporary storage is Local DB.  This is one of the

databases that both experts analyzed.  The problem with

Local DB as it relates to the WildFire reports is that there

was no evidence that the WildFire reports are ever stored in

Local DB.  And so it's an issue where we don't have -- where

one of the two limitations is missing.  In this case, it's the
requirement that the WildFire reports be stored in temporary
storage.

     That takes us, then, to a couple slides on the
AV Signatures, which are no longer in the case, and so we will
skip on past those.

     And that takes us to Slide 8.  And so Slide 8 addresses a
couple of newer theories that we found in Finjan's opposition
where it asserts that various scan results and analysis results
are the security profile that are stored in a security profile
cache and, therefore, supposedly meet the claims.

     The problem with this theory is that there is no evidence
that the scan results and analysis results that they rely on in
their opposition meet the express requirement of the security
profile as containing one or more computer commands.

     Very much like the issue we saw with the '633 patent that
we just went over, the only thing that they can point to is
conclusory assertions by their experts saying that the claim
limitation is met.  We know from the Federal Circuit that that
is not sufficient to defeat summary judgment.

     And so on Slide 8 we see an excerpt that Finjan relies on
from Dr. Jakobsson's report.  He asserts that the analyzer,
PAN's analyzer, finishes sample processing and outputs result
data into Local DB.  And he asserts that this, quote, "maps to
the functionality required by the security profile cache since

1 it stores the scan results (i.e., the security profiles derived

2 by the scanner including a list of computer commands...)"

3   That's just parroting the claim language.  He has no

4 analysis identifying what the supposed computer commands are

5 that are present in the results data.  There's no

6 identification of that whatsoever.

7   And so this is just like the *Intellectual Science* case in

8 which the Federal Circuit found that the expert opinions there

9 fail to set forth facts in a line of reasoning with a logical

10 foundation sufficient to show infringement.

11   There are a host of other results -- scan results,

12 analysis results, et cetera -- covered in Finjan's opposition.

13 The same problem applies with respect to each of them.

14   If you take a look at the only evidence they have for the

15 proposition that they contain computer instructions, it's the

16 bare assertion of their expert.  There's zero identification of

17 any actual computer instructions.

18   Finally, that takes us to DOE.  I think this is pretty

19 straightforward because Dr. Jakobsson's DOE theory doesn't

20 address the absence of computer instructions.  We've produced

21 his DOE theory on Slides 9 and 10 of the slide presentation.

22 And so we can see from these four paragraphs what he's trying

23 to address is he's essentially saying:  Even if it's understood

24 that the locations in which the security profiles are stored is

25 not temporary, it's still temporary under the doctrine of

1    equivalents.  I, therefore, find that there's still a security

2    profile cache under the doctrine of equivalents.

3        But the foundational problem with this theory is that it

4    doesn't address the separate requirement that there has to be a

5    security profile containing one or computer instructions.

6    Therefore, it cannot -- the DOE theory cannot cure the

7    foundational problem with the analysis results and scan results

8    that Finjan relies on because there is still no computer

9    instructions.

10       **THE COURT:**  Okay.

11       **MR. DENNING:**  I'll start right there at the end.

12       So counsel showed a slide that had WildFire reports and

13   then scan results or analysis results as a separate column.

14   Those are the same thing, and Dr. Jakobsson treats them as the

15   same thing throughout his report.  The scan results, analysis

16   results, analysis reports, WildFire reports, that's what comes

17   out of WildFire after it has analyzed the suspicious code.

18   It's all the same thing.

19       So is there any chance that I could use the ELMO?

20       **THE CLERK:**  Sure.  Oh, the ELMO?  Okay.  Yeah.

21       **MR. DENNING:**  Thank you so much.

22       So I'm going to start near the end of counsel's

23   presentation where he said there's absolutely no evidence from

24   Dr. Jakobsson that those scan results contain a list of the

25   tasks or program that the suspicious code was seeking to

```
 1   execute.
 2           THE CLERK:  It's on.  For some reason it's not working
 3   now.  Hold on one second.
 4                     (Pause in proceedings.)
 5           MR. DENNING:  So I'm showing, Your Honor, this is
 6   Exhibit --
 7           THE CLERK:  It's still not working.
 8           MR. DENNING:  Oh, it's not showing on yours?
 9           THE CLERK:  It's not showing anywhere.
10           THE COURT:  You'll have to go to Plan B.
11           MR. DENNING:  Plan B, Your Honor.
12           THE COURT:  Yes, Plan B.
13           MR. DENNING:  I will -- I will show you based on the
14   exhibits to the briefing.
15           THE COURT:  Okay.
16           MR. DENNING:  So I'm looking at Exhibit 14 to PAN's
17   opening brief, opening summary judgment brief, and those are
18   excerpts from Dr. Jakobsson's expert report, and I will direct
19   your attention to paragraph 658 to start with.  I'm going to
20   show you a few of these just because I really think I need to
21   disprove the point that counsel for PAN just made.
22       At paragraph 658 Dr. Jakobsson said [as read]:
23           "As part of the malware sandboxing process, WildFire
24       scans for behaviors and provides a listing of behaviors
25       (i.e., behavior summary) which correspond to a list of
```

1    computer commands that a corresponding one of the incoming

2    files is programmed to perform."

3    It's exactly that, the list of computer commands that this

4    incoming file is programmed to perform.

5    And then Dr. Jakobsson pastes in an example from a PAN

6    document.  It says "Example" on top.  So this is at the top of

7    page 228 of his expert report.  There's an example that's

8    called "Behavioral Summary," and it lists all of the things

9    that that suspicious code was trying to do:  Use the HTPP post

10   method, attempted to sleep for a long period, connected to an

11   IP address over HTTP.  That's a listing of the things that this

12   suspicious code was attempting to execute.

13   And Dr. Jakobsson said, "Those are computer commands that

14   correspond to the incoming file."  That's the scan analysis

15   report.

16   In paragraph 664 of his report, which is just a few pages

17   later, Dr. Jakobsson talks about testing and says [as read]:

18        "Testing of WildFire and the NGFW show -- in addition

19        to PAN documentation, explains that reports are generated

20        for WildFire and NGFW based on the incoming file that is

21        analyzed and that the report will show detailed behavioral

22        information, including a behavioral summary (deriving a

23        security profile, including a list of computer commands

24        that a corresponding one of the incoming files is

25        programmed to perform)."

And then he attaches snippets from documents from PAN that
say things like [as read]:

>"The WildFire reports will show detailed behavioral
>information for the sample."

And then it shows actual, on pages 6- -- 234, 235 shows
actual sample reports.  This is the scan results, the analysis
results.  And on page 237 we see a heading called "Behavioral
Summary," and it lists all the things that this suspicious code
was trying to do [as read]:

>"Each virtual machine tab summarizes the behavior of
>the sample file in the specific environment.  Examples
>include whether the sample created or modified files,
>started a process, spawns new processes, modified the
>registry, or installed browser helper objects."

This is exactly what counsel for PAN just said isn't in
Dr. Jakobsson's report at all, and it is in here over and over
again.  Paragraph 667 shows additional reports from his own
testing.  Dr. Jakobsson tested this product on his own in
addition to looking at the source code, and at page 241 he
shows the behavioral summary portion of the results that came
back from his own testing of this product.

So there is no question and there can be no question that
these scan reports do include the type of behavior that this
suspicious code was trying to execute.  Certainly at the very
least for purposes of today, a reasonable jury could find that

1    based on Dr. Jakobsson's expert report, that it is included in

2    there.

3        Okay.  So that's the first part.  This is the security

4    profile that includes a list of computer commands that the

5    corresponding file was to perform.

6        The second question then presented by counsel for PAN is:

7    Yeah, but is that stored in temporary storage?  And, yes, it

8    absolutely is.

9        Dr. Jakobsson opines that, quote [as read]:

10            "Security profiles (e.g., scan results or analysis

11            reports following a scan) are stored in a security profile

12            cache (e.g., in a local database such as Local DB,

13            Central DB, Virus Database, or in disk storage after a

14            scan ends)."

15        There's also -- there are multiple cites here.  I'm

16    looking at paragraph -- this is page 19 of our opposition,

17    lines 13 through 19, showed PAN documentation that say exactly

18    that; that the Wild -- this is, quote, "The WildFire analyzer

19    stores analysis results and intermediate data derived security

20    profile in Local DB," which he says is a security profile

21    cache.

22        All right.  So we know that these scan results have the

23    program information.  They're stored in Local DB.  The next

24    thing we need to know is:  What is Local DB and is it temporary

25    storage?  And we know for sure that it is.

1    If we look on page 19 of our opposition, there is a

2  snippet from a PAN document.  This isn't something

3  Dr. Jakobsson is opining on.  This is a PAN document that says

4  [as read]:

5         "Local DB in each PU for analyzer to temporarily save

6      the analysis results and intermit data."

7    PAN's own document -- this is -- it's Exhibit H to the

8  opposition at 337.  PAN's own document says that its Local DB

9  is temporary storage.

10    Based on all of that, there can be no dispute that it

11  meets the limitation, let alone that a reasonable jury could

12  find that it meets this limitation.

13    I think I'm done, Your Honor.  Let me check -- oh, no.

14    I want to say one thing about the doctrine of equivalents

15  point.  I don't think we need to get there because I think we

16  have this under literal infringement, but Dr. Jakobsson's

17  opinions go on for hundreds of pages and hundreds of paragraphs

18  before this.

19    So when he says in the doctrine of equivalent section,

20  "Based on the things I talked about before, it would also meet

21  the same function, way, and result," he's not doing that in a

22  vacuum.  It's bassed on hundreds of pages and hundreds of

23  paragraphs of his analysis.

24    And his statements in each of these paragraphs is not

25  simply function, way, result.  He gives an explanation.  For

1    example, for the function test, he says [as read]:

2         "The security policy cache for each of the accused

3    products at least temporarily store the index security

4    policy derived from the scanner's static and dynamic

5    behavioral analysis of the file."

6    He said similar things for the way and for the results.

7    This wasn't just a bare doctrine of equivalents analysis.

8    And with that, I'll conclude on the '731, Your Honor.

9         **THE COURT:** Okay.

10        **MR. SAULSBURY:** So just briefly a few points,

11   Your Honor.

12   On the doctrine of equivalents, I don't think we need to

13   go there because we heard nothing about how it addresses the

14   problem with security profiles. We only heard about how it

15   addresses temporary storage.

16   And then going to where counsel started, there was an

17   assertion that WildFire reports are the same as the scan

18   results and the analysis results. That's not Dr. Jakobsson's

19   opinion. If we take a look at his report, throughout when he's

20   talking about WildFire reports, he uses capital W, WildFire,

21   capital R, Report. That's a specific thing he identifies.

22   And when he's talking about WildFire reports, he attempts

23   to map it to something that is stored in temporary storage, but

24   he fails to. And as we explained earlier, that's why WildFire

25   reports can't be sufficient because even if -- even if they

1    could be understood to include computer commands, they're not

2    stored in temporary storage.

3        That, then, takes us to all the scan results and analysis

4    results that we heard counsel address.  And the problem with

5    those, again, is that there's not actually any opinion other

6    than a conclusory assertion they contain computer instructions.

7    There's no identification of computer instructions.

8        We heard a bunch of references to portions of

9    Dr. Jakobsson's report.  I'll just take one as an example.  We

10   were pointed to paragraph 658, and we were told that he

11   identifies computer commands right there.  What he actually

12   says is [as read]:

13            "As part of the malware sandboxing process, WildFire

14        scans for behaviors and provides a reporting" -- "report

15        listing the behaviors which correspond to a list of

16        computer commands."

17       He says "correspond to."  He doesn't actually say there

18   are computer commands there nor does he identify what the

19   purported security profile is much less identify temporary

20   storage, a cache, that it's located in.

21       And so what we have here is they were required under the

22   claims to identify a specific security profile that was stored

23   in a specific cache that is temporary storage.  Instead, they

24   point to all sorts of different random references to different

25   scan results that they assert contain computer commands, but

 1   there's not actually evidence of that.

 2         And, moreover, there's not any tying of a specific scan

 3   result that contains computer instructions to temporary

 4   storage.

 5         And for that reason, we're entitled to summary judgment,

 6   Your Honor.

 7               THE COURT:  I know you're busting at the seams to say

 8   something, so I'll let you say something.

 9               MR. DENNING:  Just if you turn the page, right after

10   that paragraph he read on 658 is the example that lists the

11   commands that I just discussed with you.  So it's not just a

12   bare assertion.  He's pointing to the example that he includes

13   there.

14               MR. SAULSBURY:  He says "correspond to a list of

15   computer commands."

16               THE COURT:  I gotcha.

17         Okay.  I know I have other motions that are pending, but

18   today's hearing were focused on the motion for summary judgment

19   by PAN.  So I will take that under submission and work on it.

20               MR. SAULSBURY:  Thank you very much, Your Honor.

21               THE COURT:  Thank you.

22               MR. DENNING:  And may I say one thing to the Court?

23               THE COURT:  Yes.

24               MR. DENNING:  You had asked in the order that you

25   submitted after filing the opening briefs with regard to

1    Finjan's motion for summary judgment of no invalidity --

2        **THE COURT:**  Yes.

3        **MR. DENNING:**  -- you had asked the parties to indicate

4    in our briefs whether it's necessary to reach those --

5        **THE COURT:**  Yes.

6        **MR. DENNING:**  -- should you grant.

7        We neglected to do that in our reply brief.  I apologize

8    to the Court.  I can tell you now that if you find no

9    infringement of any of the -- of all three patents, then you

10   would not have to reach that.

11       **THE COURT:**  Fine.

12       Which is also your position.

13       **MR. SAULSBURY:**  That's right, Your Honor.

14       **THE COURT:**  Yeah.

15       **MR. SAULSBURY:**  Thank you.

16       **THE COURT:**  Okay.  Thank you.

17              (Proceedings adjourned at 3:19 p.m.)

18                    ---oOo---

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Thursday, November 21, 2024

_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter